UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

In re ) Bankruptcy Case No. 09-29162-D-11
SK Foods, L.P. )
)
) DC No. 2:11-cv-2369 JAM EFB (BK)
Debtor(s). )
)
_____ )
) Adversary No. 11-2337-D
Bradley D. Sharp )
) **FILED**
Plaintiff(s), )
vs. )
SKPM Corp. Inc., et al. ) SEP 0 8 2011
)
Defendant(s). ) CLERK, U.S. DISTRICT COURT
) EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

## TRANSMITTAL OF WITHDRAWAL OF REFERENCE
## TO THE DISTRICT COURT

MOTION TO WITHDRAW REFERENCE (date filed): __9/7/11_____

RESPONSE TO WITHDRAW REFERENCE (date filed): _____

PLEADINGS TRANSMITTED TO DISTRICT COURT:

___X___    Motion to Withdraw Reference

_____    Memorandum in Support of Motion to Withdraw Reference

_____    Response to Motion to Withdraw Reference

___X___    Other Pertinent Documents: Request for Judicial Notice, Declaration and
           Exhibits

DATE TRANSMITTED: _9/8/11_____    BY: _____
                                            Deputy Clerk

_____

DISTRICT COURT CASE NUMBER:_____

DATE:_____    BY:_____

## PLEASE RETURN SECOND COPY UPON COMPLETION

EDC 005-601 (Revised 5/18/04)

FILED
September 07, 2011
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0003752034

[24]

1  DEAN M. GLOSTER, State Bar No. 109313
2  MARK D. PETERSEN, State Bar No. 111956
   KELLY A. WOODRUFF, State Bar No. 160235
3  FARELLA BRAUN + MARTEL LLP
   235 Montgomery Street, 17th Floor
4  San Francisco, California 94104
   Telephone:    (415) 954-4400
5  Facsimile:     (415) 954-4480
   dgloster@fbm.com
6  mpetersen@fbm.com
   kwoodruff@fbm.com
7

8  Attorneys for Defendants
   SKPM Corp., SSC&L 2007 Trust, Monterey
9  Peninsula Farms, LLC, Scott Salyer, in his capacity
   as Trustee of the Scott Salyer Revocable Trust, and
10 the Scott Salyer Revocable Trust

**FILED**

SEP 0 8 2011

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

11                 UNITED STATES BANKRUPTCY  COURT

12                  EASTERN DISTRICT OF CALIFORNIA

13                       SACRAMENTO DIVISION

14

| | |
|---|---|
| 15  In re: | Case No. 09-29162 |
| 16  SK Foods, LP, a California limited | Chapter 11 |
| 17  partnership, *et al.*, | |
| 18                              Debtors. | |
| 19  Bradley D. Sharp, Chapter 11 Trustee, | Adversary Proceeding No. 11-02337 |
| 20                              Plaintiff | **DEFENDANTS' MOTION FOR** |
|         v. | **ORDER WITHDRAWING** |
| 21  SKPM Corp., *et al.*, | **REFERENCE OF BANKRUPTCY** |
| 22                              Defendants. | **ADVERSARY PROCEEDING** |
| 23 | *[Hearing Date and Time to be Provided Upon* |
| 24 | *Assignment of a District Court Judge and* |
| | *Establishment of a Hearing Date]* |

25

26  PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 5011, THE CLERK

27  OF THE BANKRUPTCY COURT IS TO PROMPTLY TRANSMIT THIS MOTION TO THE

28                              DISTRICT COURT

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING                                    27019\2749438.2

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................................... 1

II.  FACTUAL AND PROCEDURAL BACKGROUND ..................................... 3

    A.  The Bankruptcy Case ............................................................................ 3

    B.  The Original Adversary Proceedings ..................................................... 3

        1.  Sharp v. Salyer, et al., Adv. P. No. 10-02014 (the "Substantive Consolidation Action") ............................................. 3

        2.  Sharp v. CSSS, L.P., Adv. P. No. 09-02543 (the "Drum Line Action") ........................................................................................ 4

        3.  Sharp v. SSC Farms I, LLC, et al., Adv. P. No. 09-02692 (the "Quiet Title Action") ...................................................................... 4

        4.  Sharp v. Salyer, et al., Adv. P. No. 10-02015, (the "Breach of Fiduciary Duty Action") ............................................................... 5

        5.  Sharp v. SKF Aviation, LLC and CSSS, L.P., Adv. P. No. 10-02016 (the "Avoidance Action") ................................................. 5

        6.  Sharp v. Fred Salyer Irrevocable Trust, Adv. P. No. 10-02017 (the "FSIT Action") ........................................................................ 5

    C.  The Various Stay Orders ........................................................................ 6

    D.  The New Adversary Proceedings ........................................................... 8

        1.  Sharp v. SK PM Corp., et al., Adv. P. No. 11-02337 (the "Instant Action") ......................................................................... 8

        2.  Sharp v. Salyer American Fresh Foods, et al., Adv. P. No. 11-2338 (the "SAFF Action") ................................................... 9

        3.  Bank of Montreal v. California Franchise Tax Board, et al., Adv. P. No. 11-2339 (the "FTB Action") ...................................... 9

        4.  Bank of Montreal v. Cary Collins, et al., Adv. P. No. 11-2340 (the "Unjust Enrichment Action") .................................. 10

        5.  Sharp v. Blackstone Ranch Corp., et al., Adv. P. No. 11-02348 .............. 10

    E.  The Appeals Of The Bankruptcy Court's June 28 Stay Orders ............................. 10

    F.  Proceedings In The Instant Action ......................................................... 10

III.  ARGUMENT ................................................................................................ 14

    A.  The Instant Action Is Not A "Core" Proceeding That Can Be Finally Determined By The Bankruptcy Court Under *Stern v. Marshall*. ........................ 15

    B.  Movants Have A Constitutional Right To A Jury Trial, And Do Not Consent To Having The Instant Action Tried In The Bankruptcy Court. ............ 18

    C.  Withdrawal Of The Reference Of The Instant Action Would Promote The Efficient Use Of Judicial Resources. ................................................. 18

IV.  CONCLUSION .............................................................................................. 20

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING

- i -

27019\2749438.2

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Granfinanciera, S.A. v. Nordberg,*
492 U.S. 33 (1989) ................................................................. 15, 16, 17, 18

*In re Cinematronics, Inc.,*
916 F.2d 1444 (9th Cir. 1990) ....................................................... 18

*In re First Alliance Mortg. Co.,*
282 B.R. 894 (C.D. Cal. 2001) ....................................................... 14

*Green v. Fed. Deposit Ins. Corp.,*
451 B.R. 6 (N.D. Cal. 2011) .......................................................... 14

*Knupfer v. Lindblade (In re Dyer),*
322 F.3d 1178 (9th Cir. 2003) ....................................................... 18

*Northern Pipeline Constr. Co. v. Marathon Pipe Line,Co.*
458 U.S. 50 (1982) ..................................................................... 15

*Security Farms v. Int'l Brotherhood Of Teamsters, et al.,*
124 F.3d 999 (9th Cir. 1997) ................................................. 14, 17, 19

*Stendhal v. Irving Trust Co.,*
287 U.S. 92 (1932) ............................................................ 15, 16, 17

*Stern v. Marshall,*
131 S. Ct. 2594 (2011) .......................................................... *passim*

## FEDERAL STATUTES

28 U.S.C. § 1334(b) ...................................................................... 13

28 U.S.C. § 157(c) ........................................................................ 15

28 U.S.C. § 157(d) .................................................................. *passim*

28 U.S.C. § 157(e) ........................................................................ 18

28 U.S.C. § 158(d)(2)(A) ............................................................... 10

28 U.S.C. §§ 157(b)(2) .................................................................. 15

## STATE STATUTES

Cal. Civ. Proc. Code § 760.020 ......................................................... 4

Cal. Civ. Proc. Code §§ 3439.05, 3439.07 .......................................... 8

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING       - ii -       27019\2749438.2

1
2
**FEDERAL RULES AND REGULATIONS**

3    Fed. R. Bankr. P. 7065 ............................................................................................... 13

4    Fed. R. Civ. P. 65 ...................................................................................................... 13

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING

- iii -

27019\2749438.2

1   Defendants Scott Salyer, as trustee of the Scott Salyer Revocable Trust, the Scott Salyer

2   Revocable Trust, the SSC&L 2007 Trust, SK PM Corporation, and Monterey Peninsula Farms,

3   LLC (collectively, "Movants"), hereby submit the following Memorandum of Points and

4   Authorities in support of their Motion for Order Withdrawing Reference of Bankruptcy

5   Adversary Proceeding pursuant to 28 U.S.C. section 157(d) ("Motion").

6   **I.   INTRODUCTION**

7   Movants, along with numerous entities related to Movants (collectively, the "Salyer

8   Parties"), have been engaged in litigation in the Bankruptcy Court for nearly two years.  There are

9   currently twelve adversary proceedings pending against various Salyer Parties (the "Related

10   Adversary Proceedings"), which were filed between August 21, 2009 and May 4, 2011.

11   Mr. Salyer is also the defendant in an ongoing criminal prosecution that substantially

12   overlaps the Related Adversary Proceedings.  Because of the pending criminal case against

13   Mr. Salyer, this Court has previously ordered that the Related Adversary Proceedings must be

14   stayed if "discovery from or testimony of Salyer or his criminal counsel is reasonably necessary

15   to dispose of a particular matter before the Bankruptcy Court."  Since that time, eleven of the

16   twelve Related Adversary Proceedings have been stayed by the Bankruptcy Court.

17   The above-captioned matter is the one adversary proceeding pending against the Salyer

18   Parties that is not currently stayed, but only because the Bankruptcy Court has yet to hear

19   Movants' renewed motion to stay.  The action was commenced by the Debtors' duly-appointed

20   Chapter 11 Trustee, Bradley D. Sharp (the "Trustee"), on May 4, 2011, asserting both bankruptcy

21   and state law claims.  Movants promptly moved to stay the action in accordance with this Court's

22   prior stay orders.  Rather than oppose the stay motion, the Trustee stipulated to a stay of

23   proceedings until July 31, 2011, or until further extended by the parties, with any renewed motion

24   for a stay that was filed by August 15, 2011 treated as timely.  Despite the fact that the

25   Bankruptcy Court stayed the remaining Related Adversary Proceedings on June 28, 2011, the

26   Trustee refused to extend the stipulated stay in this action except on onerous conditions.

27   Accordingly, the Salyer Defendants timely filed their renewed motion to stay the adversary

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING          - 1 -

27019\2749438.2

1 | proceeding under the terms of the stipulation; the hearing on this motion is not set until
2 | September 28, 2011.

3 |     The Trustee took full advantage of the gap in the stay of this case caused by his refusal to
4 | extend the stipulated stay, and filed an *Ex Parte* Motion for a Temporary Restraining Order
5 | ("TRO") and Order to Show Cause ("OSC") re Preliminary Injunction ("TRO Motion").  On
6 | September 1, 2011, the bankruptcy court issued the TRO and OSC, and set a hearing on the OSC
7 | for September 15, 2011 at 10:00 a.m.  Because Movants cannot adequately defend themselves
8 | against the preliminary injunction without testimony from Mr. Salyer, Movants believe the
9 | Trustee's rush to the Bankruptcy Court, and the Bankruptcy Court's rush to issue rulings before a
10 | stay is in place, violates the intent and spirit of this Court's prior stay orders.  Accordingly,
11 | Movants asked the Bankruptcy Court to expedite the hearing on the earlier-filed motion to stay
12 | or, alternatively, to issue the stay immediately and certify it for direct appeal with the appeal of
13 | the other stay orders issued in the Related Adversary Proceedings.  The Bankruptcy Court
14 | refused.  Movants then offered to stipulate to extend the TRO to September 28 and asked the
15 | Bankruptcy Court to continue the OSC hearing to September 28 to be heard after the motion to
16 | stay is heard.  Again, the Bankruptcy Court refused.

17 |     Accordingly, because the instant case involves questions of both bankruptcy law and state
18 | law, and because the Bankruptcy Court seemingly refuses to comply with the spirit of this Court's
19 | prior stay orders, Movants respectfully request that this Court withdraw the reference of this
20 | adversary proceeding pursuant to 28 U.S.C. section 157(d) and the United States Supreme
21 | Court's recent decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011).[1]  Concurrently with this
22 | Motion, Movants are asking the Bankruptcy Court for an emergency stay of proceedings to give
23 | this Court an opportunity to rule on the Motion prior to the preliminary injunction hearing.

24 |
25 |
26 |
27 | [1]   Because the remaining Related Adversary Proceedings are currently stayed, at this time the Salyer Parties are not seeking to withdraw the reference as to any of those actions.  Should the stay be lifted in any of those actions
28 | involving state law or other non-core causes of action, however, the appropriate defendants will promptly move to withdraw the reference in those actions as well.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING   - 2 -    27019\2749438.2

1   II.     **FACTUAL AND PROCEDURAL BACKGROUND**

2           A.      **The Bankruptcy Case**

3           Debtors SK Foods, L.P., a California limited partnership and RHM Industrial/Specialty

4   Foods, Inc., a California Corporation, d/b/a Colusa County Canning Co. ("Debtors") were part of

5   a vertical family-owned agribusiness that produced and processed tomato products.  Scott Salyer

6   indirectly owned 100% of both Debtors.

7           In April 2008, Debtors became the target of an FBI investigation involving allegations of

8   bribery and price fixing.  On April 8, 2008, the FBI raided Debtors' offices and removed virtually

9   all corporate books and records.  As a result of subsequent difficulties in connection with the

10  investigation and subsequent difficulties with its lenders in light of the investigation, Debtors'

11  business ran into serious financial difficulties at the beginning of 2009.

12          On May 5, 2009 (the "Petition Date"), involuntary petitions were filed under chapter 11 of

13  title 11 of the United States Code against Debtors.  On May 7, 2009, voluntary petitions for relief

14  were filed.  On May 17, 2009, the Court appointed Bradley D. Sharp as Chapter 11 Trustee of the

15  Debtors.

16          On February 4, 2010, the Federal Bureau of Investigation arrested Mr. Salyer.  On

17  February 18, 2010, the United States government filed an indictment.  On April 29, 2010, the

18  United States government filed a superseding indictment, bringing twelve counts and two

19  forfeiture allegations against Mr. Salyer.

20          B.      **The Original Adversary Proceedings**

21          From August 2009 through January 2010, the Trustee commenced the following six

22  adversary proceedings against Mr. Salyer and several companies and trusts related to the Debtors:

23                  1.      **Sharp v. Salyer, et al., Adv. P. No. 10-02014 (the "Substantive**
                            **Consolidation Action")**
24
            On January 11, 2010, the Trustee commenced the Substantive Consolidation Action
25
    against Mr. Salyer as the trustee for the Scott Salyer Revocable Trust (the "SSR Trust"), SK PM
26
    Corp ("SKPM"), SK Foods, LLC, SKF Canning, LLC, Blackstone Ranch Corporation, Monterey
27
    Peninsula Farms, LLC ("MPF"), Salyer Management Company, LLC, SK Farms Services, LLC,
28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF          - 3 -
BANKRUPTCY ADVERSARY PROCEEDING                                          27019\2749438.2

1   SK Frozen Foods, LLC, SS Farms, LLC, SSC Farming, LLC, SSC Farms I, LLC, SSC Farms II,

2   LLC, and SSC Farms III, LLC (collectively, the "Consolidation Defendants").  In the Substantive

3   Consolidation Action, the Trustee contends that the Debtors and the Consolidation Defendants

4   operated as one entity, and held themselves out to creditors as a single enterprise.  The Trustee

5   also contends that Mr. Salyer caused millions of dollars of the Debtors' assets to be transferred to

6   the Consolidation Defendants, including assets critical to the Debtors' operations such as the

7   waste water land and the Debtor's Australian and New Zealand subsidiaries.  The Trustee seeks

8   substantive consolidation of the Consolidation Defendants with Debtors, avoidance and recovery

9   of fraudulent transfers and declaratory relief that the Consolidation Defendants are the alter ego

10  of Debtors.

11              2.      **Sharp v. CSSS, L.P., Adv. P. No. 09-02543 (the "Drum Line Action")**

12          On August 21, 2009, the Trustee commenced the Drum Line Action, seeking to recover

13  certain manufacturing equipment (the "Drum Line") used to make fiberglass vessels in which

14  finished tomato products are stored.  The Trustee alleges that the Debtors had possession of the

15  Drum Line at the Lemoore facility until a few weeks prior to the Petition Date.  The Trustee

16  contends that Mr. Salyer thereafter purported to "transfer" the Drum Line to CSSS, L.P. d/b/a

17  Central Valley Shippers ("CSSS"), an affiliate controlled by Mr. Salyer.  The Trustee also

18  contends that Mr. Salyer shipped the Drum Line overseas to New Zealand in violation of a TRO

19  and preliminary injunction.

20              3.      **Sharp v. SSC Farms I, LLC, et al., Adv. P. No. 09-02692 (the "Quiet
                        Title Action")**

21

22          On October 23, 2009, the Trustee commenced the Quiet Title Action against SSC Farms I,

23  LLC, SSC Farms II, LLC, and SSC Farming, LLC (collectively, the "Quiet Title Defendants").

24  In the Quiet Title Action, the Trustee seeks a decree under California Code of Civil Procedure

25  Section 760.020 that the Debtors are true and equitable owners of waste water land nominally

26  held by the Quiet Title Defendants.  The grounds for the claim are that Mr. Salyer had an alleged

27  fiduciary obligation to place title in property purchased with the Debtors' funds and which was

28  necessary to the Debtors' operations in the names of the Debtors, not the Quiet Title Defendants.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING

- 4 -

27019\2749438.2

1

2

       4.     **Sharp v. Salyer, et al., Adv. P. No. 10-02015, (the "Breach of Fiduciary Duty Action")**

3      On January 11, 2010, the Trustee commenced the Breach of Fiduciary Duty Action

4    against Mr. Salyer, the SSR Trust and SKPM.  In the Breach of Fiduciary Duty Action, the

5    Trustee is seeking a money judgment against Mr. Salyer for alleged breach of his fiduciary duty

6    owed to the Debtors, based on the same allegations in the Substantive Consolidation Action, the

7    Quiet Title Action, and the Drum Line Action.

8          5.     **Sharp v. SKF Aviation, LLC and CSSS, L.P., Adv. P. No. 10-02016 (the "Avoidance Action")**

9

10      On January 11, 2010, the Trustee commenced the Avoidance Action.  In the Avoidance

11    Action, the Trustee contends that Mr. Salyer set up SKF Aviation, LLC to own and maintain

12    airplanes used by Mr. Salyer.  Additionally, the Trustee contends that Mr. Salyer set up CSSS to

13    generate only enough revenue to pay the premium on a life insurance policy under which he was

14    the beneficiary so as to avoid such costs personally.

15         6.     **Sharp v. Fred Salyer Irrevocable Trust, Adv. P. No. 10-02017 (the "FSIT Action")**

16

17      On January 12, 2010, the Trustee commenced the FSIT Action against the Fred Salyer

18    Irrevocable Trust (the "FSIT") and Gerard Rose as the trustee of the FSIT.  In the FSIT Action,

19    the Trustee is seeking to recover money that was allegedly loaned by the Debtors to the FSIT to

20    pay for a life insurance policy.  The Trustee contends that FSIT is obligated to repay the money

21    loaned by SK Foods, and that Gerard Rose, as trustee, is personally liable to the Debtors for

22    permitting money to be dissipated by the FSIT and/or allowing money to be expended from the

23    FSIT without making provision for repayment of that indebtedness owed to the Debtors.  The

24    Trustee also alleges that Mr. Alan Huey, a defendant in the criminal proceeding *U.S. v. Alan*

25    *Huey*, Case No. 09-CR-468 LKK, pending before the District Court, was the trustee of the FSIT

26    when the alleged improper activity occurred.

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

C.    **The Various Stay Orders**

On February 18, 2010, the United States filed an indictment against Scott Salyer as a result of the FBI investigation described above in *United States v. Salyer*, Case No. 2:10-cr-00061-LKK (E.D. California) (the "Criminal Proceeding").  On April 29, 2010, the government filed a superseding indictment, bringing twelve criminal counts and two forfeiture counts against Mr. Salyer seeking to recover all real and personal property traceable to the alleged criminal conduct (which would apparently include property and proceeds otherwise subject to the bankruptcy proceedings).  The Criminal Proceeding against Mr. Salyer is set for trial April 17, 2012.

In light of the Criminal Proceeding, on April 28, 2010, various Salyer-related defendants filed motions to stay these six adversary proceedings pending the Criminal Proceeding.  The Bankruptcy Court denied the motions on June 1, 2010, and the defendants appealed to this Court.  The appeals were consolidated and heard by the Honorable Lawrence K. Karlton, the same judge presiding over the Criminal Proceeding.  On June 18, 2010, Judge Karlton granted the Salyer Parties' Emergency Application to Enjoin and Stay Discovery in the adversary proceedings.  The Court then held a hearing on August 3, 2010, on the emergency application and continued the stay until resolution of the instant appeals.

On December 10, 2010, this Court entered an order (the "Stay Order") determining that the Bankruptcy Court "made several significant erroneous factual findings" and, therefore, "abused its discretion in denying [the Salyer Parties'] motion for a stay."  Request for Judicial Notice ("RJN"), Ex. 1 (Dec. 10, 2010 Order, *Sharp v. SSC Farms 1, LLC, et al.*, Case No. S-10-1492 LKK), at 23.  Judge Karlton, who had familiarity with the allegations in the Criminal Proceeding, found that the Bankruptcy Court clearly erred in four of its six factual findings, including that the adversary proceedings bear no significant relationship to the Criminal Proceeding and that Mr. Salyer's Fifth Amendment rights were not implicated by prosecution of the adversary proceedings.  *Id.* at 16-17.  The Court therefore reversed the Bankruptcy Court and "order[ed] a stay of all further bankruptcy proceedings where [the Salyer Parties] make a credible showing that discovery from or testimony of Scott Salyer or his criminal counsel is relevant to the

-6-

1    proceedings." *Id.*  The Trustee filed a motion for rehearing, and the Court held a rehearing on

2    April 11, 2011.

3         On April 14, 2011, this Court entered an order (the "Remand Order") confirming and

4    incorporating its original Stay Order, but clarifying that it was up to the Bankruptcy Court in the

5    first instance to determine

6              whether discovery from or testimony of Salyer or his criminal counsel is
7              reasonably necessary to dispose of a particular matter before the
                 Bankruptcy Court in the adversary proceedings.  A matter is reasonably
8              necessary if [the Salyer parties] cannot adequately defend themselves in an
                 adversary proceeding without evidence from Salyer or his criminal
9              counsel.

10
11   RJN, Ex. 2 at 5 (footnote omitted).  The Court also ordered the Salyer parties to file their renewed

12   motions to stay the adversary proceedings within 14 days of entry of the Remand Order, or within

13   14 days of learning of grounds for a stay under the Remand Order, which motions "***must be set***

14   ***for hearing as early as practicable.***"  *Id.* at 6 (emphasis added).  In anticipation that any further

15   orders regarding the stay motions could be considered interlocutory, and not appealable as of

16   right, this Court expressly found that the Bankruptcy Court's further "decisions on these matters

17   may be directly appealed to this court on the same grounds that the court had jurisdiction to hear

18   the appeal of the first order denying a stay of proceedings."  *Id.* at 5-6.

19        In the meantime, on March 23, 2010, the Trustee filed an action for breach of contract,

20   interference with contract and objection to claims against defendants Lidestri Foods, Inc. and

21   Frito-Lay, Inc. (the "Frito-Lay Action").  On May 10, 2010, Lidestri Foods and Frito-Lay each

22   brought third-party claims against, among others, Scott Salyer individually, alleging damages

23   caused by the third-party defendants' alleged criminal conduct.  The Frito-Lay Action was not

24   subject to the Bankruptcy Court's original order denying the motions for stay, nor this Court's

25   Stay Order and Remand Order.

26        Also while the appeals of the Bankruptcy Court's denial of stay were pending, in

27   September 2010 the Trustee sought bankruptcy court approval of a settlement agreement with

28   Bank of Montreal ("BMO").  BMO is the principal secured creditor of the Debtors' bankruptcy

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING                    - 7 -                    27019\2749438.2

1   estate, as the lead agent for banks that lent Debtors almost $200 million secured by certain of the

2   Debtors' assets.  BMO also asserts a "super priority claim" in the bankruptcy case of between $22

3   million and $59 million, as a result of alleged diminution in value of its collateral when the

4   Trustee sold substantially all operating assets of the Debtor.  The settlement, among other things,

5   transferred to BMO certain claims and causes of action of the estate, including the Breach of

6   Fiduciary Duty Action and the Frito-Lay Action.[2]  BMO substituted the Trustee as plaintiff in the

7   Breach of Fiduciary Duty Action on April 14, 2011 and the Frito-Lay Action on April 15, 2011.

8        After this Court issued the Remand Order, the Salyer Parties filed renewed motions to stay

9   each of the six adversary proceedings and a new motion to stay the Frito-Lay Action on April 28,

10   2011.  At the contested hearing on the motions, the Bankruptcy Court granted the Salyer Parties'

11   motion to stay the adversary proceedings, and stayed all proceedings other than a limited amount

12   of discovery to investigate compliance with an earlier-issued preliminary injunction.  Those

13   orders were made final on June 28, 2011.  The third-party plaintiffs in the Frito-Lay Action

14   stipulated to stay the proceedings, and that stipulation was approved and entered by the

15   Bankruptcy Court on June 29, 2011.

16       **D.**    **The New Adversary Proceedings**

17        Shortly after this Court issued the Remand Order, the Trustee and BMO, as successor by

18   assignment to certain of the Trustee's claims, brought five additional adversary proceedings

19   against Mr. Salyer and other Salyer Parties, including the instant action.  With the exception of

20   this action, the other four adversary proceedings have all been stayed, either pursuant to

21   stipulation between the parties or by the Bankruptcy Court after a contested motion to stay

22   brought by Salyer Parties.

23       1.    ***Sharp v. SK PM Corp., et al.***, **Adv. P. No. 11-02337 (the "Instant**

24   **Action")**

25        On May 4, 2011, the Trustee brought the Instant Action against SKPM, Scott Salyer, the

26   SSR Trust, the SSC&L 2007 Trust, MPF, Fast Falcon, LLC and Henry Heath, alleging that Mr.

27

---

28   [2] Although the Bankruptcy Court approved the settlement agreement, the approval was reversed by this Court on appeal in *In re SK Foods, L.P.*, E.D. Cal. Case No. 10-cv-03467, dated July 18, 2011.  RJN Exh. 3.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING

- 8 -

27019\2749438.2

1   Salyer orchestrated the divestiture of Debtor's Australian subsidiaries ("Cedenco") by

2   transferring the ownership to SKPM and the SSR Trust with no consideration. *See* Complaint,

3   RJN, Ex. 4. The Trustee also alleges that Mr. Salyer caused the Debtor to transfer a note

4   receivable from Cedenco to another Salyer Trust, the SSC&L 2007 Trust, for no consideration,

5   and that both the equity and the note receivable were subsequently transferred to MPF and then to

6   Fast Falcon. The Trustee seeks to recover the equity in Cedenco and the note receivable as

7   fraudulent transfers under the Bankruptcy Code and California Code of Civil Procedure sections

8   3439.05 and 3439.07.

9   The allegations in the Instant Action are repetitive of allegations in the Substantive

10  Consolidation Action, RJN, Ex. 5 (Substantive Consolidation complaint) at ¶¶ 171-182, and the

11  Breach of Fiduciary Duty Action, RJN, Ex. 6 (Breach of Fiduciary Duty complaint) at ¶¶ 50-55.

12  Both of these earlier-filed actions have been stayed by the Bankruptcy Court following this

13  Court's Remand Order.

14          2.      *Sharp v. Salyer American Fresh Foods, et al.*, Adv. P. No. 11-2338 (the
                    "SAFF Action")
15

16  On May 4, 2011, the Trustee brought the SAFF Action against Salyer American Fresh

17  Foods ("SAFF") and its court-appointed receiver, seeking avoidance and recovery of preferential

18  and fraudulent transfers and declaratory relief concerning the parties' respective contractual

19  obligations. The Trustee also alleged that both Debtor and SAFF were owned by the SSR Trust

20  and controlled by Mr. Salyer, and that transactions between them were not conducted at arms'

21  length. A hearing on SAFF's motion to stay the SAFF action has been continued to September

22  14, 2011, and the parties stipulated stay all discovery pending resolution of the motion to stay.

23          3.      *Bank of Montreal v. California Franchise Tax Board, et al.*, Adv. P. No.
                    11-2339 (the "FTB Action")
24

25  On May 4, 2011, BMO, successor by assignment to certain of the Trustee's claims, sued

26  the California Franchise Tax Board, the SSR Trust, Scott Salyer individually, and Mr. Salyer's

27  daughters and their trusts, for fraudulent transfers, the return of funds paid by Debtor for taxes

28  owed by Mr. Salyer, his daughters and the SSR Trust, and to recover from the Salyer parties as

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF     - 9 -
BANKRUPTCY ADVERSARY PROCEEDING                                    27019\2749438.2

1  subsequent transferees. BMO alleges that Mr. Salyer caused Debtor to pay $1.65 million of his

2  and his daughters' tax liabilities to generate a future refund and pass Debtor's assets through the

3  Franchise Tax Board back to himself and his daughters. The Bankruptcy Court stayed the FTB

4  Action after a contested hearing.

5      4.   ***Bank of Montreal v. Cary Collins, et al.*, Adv. P. No. 11-2340 (the "Unjust Enrichment Action")**

6

7      On May 4, 2011, BMO, successor by assignment to certain of the Trustee's claims, sued

8  accountant Cary Collins, Scott Salyer, his daughters and their trusts for fraudulent transfers and

9  unjust enrichment. In the Unjust Enrichment Action, BMO alleges that Mr. Salyer caused

10  Debtors to make excessive tax payments on his and his daughters' behalf, resulting in an

11  unauthorized tax refund to Mr. Salyer and his daughters, which allowed Mr. Salyer to pass

12  millions of dollars of Debtors' assets through the IRS and back to him and his daughters. BMO

13  also alleges that Mr. Salyer transferred the unauthorized tax returns to an offshore trust, and

14  transferred New Zealand and Australian companies allegedly belonging to Debtor and/or SK

15  Foods, LLC to an offshore trust. the Bankruptcy Court stayed the Unjust Enrichment Action at

16  the contested hearing on the motion.

17      5.   ***Sharp v. Blackstone Ranch Corp., et al.*, Adv. P. No. 11-02348**

18      The Trustee brought this adversary proceeding on May 6, 2011, seeking to recover for

19  allegedly fraudulently transfers made by Debtor to defendants. The defendants moved to stay this

20  action on May 18, 2011. Rather than filing on opposition, the Trustee stipulated to a stay of

21  proceedings pending a final judgment or resolution of the Substantive Consolidation Action.

22      **E.   The Appeals Of The Bankruptcy Court's June 28 Stay Orders**

23      In the eight (8) Related Adversary Proceedings in which the bankruptcy court issued stays

24  of proceedings after this Court's Remand Order, on July 12, 2011, the Trustee and/or BMO filed

25  notices of appeal, statements of election to have appeal heard by the District Court, and

26  precautionary motions for leave to appeal. The Trustee and BMO filed their designations of

27  record and statement of issues in each case on July 22, and the respective Salyer Parties filed their

28  counter-designations of record on August 5.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING   - 10 -   27019\2749438.2

1    Despite that this Court's Remand Order expressly provided for appeal of any further

2    Bankruptcy Court stay orders to this Court, on August 4, 2011, the Trustee and BMO filed a joint,

3    omnibus Motion for Certification of the Order Staying Proceedings for Direct Appeal to the

4    United States Court of Appeals for the Ninth Circuit. RJN, Ex. 7. The Salyer Parties filed an

5    opposition to the certification motion, arguing that the Trustee and BMO failed to establish any of

6    the necessary prerequisites of certification for direct appeal under 28 U.S.C. section 158(d)(2)(A).

7    RJN, Ex. 8. On August 30, 2011, the Bankruptcy Court certified the appeals for direct appeal to

8    the Ninth Circuit on the ground that direct appeal "may materially advance the progress of the

9    adversary proceedings in which the appeal is taken, as well as the underlying bankruptcy case."

10   *Id.* at 3. The Bankruptcy Court reached this conclusion based on its not-so-subtle disagreement

11   with this Court's prior Stay Order and Remand Order, and its apparent desire to avoid having this

12   Court review the stay orders again. *See id.* at 4-5. The Trustee and BMO filed a petition to the

13   Ninth Circuit for leave to appeal on September 2, 2011.

14              F.    **Proceedings In The Instant Action**

15   As described above, the Trustee filed the Instant Action on May 4, 2011, asserting claims

16   under the Bankruptcy Code and California state law for fraudulent transfer relating to Debtor's

17   2006 distribution of its Australian subsidiaries to its general and limited partners. Movants filed a

18   motion to stay the proceedings on May 18, 2011, pursuant to this Court's Remand Order and even

19   before being served with the complaint.

20   The Trustee's response to Movants' motion to stay was due June 1, 2011. Rather than

21   oppose the motion in the face of this Court's clear directive in its Remand Order, on the day the

22   response was due, the Trustee stipulated to a stay of the action until July 31, 2011. RJN, Ex. 9.

23   The stipulation provided that the stay could be extended by agreement of the parties, or, if no

24   agreement is reached, Movants could renew their motion by August 15 and it would be

25   considered timely.

26   After the Bankruptcy Court issued stay orders in the Related Adversary Proceedings,

27   former counsel for Movants sought the Trustee's agreement to extend the stay on the same terms

28   as the Bankruptcy Court stay orders. The Trustee's counsel refused except on onerous

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF          - 11 -
BANKRUPTCY ADVERSARY PROCEEDING                                        27019\2749438.2

1   conditions.  Declaration of Kelly A. Woodruff ("Woodruff Decl."), Ex. 1.  Accordingly, Movants

2   renewed their motion for a stay of proceedings on August 15, 2011, believing the stay would

3   continue in effect pending resolution of the motion on September 28.

4        When Movants were informed that the Trustee considered their response to the adversary

5   complaint to be late (despite their timely renewed motion to stay), Movants requested an

6   extension of time to respond until after the hearing on the motion to stay.  The Trustee refused.

7   Woodruff Decl., Ex. 2.  Movants, therefore, filed an *Ex Parte* Application to Shorten Time on the

8   hearing on the motion to stay, seeking it to be set for hearing along with numerous other matters

9   in the bankruptcy case that were being heard on August 31.  RJN, Ex. 10.  Although this Court's

10  Remand Order required that the motion "must be set for hearing as early as practicable" (Remand

11  Order, RJN 2, at 6), the Bankruptcy Court denied the request and said the August 31 hearing

12  would be used "to set a briefing schedule" on the motion.[3]  RJN, Ex. 11.

13       Taking full advantage of the gap in the stay in this one adversary proceeding, the Trustee

14  filed his TRO Motion on August 31, to be heard on September 1 at 10:00 a.m.  The TRO Motion

15  was supported by several declarations and approximately 2,000 pages worth of exhibits.  The

16  memorandum of points and authorities, but not the declarations and exhibits, is attached at RJN,

17  Ex. 12.  In the TRO Motion, the Trustee sought a TRO and preliminary injunction against all

18  defendants – even those who had not yet been served[4] – prohibiting them from transferring the

19  "Cedenco Assets," which included the stock in and the note receivable from Debtor's former

20  Australian subsidiary.  Because the Cedenco Assets were tied up in an Australian liquidation

21

22  [3]  The Bankruptcy Court's order was ambiguous.  There already was a hearing set, and therefore a briefing schedule established by the local rules.  Without shortening time on the hearing, the briefing schedule did not change.

23  [4]  The Trustee served the summons and complaint on SKPM and MPF on May 18, 2011.  The Trustee served the SSR Trust on August 25, by serving its trustee Scott Salyer.  The Trustee also attempted to serve the SSC&L 2007 Trust

24  on August 25 by serving Scott Salyer as its trustee, but Mr. Salyer is not the trustee of the SSC&L 2007 Trust.  Rather, Robert Pruett is.  The Trustee has never served process on Henry Heath, who is a resident of Australia, or on

25  Fast Flacon, which is a St. Nevis limited liability company.  The Trustee attempted to serve Fast Falcon first by sending the summons and complaint to Cary Collins as "manager" on June 10, then by sending them to Dean Gloster,

26  Movants' counsel, on August 11, and finally by serving Scott Salyer as "manager" on August 25.  As has been pointed out to the Trustee several times, Fast Falcon is not registered to do business in California, has no registered

27  agent for service of process in California and has no offices, managers or officers in California.  Neither Mr. Collins nor Mr. Salyer are "managers" of Fast Falcon, and neither is authorized to accept service of process on its behalf.

28  Mr. Gloster is an attorney representing various Salyer Parties, but he does not represent Fast Falcon and, regardless, is not authorized to accept service on its behalf.  *See* Woodruff Decl., Ex. 3.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING                      - 12 -                      27019\2749438.2

1   proceeding and not in possession of any of the defendants, Movants filed a brief six-page

2   response the afternoon before the hearing. RJN, Ex. 13.

3   At the hearing on the TRO Motion, the Bankruptcy Court indicated it had not received,

4   nor read, Movants' opposition to the motion. Woodruff Decl. ¶ 8. The Bankruptcy Court also

5   indicated it was inclined to issue the TRO to preserve the status quo. *Id.* Despite Movants'

6   meritorious arguments that there was no risk of irreparable harm since Movants did not control

7   any of the Cedenco Assets and that the court lacked jurisdiction over those defendants the Trustee

8   had not yet served, the Bankruptcy Court issued the TRO against all defendants and set the OSC

9   hearing for September 15, 2011. RJN, Ex. 14.

10   Because of the Trustee's transparent motive in getting the TRO and preliminary injunction

11   *before* the inevitable stay of proceedings was issued, Movants requested that the Bankruptcy

12   Court move the hearing on the stay to September 15 to be decided before the preliminary

13   injunction. The Bankruptcy Court refused. Woodruff Decl. ¶ 9. The court indicated that if the

14   parties stipulated to continue the TRO until September 28, it would set the OSC hearing for

15   September 28 at the same time as the motion to stay. *Id.* Accordingly, Movants promptly

16   informed the Trustee's counsel that they were willing to stipulate to extend the TRO to September

17   28 as indicated by the Bankruptcy Court. The Trustee refused unless Fast Falcon also agreed,

18   which the Trustee knew was not possible since Fast Falcon has never been served with the

19   summons and complaint, and the undersigned does not represent it. Woodruff Decl., Ex. 4.

20   Therefore, Movants filed an *Ex Parte* Application to continue the OSC hearing until September

21   28, arguing that good cause exists under Federal Rule of Civil Procedure 65, incorporated into the

22   bankruptcy case by Federal Rule of Bankruptcy Procedure 7065, to extend the TRO against *all*

23   *defendants* and continue the hearing so that the motion to stay could be decided first. RJN, Ex.

24   15. The bankruptcy court denied the application. RJN, Ex. 16.

25   Because it is clear the Bankruptcy Court intends to issue a preliminary injunction in this

26   adversary proceeding *before* it stays the remaining proceedings, and because Movants cannot

27   adequately defend themselves against the preliminary injunction without testimony and evidence

28   from Scott Salyer, Movants respectfully request the Court to withdraw the reference to the

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING                - 13 -                27019\2749438.2

1    Bankruptcy Court of this adversary proceeding.  Concurrently with this Motion, Movants are

2    filing an emergency motion to stay proceedings in the Bankruptcy Court pending resolution of

3    this Motion by this Court.

4    ## III.   ARGUMENT

5         District courts, rather than bankruptcy courts, have original jurisdiction over all

6    bankruptcy matters.  28 U.S.C. § 1334(b); *In re First Alliance Mortgage Co.*, 282 B.R. 894, 901

7    (C.D. Cal. 2001).  District courts also have the power automatically to refer all bankruptcy

8    matters to the bankruptcy court (*id.*; U.S.C. § 157(a)[5]), as has the Eastern District of California.

9    *See* U.S. District Court for the Eastern District of California, General Order No. 223.

10        Under 28 U.S.C. section 157(d), however, a district court may withdraw the reference

11   made to a bankruptcy court:

12        The district court may withdraw, in whole or in part, any case or proceeding referred
          under this section, on its own motion or on timely motion of any party, for cause shown.
13        The district court shall, on timely motion of a party, so withdraw a proceeding if the court
          determines that resolution of the proceeding requires consideration of both title 11 and
14        other laws of the United States regulating organizations or activities affecting interstate
          commerce.
15

16   28 U.S.C. § 157(d).  Section 157(d) provides for either the mandatory withdrawal of a matter

17   pending in bankruptcy court if such matter involves significant issues of non-bankruptcy federal

18   law, or permissive withdrawal of a bankruptcy matter for "cause shown."  *Id.*

19        In determining whether cause exists to withdraw a reference under the permissive

20   component of 28 U.S.C. section 157(d), courts have typically focused first on whether the

21   proceeding is core or non-core, and thereafter on a number of factors, including whether there has

22   been a jury demand and judicial economy considerations.  *See, e.g., Security Farms v. Int'l Bhd.*

23   *Of Teamsters, et al.*, 124 F.3d 999, 1008 (9th Cir. 1997); *Green v. Fed. Deposit Ins.Corp.*, 451

24   B.R. 6, 10 (N.D. Cal. 2011).  In *Stern v. Marshall*, however, the United States Supreme Court

25   ruled that whether a proceeding is labeled a "core" matter in the bankruptcy law is not

26   determinative.  Rather, the Supreme Court held that, even if a proceeding is labeled by the

27

28   [5] "Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11
     or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING          - 14 -                              27019\2749438.2

1    Bankruptcy Code as a "core" proceeding, a bankruptcy court cannot issue a final judgment in the

2    proceeding unless "the action at issue stems from the bankruptcy itself or would necessarily be

3    resolved in the claims allowance process." *Stern v. Marshall*, 131 S. Ct. at 2618.  For non-core

4    proceedings, and "any matter[s] which, from [their] nature, [are] the subject of a suit at the

5    common law, or in equity or in admiralty," bankruptcy courts only can make reports and

6    recommendations for the district courts to act on.  *Id.* at 2612.

7         Good cause exists to withdraw the reference of the Instant Action to the Bankruptcy Court

8    for three reasons:  (1) it cannot be finally decided by the Bankruptcy Court under *Stern v.*

9    *Marshall*, and judicial economy would be served by having this Court determine the proceeding

10   in the first instance; (2) Movants have a constitutional right to a jury trial on the Trustee's claims,

11   and they do not consent to have the case tried in the Bankruptcy Court; and (3) it would be a more

12   efficient use of judicial resources and cause less delay and expense to the parties to withdraw the

13   reference.

14        A.    **The Instant Action Is Not A "Core" Preceding That Can Be Finally**
              **Determined By The Bankruptcy Court Under *Stern v. Marshall.***
15

16        In 1984, Congress amended the bankruptcy code in response to the Supreme Court's

17   decision in *Northern Pipeline Constr. Co. v. Marathon Pipe Line co.*, 458 U.S. 50 (1982)

18   (holding the broad jurisdiction granted to the bankruptcy courts under the 1978 Bankruptcy Act

19   was an unconstitutional delegation of Article III authority).  In *Northern Pipeline*, the Supreme

20   Court held that a state law fraudulent transfer suit brought by a debtor against a company that had

21   not filed a claim against the estate involved a private dispute, rather than a "public right," and

22   therefore must be resolved by an Article III court.  458 U.S. at 69-72 (plurality opinion).

23   Subsequently, Congress amended the code to distinguish between "core" matters, *i.e.*, those

24   which a bankruptcy court may hear and adjudicate, and non-core proceedings, *i.e.*, those that must

25   be determined by an Article III judge.  *See* 28 U.S.C. §§ 157(b)(2),(3); 157(c).

26        Interpreting the new Bankruptcy Code, the Supreme Court in *Granfinanciera, S.A. v.*

27   *Nordberg*, 492 U.S. 33 (1989), considered whether Congress could displace a party's Seventh

28   Amendment right to jury trial by classifying fraudulent conveyance actions as core proceedings

Farella Braun + Martel L.L.P
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF     - 15 -
BANKRUPTCY ADVERSARY PROCEEDING                              27019\2749438.2

1    that may be heard and decided by a bankruptcy court sitting without a jury.  The Court answered

2    the question emphatically – no.  492 U.S. at 61.  The Court first noted:

3         There can be little doubt that fraudulent conveyance actions by bankruptcy trustees – suits
4         which, we said in *Stendhal v. Irving Trust Co.*, 287 U.S. 92, 94-95 (1932) (citation
          omitted), "constitute no part of the proceedings in bankruptcy but concern controversies
5         arising out of it" – are quintessentially suits at common law that more nearly resemble
          state-law contract claims brought by a bankrupt corporation to augment the bankruptcy
6         estate than they do creditors' hierarchically ordered claims to a pro rata share of the
7         bankruptcy res.

8    *Id.* at 56.  Because fraudulent conveyance suits are more in the matter of a private suit than one

9    involving a public right, Congress could not constitutionally authorize a non-Article III court to

10   adjudicate it.  *Id.* at 53 (if statutory cause of action is not a "public right," "Congress may not

11   assign its adjudication to a specialized non-Article III court lacking 'the essential attributes of the

12   judicial power'").  The Court concluded that the trustee's fraudulent transfer action was one in

13   law, rather than in equity, which entitled the parties to a trial by jury, and that "Congress

14   cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause

15   of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a

16   specialized court of equity."  *Id.* at 60-61.

17          This summer, the Supreme Court took the holding of *Granfinanciera* one step further.

18   *Stern v. Marshall, supra*, involved a dispute between Anna Nicole Smith and Pierce Marshall

19   over the inheritance of Smith's deceased husband and Marshall's father.  After her husband died

20   without leaving her half of his estate, Smith filed for bankruptcy.  Marshall filed a complaint in

21   the bankruptcy contending that Smith had defamed him by telling the press that he had defrauded

22   his father to gain control over his assets.  Marshall also filed a proof of claim in the bankruptcy,

23   based on the adversary complaint, and sought a declaration that his claim was not dischargeable

24   in bankruptcy.  Smith filed a counterclaim for tortious interference with her ability to recover

25   from her late husband's estate.  *Stern v. Marshall*, 131 S. Ct. at 2601.

26          The bankruptcy court ruled in favor of Smith on her counterclaim, which was defined as a

27   "core proceeding" under Section 157(b), and awarded her over $425 million.  Subsequently, the

28   probate court ruled in favor of Marshall.  *Id.*  The question was, therefore, one of preclusion as to

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING                    - 16 -                    27019\2749438.2

1   which judgment should be given effect.  The Supreme Court, in a 5-4 decision, held that the

2   bankruptcy court lacked the constitutional authority to issue a final judgment, notwithstanding

3   Congress' designation of counterclaims by the estate against creditors filing claims as core

4   proceedings.  *Id.* at 2608-15.  Rather, non-Article III judges may only enter final judgments in

5   core proceedings that stem "from the bankruptcy itself or would necessarily be resolved in the

6   claims allowance process."  *Id.* at 2618.  Because Smith's counterclaim involved state law

7   questions that only tangentially related to Marshall's defamation and nondischargeability

8   complaint, the Supreme Court held that the bankruptcy court could not render final judgment, and

9   instead was required to submit proposed findings and conclusions to the district court for *de novo*

10   review and entry of judgment.  *Id.*

11        Here, the Trustee's action against Movants is not a core proceeding stemming from the

12   bankruptcy itself.  The claims do not invoke a substantial right *created by* Title 11; they could

13   exist outside of bankruptcy.  *See Security Farms*, 124 F.2d at 1008.  Although it is captioned as a

14   claim for fraudulent transfers, a close examination of the complaint reveals that the Trustee is

15   actually seeking declaratory relief.  RJN, Ex. 4.  The Trustee contends the loan transfers and

16   equity transfers were not effective under applicable Australian law, but seeks a declaration that *if*

17   the transfers are found to be effective, *then* they were fraudulent.  *Id.*  The answer to the first

18   question depends entirely on the application of Australian law, or California corporate law.  It is,

19   therefore, a quintessentially private dispute "brought by a bankruptcy corporation to augment the

20   bankruptcy estate" rather than one that seeks "a pro rata share of the bankruptcy res."  *See*

21   *Granfinanciera*, 492 U.S. at 56.

22        Moreover, the fact that the complaint is captioned as a fraudulent transfer action does not

23   change its character into a claim that may adjudicated by a non-Article III court.  *Id.* at 56, 61

24   (holding that a fraudulent transfer action was a quintessential common law suit that must be

25   determined by an Article III court, despite the nomenclature assigned to it by Congress).  As the

26   Supreme Court has now repeatedly held, the fact that something is labeled a "core" matter in the

27   Bankruptcy Code is not determinative.  *Stern*, 131 S. Ct. at 2618.  The fraudulent transfer claims

28   are in no way dependent upon bankruptcy law for their resolution, and in fact can be resolved

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING     - 17 -     27019\2749438.2

1   entirely by reference to Australian and California law.  It therefore cannot constitutionally be

2   adjudicated by a bankruptcy court, and the reference should be withdrawn.

3   **B.      Movants Have A Constitutional Right To A Jury Trial, And Do Not Consent**

4   **To Having The Instant Action Tried In The Bankruptcy Court.**

5          Where a party has a right to trial by jury, that trial may only be conducted in a bankruptcy

6   court "with the express consent of all the parties." 28 U.S.C. § 157(e); *Knupfer v. Lindblade (In*

7   *re Dyer)*, 322 F.3d 1178, 1194 (9th Cir. 2003) ("bankruptcy court is unable to preside over a jury

8   trial absent explicit consent from the parties and the district court.").  Although Movants have not

9   yet responded to the complaint,[6] their right to a jury trial is certain, and they will invoke that right.

10  *See Granfinanciera*, 492 U.S. at 47-49 (when an action is one for money damages, the action is

11  legal and the parties have a right to a jury trial).

12         Cause for withdrawal of the reference within the meaning of Section 157(d) exists where,

13  as here, a party has a right to a jury trial and does not consent to trial or entry of a final order of

14  the bankruptcy court.  *See In re Cinematronics, Inc.,* 916 F.2d 1444, 1451 (9th Cir. 1990).  Here,

15  Movants' right to jury trial weighs heavily in favor of immediate withdrawing the reference to

16  avoid duplication of efforts in both the bankruptcy court and this Court.  Leaving a case in the

17  Bankruptcy court until a case is ready for trial forces both the bankruptcy court and the district

18  court to "learn" the case and puts a double burden on Movants to prepare the case for two courts.

19  Because it is early in the adversary proceeding, withdrawal of the reference now will conserve

20  judicial resources.

21  **C.      Withdrawal Of The Reference Of The Instant Action Would Promote The**

22  **Efficient Use Of Judicial Resources.**

23         Not only should the reference to the Instant Action be withdrawn on the basis of *Stern* and

24  *Granfinanciera*, but it also should be withdrawn to preserve judicial resources.  As described

25  above, there are twelve adversary proceedings pending against Movants and related parties.  Of

26  those, most – if not all – will be subject to withdrawal of the reference once the stays are lifted.

27

28  _____

[6]   The Trustee has not effectively served process on the SSC&L 2007 Trust. *See, supra,* note 4.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400
MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING                    - 18 -                    27019\2749438.2

1    In particular, the Quiet Title Action, the Breach of Fiduciary Duty Action, the Unjust Enrichment

2    Action and the third-party claims against Mr. Salyer in the Frito-Lay Action all involve only non-

3    core, state law claims, and cannot be finally determined by the bankruptcy court.  As the Ninth

4    Circuit has said, "Inasmuch as a bankruptcy court's determinations on non-core matters are

5    subject to de novo review by the district court, unnecessary costs could be avoided by a single

6    proceeding in the district court."  *Security Farms*, 124 F.3d at 1008 (internal citations omitted).

7         Here, the Instant Action is in its infancy; neither the Bankruptcy Court nor this Court has

8    the advantage of being more familiar with the issues.  To the contrary, those few issues that have

9    been definitely resolved in the Bankruptcy Court in related proceedings, have all been appealed to

10   this Court and consolidated in front of the Honorable Lawrence K. Karlton.  Accordingly, the

11   Bankruptcy Court does not have any greater familiarity than this Court with the factual

12   background and legal issues underscoring the Instant Action.

13        Since the Bankruptcy Court can only issue findings and recommendation to this Court for

14   final resolution, judicial economy would be served by withdrawing the reference to the Instant

15   Action (and the Related Adversary Proceedings as well, when that issue is raised), so that there is

16   no duplication of efforts or risk of interfering with the administration of the bankruptcy estate.  In

17   such circumstances, "good cause" is more than amply shown to justify removal of the reference

18   of the Instant Action.

19

20

21

22

23

24

25

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING          - 19 -

27019\2749438.2

1  **IV.   CONCLUSION**

2         This Court reversed the Bankruptcy Court's orders and held that the various adversary

3  proceedings pending against Mr. Salyer and his related entities should be stayed.  The intent and

4  spirit of this Court's orders applies equally to the present matter as well.  For the reasons set forth

5  above, these moving defendants respectfully request that this Court withdraw the reference of this

6  bankruptcy adversary proceeding.

7

8  Dated: September 7, 2011                          FARELLA BRAUN + MARTEL LLP

9                                                    By: _/s/ Kelly A. Woodruff_____
                                                         Kelly A. Woodruff
10

11                                                  Attorneys for Defendants
                                                    SKPM Corp., SSC&L 2007 Trust, Monterey
                                                    Peninsula Farms, LLC, Scott Salyer, in his
12                                                  capacity as Trustee of the SSC&L 2007 Trust
                                                    and the Scott Salyer Revocable Trust, and the
13                                                  Scott Salyer Revocable Trust

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING                    - 20 -

27019\2749438.2

[24]

FILED
September 07, 2011
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0003752034

1  DEAN M. GLOSTER, State Bar No. 109313
   MARK D. PETERSEN, State Bar No. 111956
2  KELLY A. WOODRUFF, State Bar No. 160235
3  FARELLA BRAUN + MARTEL LLP
   235 Montgomery Street, 17th Floor
4  San Francisco, California 94104
   Telephone:   (415) 954-4400
5  Facsimile:   (415) 954-4480
   dgloster@fbm.com
6  mpetersen@fbm.com
7  kwoodruff@fbm.com

8  Attorneys for Defendants
   SKPM Corp., SSC&L 2007 Trust, Monterey
9  Peninsula Farms, LLC, Scott Salyer, in his capacity
   as Trustee of the Scott Salyer Revocable Trust, and
10 the Scott Salyer Revocable Trust

11                 UNITED STATES BANKRUPTCY  COURT

12                 EASTERN DISTRICT OF CALIFORNIA

13                      SACRAMENTO DIVISION

14

15 | In re:                                    | Case No. 09-29162
16 |                                           | Chapter 11
   | SK Foods, LP, a California limited        |
17 | partnership, *et al.*,                    |
   |                    Debtors.               |
18 |                                           |
19 | Bradley D. Sharp, Chapter 11 Trustee,     | Adversary Proceeding No. 11-02337
20 |                    Plaintiff              | **DEFENDANTS' MOTION FOR
   |            v.                             | ORDER WITHDRAWING
21 |                                           | REFERENCE OF BANKRUPTCY
   | SKPM Corp., *et al.*,                     | ADVERSARY PROCEEDING**
22 |                    Defendants.            |
23 |                                           | *[Hearing Date and Time to be Provided Upon
24 |                                           | Assignment of a District Court Judge and
   |                                           | Establishment of a Hearing Date]*
25

26  PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 5011, THE CLERK

27  OF THE BANKRUPTCY COURT IS TO PROMPTLY TRANSMIT THIS MOTION TO THE

28                        DISTRICT COURT

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING

27019\2749438.2

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................................ 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ...................................... 3

    A.    The Bankruptcy Case ............................................................................... 3

    B.    The Original Adversary Proceedings ......................................................... 3

         1.   Sharp v. Salyer, et al., Adv. P. No. 10-02014 (the "Substantive Consolidation Action") .............................................................. 3

         2.   Sharp v. CSSS, L.P., Adv. P. No. 09-02543 (the "Drum Line Action") ................................................................................. 4

         3.   Sharp v. SSC Farms I, LLC, et al., Adv. P. No. 09-02692 (the "Quiet Title Action") .......................................................... 4

         4.   Sharp v. Salyer, et al., Adv. P. No. 10-02015, (the "Breach of Fiduciary Duty Action") ...................................................... 5

         5.   Sharp v. SKF Aviation, LLC and CSSS, L.P., Adv. P. No. 10-02016 (the "Avoidance Action") ................................................ 5

         6.   Sharp v. Fred Salyer Irrevocable Trust, Adv. P. No. 10-02017 (the "FSIT Action") ................................................................. 5

    C.    The Various Stay Orders .......................................................................... 6

    D.    The New Adversary Proceedings .............................................................. 8

         1.   Sharp v. SK PM Corp., et al., Adv. P. No. 11-02337 (the "Instant Action") .................................................................. 8

         2.   Sharp v. Salyer American Fresh Foods, et al., Adv. P. No. 11-2338 (the "SAFF Action") ..................................................... 9

         3.   Bank of Montreal v. California Franchise Tax Board, et al., Adv. P. No. 11-2339 (the "FTB Action") ...................................... 9

         4.   Bank of Montreal v. Cary Collins, et al., Adv. P. No. 11-2340 (the "Unjust Enrichment Action") ............................................. 10

         5.   Sharp v. Blackstone Ranch Corp., et al., Adv. P. No. 11-02348 .............. 10

    E.    The Appeals Of The Bankruptcy Court's June 28 Stay Orders ............................ 10

    F.    Proceedings In The Instant Action .......................................................... 10

III.  ARGUMENT ..................................................................................................... 14

    A.    The Instant Action Is Not A "Core" Proceeding That Can Be Finally Determined By The Bankruptcy Court Under *Stern v. Marshall*. ....................... 15

    B.    Movants Have A Constitutional Right To A Jury Trial, And Do Not Consent To Having The Instant Action Tried In The Bankruptcy Court. ............. 18

    C.    Withdrawal Of The Reference Of The Instant Action Would Promote The Efficient Use Of Judicial Resources. ........................................................ 18

IV.  CONCLUSION ................................................................................................. 20

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING
- i -
27019\2749438.2

1

## TABLE OF AUTHORITIES

2

Page

3

### FEDERAL CASES

4

*Granfinanciera, S.A. v. Nordberg,*
    492 U.S. 33 (1989) ................................................................................ 15, 16, 17, 18

5

*In re Cinematronics, Inc.,*
    916 F.2d 1444 (9th Cir. 1990) ................................................................................ 18

6

7

*In re First Alliance Mortg. Co.,*
    282 B.R. 894 (C.D. Cal. 2001) ................................................................................ 14

8

*Green v. Fed. Deposit Ins. Corp.,*
    451 B.R. 6 (N.D. Cal. 2011) ................................................................................ 14

9

10

*Knupfer v. Lindblade (In re Dyer),*
    322 F.3d 1178 (9th Cir. 2003) ................................................................................ 18

11

*Northern Pipeline Constr. Co. v. Marathon Pipe Line,Co.*
    458 U.S. 50 (1982) ................................................................................ 15

12

13

*Security Farms v. Int'l Brotherhood Of Teamsters, et al.,*
    124 F.3d 999 (9th Cir. 1997) ................................................................................ 14, 17, 19

14

*Stendhal v. Irving Trust Co.,*
    287 U.S. 92 (1932) ................................................................................ 15, 16, 17

15

16

*Stern v. Marshall,*
    131 S. Ct. 2594 (2011) ................................................................................ *passim*

17

### FEDERAL STATUTES

18

28 U.S.C. § 1334(b) ................................................................................ 13

19

28 U.S.C. § 157(c) ................................................................................ 15

20

28 U.S.C. § 157(d) ................................................................................ *passim*

21

28 U.S.C. § 157(e) ................................................................................ 18

22

28 U.S.C. § 158(d)(2)(A) ................................................................................ 10

23

28 U.S.C. §§ 157(b)(2) ................................................................................ 15

24

### STATE STATUTES

25

Cal. Civ. Proc. Code § 760.020 ................................................................................ 4

26

Cal. Civ. Proc. Code §§ 3439.05, 3439.07 ................................................................................ 8

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

1

2

## FEDERAL RULES AND REGULATIONS

3  Fed. R. Bankr. P. 7065 ................................................................................................................ 13

4  Fed. R. Civ. P. 65 ....................................................................................................................... 13

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

1    Defendants Scott Salyer, as trustee of the Scott Salyer Revocable Trust, the Scott Salyer

2    Revocable Trust, the SSC&L 2007 Trust, SK PM Corporation, and Monterey Peninsula Farms,

3    LLC (collectively, "Movants"), hereby submit the following Memorandum of Points and

4    Authorities in support of their Motion for Order Withdrawing Reference of Bankruptcy

5    Adversary Proceeding pursuant to 28 U.S.C. section 157(d) ("Motion").

6    **I.    INTRODUCTION**

7    Movants, along with numerous entities related to Movants (collectively, the "Salyer

8    Parties"), have been engaged in litigation in the Bankruptcy Court for nearly two years. There are

9    currently twelve adversary proceedings pending against various Salyer Parties (the "Related

10   Adversary Proceedings"), which were filed between August 21, 2009 and May 4, 2011.

11   Mr. Salyer is also the defendant in an ongoing criminal prosecution that substantially

12   overlaps the Related Adversary Proceedings. Because of the pending criminal case against

13   Mr. Salyer, this Court has previously ordered that the Related Adversary Proceedings must be

14   stayed if "discovery from or testimony of Salyer or his criminal counsel is reasonably necessary

15   to dispose of a particular matter before the Bankruptcy Court." Since that time, eleven of the

16   twelve Related Adversary Proceedings have been stayed by the Bankruptcy Court.

17   The above-captioned matter is the one adversary proceeding pending against the Salyer

18   Parties that is not currently stayed, but only because the Bankruptcy Court has yet to hear

19   Movants' renewed motion to stay. The action was commenced by the Debtors' duly-appointed

20   Chapter 11 Trustee, Bradley D. Sharp (the "Trustee"), on May 4, 2011, asserting both bankruptcy

21   and state law claims. Movants promptly moved to stay the action in accordance with this Court's

22   prior stay orders. Rather than oppose the stay motion, the Trustee stipulated to a stay of

23   proceedings until July 31, 2011, or until further extended by the parties, with any renewed motion

24   for a stay that was filed by August 15, 2011 treated as timely. Despite the fact that the

25   Bankruptcy Court stayed the remaining Related Adversary Proceedings on June 28, 2011, the

26   Trustee refused to extend the stipulated stay in this action except on onerous conditions.

27   Accordingly, the Salyer Defendants timely filed their renewed motion to stay the adversary

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING        - 1 -

27019\2749438.2

1  proceeding under the terms of the stipulation; the hearing on this motion is not set until

2  September 28, 2011.

3      The Trustee took full advantage of the gap in the stay of this case caused by his refusal to

4  extend the stipulated stay, and filed an *Ex Parte* Motion for a Temporary Restraining Order

5  ("TRO") and Order to Show Cause ("OSC") re Preliminary Injunction ("TRO Motion").  On

6  September 1, 2011, the bankruptcy court issued the TRO and OSC, and set a hearing on the OSC

7  for September 15, 2011 at 10:00 a.m.  Because Movants cannot adequately defend themselves

8  against the preliminary injunction without testimony from Mr. Salyer, Movants believe the

9  Trustee's rush to the Bankruptcy Court, and the Bankruptcy Court's rush to issue rulings before a

10  stay is in place, violates the intent and spirit of this Court's prior stay orders.  Accordingly,

11  Movants asked the Bankruptcy Court to expedite the hearing on the earlier-filed motion to stay

12  or, alternatively, to issue the stay immediately and certify it for direct appeal with the appeal of

13  the other stay orders issued in the Related Adversary Proceedings.  The Bankruptcy Court

14  refused.  Movants then offered to stipulate to extend the TRO to September 28 and asked the

15  Bankruptcy Court to continue the OSC hearing to September 28 to be heard after the motion to

16  stay is heard.  Again, the Bankruptcy Court refused.

17      Accordingly, because the instant case involves questions of both bankruptcy law and state

18  law, and because the Bankruptcy Court seemingly refuses to comply with the spirit of this Court's

19  prior stay orders, Movants respectfully request that this Court withdraw the reference of this

20  adversary proceeding pursuant to 28 U.S.C. section 157(d) and the United States Supreme

21  Court's recent decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011).[1]  Concurrently with this

22  Motion, Movants are asking the Bankruptcy Court for an emergency stay of proceedings to give

23  this Court an opportunity to rule on the Motion prior to the preliminary injunction hearing.

24

25

26

27    [1] Because the remaining Related Adversary Proceedings are currently stayed, at this time the Salyer Parties are not
seeking to withdraw the reference as to any of those actions.  Should the stay be lifted in any of those actions

28  involving state law or other non-core causes of action, however, the appropriate defendants will promptly move to
withdraw the reference in those actions as well.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING      - 2 -      27019\2749438.2

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Bankruptcy Case

Debtors SK Foods, L.P., a California limited partnership and RHM Industrial/Specialty Foods, Inc., a California Corporation, d/b/a Colusa County Canning Co. ("Debtors") were part of a vertical family-owned agribusiness that produced and processed tomato products. Scott Salyer indirectly owned 100% of both Debtors.

In April 2008, Debtors became the target of an FBI investigation involving allegations of bribery and price fixing. On April 8, 2008, the FBI raided Debtors' offices and removed virtually all corporate books and records. As a result of subsequent difficulties in connection with the investigation and subsequent difficulties with its lenders in light of the investigation, Debtors' business ran into serious financial difficulties at the beginning of 2009.

On May 5, 2009 (the "Petition Date"), involuntary petitions were filed under chapter 11 of title 11 of the United States Code against Debtors. On May 7, 2009, voluntary petitions for relief were filed. On May 17, 2009, the Court appointed Bradley D. Sharp as Chapter 11 Trustee of the Debtors.

On February 4, 2010, the Federal Bureau of Investigation arrested Mr. Salyer. On February 18, 2010, the United States government filed an indictment. On April 29, 2010, the United States government filed a superseding indictment, bringing twelve counts and two forfeiture allegations against Mr. Salyer.

### B.   The Original Adversary Proceedings

From August 2009 through January 2010, the Trustee commenced the following six adversary proceedings against Mr. Salyer and several companies and trusts related to the Debtors:

#### 1.   Sharp v. Salyer, et al., Adv. P. No. 10-02014 (the "Substantive Consolidation Action")

On January 11, 2010, the Trustee commenced the Substantive Consolidation Action against Mr. Salyer as the trustee for the Scott Salyer Revocable Trust (the "SSR Trust"), SK PM Corp ("SKPM"), SK Foods, LLC, SKF Canning, LLC, Blackstone Ranch Corporation, Monterey Peninsula Farms, LLC ("MPF"), Salyer Management Company, LLC, SK Farms Services, LLC,

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING          - 3 -

27019\2749438.2

1    SK Frozen Foods, LLC, SS Farms, LLC, SSC Farming, LLC, SSC Farms I, LLC, SSC Farms II,

2    LLC, and SSC Farms III, LLC (collectively, the "Consolidation Defendants").  In the Substantive

3    Consolidation Action, the Trustee contends that the Debtors and the Consolidation Defendants

4    operated as one entity, and held themselves out to creditors as a single enterprise.  The Trustee

5    also contends that Mr. Salyer caused millions of dollars of the Debtors' assets to be transferred to

6    the Consolidation Defendants, including assets critical to the Debtors' operations such as the

7    waste water land and the Debtor's Australian and New Zealand subsidiaries.  The Trustee seeks

8    substantive consolidation of the Consolidation Defendants with Debtors, avoidance and recovery

9    of fraudulent transfers and declaratory relief that the Consolidation Defendants are the alter ego

10   of Debtors.

11              2.      **Sharp v. CSSS, L.P., Adv. P. No. 09-02543 (the "Drum Line Action")**

12          On August 21, 2009, the Trustee commenced the Drum Line Action, seeking to recover

13   certain manufacturing equipment (the "Drum Line") used to make fiberglass vessels in which

14   finished tomato products are stored.  The Trustee alleges that the Debtors had possession of the

15   Drum Line at the Lemoore facility until a few weeks prior to the Petition Date.  The Trustee

16   contends that Mr. Salyer thereafter purported to "transfer" the Drum Line to CSSS, L.P. d/b/a

17   Central Valley Shippers ("CSSS"), an affiliate controlled by Mr. Salyer.  The Trustee also

18   contends that Mr. Salyer shipped the Drum Line overseas to New Zealand in violation of a TRO

19   and preliminary injunction.

20              3.      **Sharp v. SSC Farms I, LLC, et al., Adv. P. No. 09-02692 (the "Quiet
                        Title Action")**

21

22          On October 23, 2009, the Trustee commenced the Quiet Title Action against SSC Farms I,

23   LLC, SSC Farms II, LLC, and SSC Farming, LLC (collectively, the "Quiet Title Defendants").

24   In the Quiet Title Action, the Trustee seeks a decree under California Code of Civil Procedure

25   Section 760.020 that the Debtors are true and equitable owners of waste water land nominally

26   held by the Quiet Title Defendants.  The grounds for the claim are that Mr. Salyer had an alleged

27   fiduciary obligation to place title in property purchased with the Debtors' funds and which was

28   necessary to the Debtors' operations in the names of the Debtors, not the Quiet Title Defendants.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING          - 4 -          27019\2749438.2

1

2

       4.     **Sharp v. Salyer, et al., Adv. P. No. 10-02015, (the "Breach of Fiduciary Duty Action")**

3      On January 11, 2010, the Trustee commenced the Breach of Fiduciary Duty Action

4    against Mr. Salyer, the SSR Trust and SKPM.  In the Breach of Fiduciary Duty Action, the

5    Trustee is seeking a money judgment against Mr. Salyer for alleged breach of his fiduciary duty

6    owed to the Debtors, based on the same allegations in the Substantive Consolidation Action, the

7    Quiet Title Action, and the Drum Line Action.

8

9

       5.     **Sharp v. SKF Aviation, LLC and CSSS, L.P., Adv. P. No. 10-02016 (the "Avoidance Action")**

10    On January 11, 2010, the Trustee commenced the Avoidance Action.  In the Avoidance

11   Action, the Trustee contends that Mr. Salyer set up SKF Aviation, LLC to own and maintain

12   airplanes used by Mr. Salyer.  Additionally, the Trustee contends that Mr. Salyer set up CSSS to

13   generate only enough revenue to pay the premium on a life insurance policy under which he was

14   the beneficiary so as to avoid such costs personally.

15

16

       6.     **Sharp v. Fred Salyer Irrevocable Trust, Adv. P. No. 10-02017 (the "FSIT Action")**

17    On January 12, 2010, the Trustee commenced the FSIT Action against the Fred Salyer

18   Irrevocable Trust (the "FSIT") and Gerard Rose as the trustee of the FSIT.  In the FSIT Action,

19   the Trustee is seeking to recover money that was allegedly loaned by the Debtors to the FSIT to

20   pay for a life insurance policy.  The Trustee contends that FSIT is obligated to repay the money

21   loaned by SK Foods, and that Gerard Rose, as trustee, is personally liable to the Debtors for

22   permitting money to be dissipated by the FSIT and/or allowing money to be expended from the

23   FSIT without making provision for repayment of that indebtedness owed to the Debtors.  The

24   Trustee also alleges that Mr. Alan Huey, a defendant in the criminal proceeding *U.S. v. Alan*

25   *Huey*, Case No. 09-CR-468 LKK, pending before the District Court, was the trustee of the FSIT

26   when the alleged improper activity occurred.

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING    - 5 -                     27019\2749438.2

## C.   The Various Stay Orders

On February 18, 2010, the United States filed an indictment against Scott Salyer as a result of the FBI investigation described above in *United States v. Salyer*, Case No. 2:10-cr-00061-LKK (E.D. California) (the "Criminal Proceeding"). On April 29, 2010, the government filed a superseding indictment, bringing twelve criminal counts and two forfeiture counts against Mr. Salyer seeking to recover all real and personal property traceable to the alleged criminal conduct (which would apparently include property and proceeds otherwise subject to the bankruptcy proceedings). The Criminal Proceeding against Mr. Salyer is set for trial April 17, 2012.

In light of the Criminal Proceeding, on April 28, 2010, various Salyer-related defendants filed motions to stay these six adversary proceedings pending the Criminal Proceeding. The Bankruptcy Court denied the motions on June 1, 2010, and the defendants appealed to this Court. The appeals were consolidated and heard by the Honorable Lawrence K. Karlton, the same judge presiding over the Criminal Proceeding. On June 18, 2010, Judge Karlton granted the Salyer Parties' Emergency Application to Enjoin and Stay Discovery in the adversary proceedings. The Court then held a hearing on August 3, 2010, on the emergency application and continued the stay until resolution of the instant appeals.

On December 10, 2010, this Court entered an order (the "Stay Order") determining that the Bankruptcy Court "made several significant erroneous factual findings" and, therefore, "abused its discretion in denying [the Salyer Parties'] motion for a stay." Request for Judicial Notice ("RJN"), Ex. 1 (Dec. 10, 2010 Order, *Sharp v. SSC Farms 1, LLC, et al.*, Case No. S-10-1492 LKK), at 23. Judge Karlton, who had familiarity with the allegations in the Criminal Proceeding, found that the Bankruptcy Court clearly erred in four of its six factual findings, including that the adversary proceedings bear no significant relationship to the Criminal Proceeding and that Mr. Salyer's Fifth Amendment rights were not implicated by prosecution of the adversary proceedings. *Id.* at 16-17. The Court therefore reversed the Bankruptcy Court and "order[ed] a stay of all further bankruptcy proceedings where [the Salyer Parties] make a credible showing that discovery from or testimony of Scott Salyer or his criminal counsel is relevant to the

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING                    - 6 -

27019\2749438.2

1  proceedings." *Id.* The Trustee filed a motion for rehearing, and the Court held a rehearing on

2  April 11, 2011.

3  On April 14, 2011, this Court entered an order (the "Remand Order") confirming and

4  incorporating its original Stay Order, but clarifying that it was up to the Bankruptcy Court in the

5  first instance to determine

6  
7  
8  
9  
> whether discovery from or testimony of Salyer or his criminal counsel is
> reasonably necessary to dispose of a particular matter before the
> Bankruptcy Court in the adversary proceedings. A matter is reasonably
> necessary if [the Salyer parties] cannot adequately defend themselves in an
> adversary proceeding without evidence from Salyer or his criminal
> counsel.

10  

11  RJN, Ex. 2 at 5 (footnote omitted). The Court also ordered the Salyer parties to file their renewed

12  motions to stay the adversary proceedings within 14 days of entry of the Remand Order, or within

13  14 days of learning of grounds for a stay under the Remand Order, which motions "*must be set

14  for hearing as early as practicable*." *Id.* at 6 (emphasis added). In anticipation that any further

15  orders regarding the stay motions could be considered interlocutory, and not appealable as of

16  right, this Court expressly found that the Bankruptcy Court's further "decisions on these matters

17  may be directly appealed to this court on the same grounds that the court had jurisdiction to hear

18  the appeal of the first order denying a stay of proceedings." *Id.* at 5-6.

19  In the meantime, on March 23, 2010, the Trustee filed an action for breach of contract,

20  interference with contract and objection to claims against defendants Lidestri Foods, Inc. and

21  Frito-Lay, Inc. (the "Frito-Lay Action"). On May 10, 2010, Lidestri Foods and Frito-Lay each

22  brought third-party claims against, among others, Scott Salyer individually, alleging damages

23  caused by the third-party defendants' alleged criminal conduct. The Frito-Lay Action was not

24  subject to the Bankruptcy Court's original order denying the motions for stay, nor this Court's

25  Stay Order and Remand Order.

26  Also while the appeals of the Bankruptcy Court's denial of stay were pending, in

27  September 2010 the Trustee sought bankruptcy court approval of a settlement agreement with

28  Bank of Montreal ("BMO"). BMO is the principal secured creditor of the Debtors' bankruptcy

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING    - 7 -    27019\2749438.2

1   estate, as the lead agent for banks that lent Debtors almost $200 million secured by certain of the

2   Debtors' assets. BMO also asserts a "super priority claim" in the bankruptcy case of between $22

3   million and $59 million, as a result of alleged diminution in value of its collateral when the

4   Trustee sold substantially all operating assets of the Debtor. The settlement, among other things,

5   transferred to BMO certain claims and causes of action of the estate, including the Breach of

6   Fiduciary Duty Action and the Frito-Lay Action.[2] BMO substituted the Trustee as plaintiff in the

7   Breach of Fiduciary Duty Action on April 14, 2011 and the Frito-Lay Action on April 15, 2011.

8       After this Court issued the Remand Order, the Salyer Parties filed renewed motions to stay

9   each of the six adversary proceedings and a new motion to stay the Frito-Lay Action on April 28,

10  2011. At the contested hearing on the motions, the Bankruptcy Court granted the Salyer Parties'

11  motion to stay the adversary proceedings, and stayed all proceedings other than a limited amount

12  of discovery to investigate compliance with an earlier-issued preliminary injunction. Those

13  orders were made final on June 28, 2011. The third-party plaintiffs in the Frito-Lay Action

14  stipulated to stay the proceedings, and that stipulation was approved and entered by the

15  Bankruptcy Court on June 29, 2011.

16  ### D.   The New Adversary Proceedings

17      Shortly after this Court issued the Remand Order, the Trustee and BMO, as successor by

18  assignment to certain of the Trustee's claims, brought five additional adversary proceedings

19  against Mr. Salyer and other Salyer Parties, including the instant action. With the exception of

20  this action, the other four adversary proceedings have all been stayed, either pursuant to

21  stipulation between the parties or by the Bankruptcy Court after a contested motion to stay

22  brought by Salyer Parties.

23      1.   *Sharp v. SK PM Corp., et al.*, Adv. P. No. 11-02337 (the "Instant
             Action")

25      On May 4, 2011, the Trustee brought the Instant Action against SKPM, Scott Salyer, the

26  SSR Trust, the SSC&L 2007 Trust, MPF, Fast Falcon, LLC and Henry Heath, alleging that Mr.

27

28  [2] Although the Bankruptcy Court approved the settlement agreement, the approval was reversed by this Court on appeal in *In re SK Foods, L.P.*, E.D. Cal. Case No. 10-cv-03467, dated July 18, 2011. RJN Exh. 3.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING        - 8 -        27019\2749438.2

1  Salyer orchestrated the divestiture of Debtor's Australian subsidiaries ("Cedenco") by

2  transferring the ownership to SKPM and the SSR Trust with no consideration. *See* Complaint,

3  RJN, Ex. 4. The Trustee also alleges that Mr. Salyer caused the Debtor to transfer a note

4  receivable from Cedenco to another Salyer Trust, the SSC&L 2007 Trust, for no consideration,

5  and that both the equity and the note receivable were subsequently transferred to MPF and then to

6  Fast Falcon. The Trustee seeks to recover the equity in Cedenco and the note receivable as

7  fraudulent transfers under the Bankruptcy Code and California Code of Civil Procedure sections

8  3439.05 and 3439.07.

9  The allegations in the Instant Action are repetitive of allegations in the Substantive

10  Consolidation Action, RJN, Ex. 5 (Substantive Consolidation complaint) at ¶¶ 171-182, and the

11  Breach of Fiduciary Duty Action, RJN, Ex. 6 (Breach of Fiduciary Duty complaint) at ¶¶ 50-55.

12  Both of these earlier-filed actions have been stayed by the Bankruptcy Court following this

13  Court's Remand Order.

14
    2.  *Sharp v. Salyer American Fresh Foods, et al.*, **Adv. P. No. 11-2338 (the**
        **"SAFF Action")**
15

16  On May 4, 2011, the Trustee brought the SAFF Action against Salyer American Fresh

17  Foods ("SAFF") and its court-appointed receiver, seeking avoidance and recovery of preferential

18  and fraudulent transfers and declaratory relief concerning the parties' respective contractual

19  obligations. The Trustee also alleged that both Debtor and SAFF were owned by the SSR Trust

20  and controlled by Mr. Salyer, and that transactions between them were not conducted at arms'

21  length. A hearing on SAFF's motion to stay the SAFF action has been continued to September

22  14, 2011, and the parties stipulated stay all discovery pending resolution of the motion to stay.

23
    3.  *Bank of Montreal v. California Franchise Tax Board, et al.*, **Adv. P. No.**
        **11-2339 (the "FTB Action")**
24

25  On May 4, 2011, BMO, successor by assignment to certain of the Trustee's claims, sued

26  the California Franchise Tax Board, the SSR Trust, Scott Salyer individually, and Mr. Salyer's

27  daughters and their trusts, for fraudulent transfers, the return of funds paid by Debtor for taxes

28  owed by Mr. Salyer, his daughters and the SSR Trust, and to recover from the Salyer parties as

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING                - 9 -                                    27019\2749438.2

1    subsequent transferees.  BMO alleges that Mr. Salyer caused Debtor to pay $1.65 million of his

2    and his daughters' tax liabilities to generate a future refund and pass Debtor's assets through the

3    Franchise Tax Board back to himself and his daughters.  The Bankruptcy Court stayed the FTB

4    Action after a contested hearing.

5                    4.    ***Bank of Montreal v. Cary Collins, et al.***, Adv. P. No. 11-2340 (the
                           **"Unjust Enrichment Action"**)

6

7         On May 4, 2011, BMO, successor by assignment to certain of the Trustee's claims, sued

8    accountant Cary Collins, Scott Salyer, his daughters and their trusts for fraudulent transfers and

9    unjust enrichment.  In the Unjust Enrichment Action, BMO alleges that Mr. Salyer caused

10   Debtors to make excessive tax payments on his and his daughters' behalf, resulting in an

11   unauthorized tax refund to Mr. Salyer and his daughters, which allowed Mr. Salyer to pass

12   millions of dollars of Debtors' assets through the IRS and back to him and his daughters.  BMO

13   also alleges that Mr. Salyer transferred the unauthorized tax returns to an offshore trust, and

14   transferred New Zealand and Australian companies allegedly belonging to Debtor and/or SK

15   Foods, LLC to an offshore trust.  the Bankruptcy Court stayed the Unjust Enrichment Action at

16   the contested hearing on the motion.

17                   5.    ***Sharp v. Blackstone Ranch Corp., et al.***, Adv. P. No. 11-02348

18        The Trustee brought this adversary proceeding on May 6, 2011, seeking to recover for

19   allegedly fraudulently transfers made by Debtor to defendants.  The defendants moved to stay this

20   action on May 18, 2011.  Rather than filing on opposition, the Trustee stipulated to a stay of

21   proceedings pending a final judgment or resolution of the Substantive Consolidation Action.

22        **E.    The Appeals Of The Bankruptcy Court's June 28 Stay Orders**

23        In the eight (8) Related Adversary Proceedings in which the bankruptcy court issued stays

24   of proceedings after this Court's Remand Order, on July 12, 2011, the Trustee and/or BMO filed

25   notices of appeal, statements of election to have appeal heard by the District Court, and

26   precautionary motions for leave to appeal.  The Trustee and BMO filed their designations of

27   record and statement of issues in each case on July 22, and the respective Salyer Parties filed their

28   counter-designations of record on August 5.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING                    - 10 -                    27019\2749438.2

1    Despite that this Court's Remand Order expressly provided for appeal of any further

2    Bankruptcy Court stay orders to this Court, on August 4, 2011, the Trustee and BMO filed a joint,

3    omnibus Motion for Certification of the Order Staying Proceedings for Direct Appeal to the

4    United States Court of Appeals for the Ninth Circuit. RJN, Ex. 7. The Salyer Parties filed an

5    opposition to the certification motion, arguing that the Trustee and BMO failed to establish any of

6    the necessary prerequisites of certification for direct appeal under 28 U.S.C. section 158(d)(2)(A).

7    RJN, Ex. 8. On August 30, 2011, the Bankruptcy Court certified the appeals for direct appeal to

8    the Ninth Circuit on the ground that direct appeal "may materially advance the progress of the

9    adversary proceedings in which the appeal is taken, as well as the underlying bankruptcy case."

10   *Id.* at 3. The Bankruptcy Court reached this conclusion based on its not-so-subtle disagreement

11   with this Court's prior Stay Order and Remand Order, and its apparent desire to avoid having this

12   Court review the stay orders again. *See id.* at 4-5. The Trustee and BMO filed a petition to the

13   Ninth Circuit for leave to appeal on September 2, 2011.

14            F.    **Proceedings In The Instant Action**

15            As described above, the Trustee filed the Instant Action on May 4, 2011, asserting claims

16   under the Bankruptcy Code and California state law for fraudulent transfer relating to Debtor's

17   2006 distribution of its Australian subsidiaries to its general and limited partners. Movants filed a

18   motion to stay the proceedings on May 18, 2011, pursuant to this Court's Remand Order and even

19   before being served with the complaint.

20            The Trustee's response to Movants' motion to stay was due June 1, 2011. Rather than

21   oppose the motion in the face of this Court's clear directive in its Remand Order, on the day the

22   response was due, the Trustee stipulated to a stay of the action until July 31, 2011. RJN, Ex. 9.

23   The stipulation provided that the stay could be extended by agreement of the parties, or, if no

24   agreement is reached, Movants could renew their motion by August 15 and it would be

25   considered timely.

26            After the Bankruptcy Court issued stay orders in the Related Adversary Proceedings,

27   former counsel for Movants sought the Trustee's agreement to extend the stay on the same terms

28   as the Bankruptcy Court stay orders. The Trustee's counsel refused except on onerous

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF       - 11 -
BANKRUPTCY ADVERSARY PROCEEDING                                    27019\2749438.2

1   conditions.  Declaration of Kelly A. Woodruff ("Woodruff Decl."), Ex. 1.  Accordingly, Movants

2   renewed their motion for a stay of proceedings on August 15, 2011, believing the stay would

3   continue in effect pending resolution of the motion on September 28.

4     When Movants were informed that the Trustee considered their response to the adversary

5   complaint to be late (despite their timely renewed motion to stay), Movants requested an

6   extension of time to respond until after the hearing on the motion to stay.  The Trustee refused.

7   Woodruff Decl., Ex. 2.  Movants, therefore, filed an *Ex Parte* Application to Shorten Time on the

8   hearing on the motion to stay, seeking it to be set for hearing along with numerous other matters

9   in the bankruptcy case that were being heard on August 31.  RJN, Ex. 10.  Although this Court's

10  Remand Order required that the motion "must be set for hearing as early as practicable" (Remand

11  Order, RJN 2, at 6), the Bankruptcy Court denied the request and said the August 31 hearing

12  would be used "to set a briefing schedule" on the motion.[3]  RJN, Ex. 11.

13    Taking full advantage of the gap in the stay in this one adversary proceeding, the Trustee

14  filed his TRO Motion on August 31, to be heard on September 1 at 10:00 a.m.  The TRO Motion

15  was supported by several declarations and approximately 2,000 pages worth of exhibits.  The

16  memorandum of points and authorities, but not the declarations and exhibits, is attached at RJN,

17  Ex. 12.  In the TRO Motion, the Trustee sought a TRO and preliminary injunction against all

18  defendants – even those who had not yet been served[4] – prohibiting them from transferring the

19  "Cedenco Assets," which included the stock in and the note receivable from Debtor's former

20  Australian subsidiary.  Because the Cedenco Assets were tied up in an Australian liquidation

21  &#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;

22  [3]  The Bankruptcy Court's order was ambiguous.  There already was a hearing set, and therefore a briefing schedule
established by the local rules.  Without shortening time on the hearing, the briefing schedule did not change.

23  [4]  The Trustee served the summons and complaint on SKPM and MPF on May 18, 2011.  The Trustee served the SSR
Trust on August 25, by serving its trustee Scott Salyer.  The Trustee also attempted to serve the SSC&L 2007 Trust

24  on August 25 by serving Scott Salyer as its trustee, but Mr. Salyer is not the trustee of the SSC&L 2007 Trust.
Rather, Robert Pruett is.  The Trustee has never served process on Henry Heath, who is a resident of Australia, or on

25  Fast Flacon, which is a St. Nevis limited liability company.  The Trustee attempted to serve Fast Falcon first by
sending the summons and complaint to Cary Collins as "manager" on June 10, then by sending them to Dean Gloster,

26  Movants' counsel, on August 11, and finally by serving Scott Salyer as "manager" on August 25.  As has been
pointed out to the Trustee several times, Fast Falcon is not registered to do business in California, has no registered

27  agent for service of process in California and has no offices, managers or officers in California.  Neither Mr. Salyer
nor Mr. Salyer are "managers" of Fast Falcon, and neither is authorized to accept service of process on its behalf.

28  Mr. Gloster is an attorney representing various Salyer Parties, but he does not represent Fast Falcon and, regardless,
is not authorized to accept service on its behalf.  *See* Woodruff Decl., Ex. 3.

1   proceeding and not in possession of any of the defendants, Movants filed a brief six-page

2   response the afternoon before the hearing. RJN, Ex. 13.

3           At the hearing on the TRO Motion, the Bankruptcy Court indicated it had not received,

4   nor read, Movants' opposition to the motion. Woodruff Decl. ¶ 8. The Bankruptcy Court also

5   indicated it was inclined to issue the TRO to preserve the status quo. *Id.* Despite Movants'

6   meritorious arguments that there was no risk of irreparable harm since Movants did not control

7   any of the Cedenco Assets and that the court lacked jurisdiction over those defendants the Trustee

8   had not yet served, the Bankruptcy Court issued the TRO against all defendants and set the OSC

9   hearing for September 15, 2011. RJN, Ex. 14.

10          Because of the Trustee's transparent motive in getting the TRO and preliminary injunction

11  *before* the inevitable stay of proceedings was issued, Movants requested that the Bankruptcy

12  Court move the hearing on the stay to September 15 to be decided before the preliminary

13  injunction. The Bankruptcy Court refused. Woodruff Decl. ¶ 9. The court indicated that if the

14  parties stipulated to continue the TRO until September 28, it would set the OSC hearing for

15  September 28 at the same time as the motion to stay. *Id.* Accordingly, Movants promptly

16  informed the Trustee's counsel that they were willing to stipulate to extend the TRO to September

17  28 as indicated by the Bankruptcy Court. The Trustee refused unless Fast Falcon also agreed,

18  which the Trustee knew was not possible since Fast Falcon has never been served with the

19  summons and complaint, and the undersigned does not represent it. Woodruff Decl., Ex. 4.

20  Therefore, Movants filed an *Ex Parte* Application to continue the OSC hearing until September

21  28, arguing that good cause exists under Federal Rule of Civil Procedure 65, incorporated into the

22  bankruptcy case by Federal Rule of Bankruptcy Procedure 7065, to extend the TRO against *all*

23  *defendants* and continue the hearing so that the motion to stay could be decided first. RJN, Ex.

24  15. The bankruptcy court denied the application. RJN, Ex. 16.

25          Because it is clear the Bankruptcy Court intends to issue a preliminary injunction in this

26  adversary proceeding *before* it stays the remaining proceedings, and because Movants cannot

27  adequately defend themselves against the preliminary injunction without testimony and evidence

28  from Scott Salyer, Movants respectfully request the Court to withdraw the reference to the

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING          - 13 -

27019\2749438.2

1    Bankruptcy Court of this adversary proceeding.  Concurrently with this Motion, Movants are

2    filing an emergency motion to stay proceedings in the Bankruptcy Court pending resolution of

3    this Motion by this Court.

4    **III.   ARGUMENT**

5         District courts, rather than bankruptcy courts, have original jurisdiction over all

6    bankruptcy matters. 28 U.S.C. § 1334(b); *In re First Alliance Mortgage Co.*, 282 B.R. 894, 901

7    (C.D. Cal. 2001).  District courts also have the power automatically to refer all bankruptcy

8    matters to the bankruptcy court (*id.*; U.S.C. § 157(a)[5]), as has the Eastern District of California.

9    *See* U.S. District Court for the Eastern District of California, General Order No. 223.

10        Under 28 U.S.C. section 157(d), however, a district court may withdraw the reference

11   made to a bankruptcy court:

12        The district court may withdraw, in whole or in part, any case or proceeding referred
13        under this section, on its own motion or on timely motion of any party, for cause shown.
          The district court shall, on timely motion of a party, so withdraw a proceeding if the court
14        determines that resolution of the proceeding requires consideration of both title 11 and
          other laws of the United States regulating organizations or activities affecting interstate
15        commerce.

16   28 U.S.C. § 157(d).  Section 157(d) provides for either the mandatory withdrawal of a matter

17   pending in bankruptcy court if such matter involves significant issues of non-bankruptcy federal

18   law, or permissive withdrawal of a bankruptcy matter for "cause shown." *Id.*

19        In determining whether cause exists to withdraw a reference under the permissive

20   component of 28 U.S.C. section 157(d), courts have typically focused first on whether the

21   proceeding is core or non-core, and thereafter on a number of factors, including whether there has

22   been a jury demand and judicial economy considerations.  *See, e.g., Security Farms v. Int'l Bhd.*

23   *Of Teamsters, et al.*, 124 F.3d 999, 1008 (9th Cir. 1997); *Green v. Fed. Deposit Ins.Corp.*, 451

24   B.R. 6, 10 (N.D. Cal. 2011).  In *Stern v. Marshall*, however, the United States Supreme Court

25   ruled that whether a proceeding is labeled a "core" matter in the bankruptcy law is not

26   determinative.  Rather, the Supreme Court held that, even if a proceeding is labeled by the

27

28   [5] "Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11
     or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING        - 14 -        27019\2749438.2

1    Bankruptcy Code as a "core" proceeding, a bankruptcy court cannot issue a final judgment in the

2    proceeding unless "the action at issue stems from the bankruptcy itself or would necessarily be

3    resolved in the claims allowance process." *Stern v. Marshall*, 131 S. Ct. at 2618.  For non-core

4    proceedings, and "any matter[s] which, from [their] nature, [are] the subject of a suit at the

5    common law, or in equity or in admiralty," bankruptcy courts only can make reports and

6    recommendations for the district courts to act on.  *Id.* at 2612.

7        Good cause exists to withdraw the reference of the Instant Action to the Bankruptcy Court

8    for three reasons:  (1) it cannot be finally decided by the Bankruptcy Court under *Stern v.*

9    *Marshall*, and judicial economy would be served by having this Court determine the proceeding

10   in the first instance; (2) Movants have a constitutional right to a jury trial on the Trustee's claims,

11   and they do not consent to have the case tried in the Bankruptcy Court; and (3) it would be a more

12   efficient use of judicial resources and cause less delay and expense to the parties to withdraw the

13   reference.

14       A.    **The Instant Action Is Not A "Core" Preceding That Can Be Finally**
              **Determined By The Bankruptcy Court Under *Stern v. Marshall.***
15

16       In 1984, Congress amended the bankruptcy code in response to the Supreme Court's

17   decision in *Northern Pipeline Constr. Co. v. Marathon Pipe Line co.*, 458 U.S. 50 (1982)

18   (holding the broad jurisdiction granted to the bankruptcy courts under the 1978 Bankruptcy Act

19   was an unconstitutional delegation of Article III authority).  In *Northern Pipeline*, the Supreme

20   Court held that a state law fraudulent transfer suit brought by a debtor against a company that had

21   not filed a claim against the estate involved a private dispute, rather than a "public right," and

22   therefore must be resolved by an Article III court.  458 U.S. at 69-72 (plurality opinion).

23   Subsequently, Congress amended the code to distinguish between "core" matters, *i.e.*, those

24   which a bankruptcy court may hear and adjudicate, and non-core proceedings, *i.e.*, those that must

25   be determined by an Article III judge.  *See* 28 U.S.C. §§ 157(b)(2),(3); 157(c).

26       Interpreting the new Bankruptcy Code, the Supreme Court in *Granfinanciera, S.A. v.*

27   *Nordberg*, 492 U.S. 33 (1989), considered whether Congress could displace a party's Seventh

28   Amendment right to jury trial by classifying fraudulent conveyance actions as core proceedings

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING                    - 15 -                    27019\2749438.2

1   that may be heard and decided by a bankruptcy court sitting without a jury. The Court answered

2   the question emphatically – no. 492 U.S. at 61. The Court first noted:

> There can be little doubt that fraudulent conveyance actions by bankruptcy trustees – suits
> which, we said in *Stendhal v. Irving Trust Co.*, 287 U.S. 92, 94-95 (1932) (citation
> omitted), "constitute no part of the proceedings in bankruptcy but concern controversies
> arising out of it" – are quintessentially suits at common law that more nearly resemble
> state-law contract claims brought by a bankrupt corporation to augment the bankruptcy
> estate than they do creditors' hierarchically ordered claims to a pro rata share of the
> bankruptcy res.

8   *Id.* at 56. Because fraudulent conveyance suits are more in the matter of a private suit than one

9   involving a public right, Congress could not constitutionally authorize a non-Article III court to

10   adjudicate it. *Id.* at 53 (if statutory cause of action is not a "public right," "Congress may not

11   assign its adjudication to a specialized non-Article III court lacking 'the essential attributes of the

12   judicial power'"). The Court concluded that the trustee's fraudulent transfer action was one in

13   law, rather than in equity, which entitled the parties to a trial by jury, and that "Congress

14   cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause

15   of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a

16   specialized court of equity." *Id.* at 60-61.

17       This summer, the Supreme Court took the holding of *Granfinanciera* one step further.

18   *Stern v. Marshall, supra*, involved a dispute between Anna Nicole Smith and Pierce Marshall

19   over the inheritance of Smith's deceased husband and Marshall's father. After her husband died

20   without leaving her half of his estate, Smith filed for bankruptcy. Marshall filed a complaint in

21   the bankruptcy contending that Smith had defamed him by telling the press that he had defrauded

22   his father to gain control over his assets. Marshall also filed a proof of claim in the bankruptcy,

23   based on the adversary complaint, and sought a declaration that his claim was not dischargeable

24   in bankruptcy. Smith filed a counterclaim for tortious interference with her ability to recover

25   from her late husband's estate. *Stern v. Marshall*, 131 S. Ct. at 2601.

26       The bankruptcy court ruled in favor of Smith on her counterclaim, which was defined as a

27   "core proceeding" under Section 157(b), and awarded her over \$425 million. Subsequently, the

28   probate court ruled in favor of Marshall. *Id.* The question was, therefore, one of preclusion as to

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING          - 16 -

27019\2749438.2

1   which judgment should be given effect.  The Supreme Court, in a 5-4 decision, held that the

2   bankruptcy court lacked the constitutional authority to issue a final judgment, notwithstanding

3   Congress' designation of counterclaims by the estate against creditors filing claims as core

4   proceedings.  *Id.* at 2608-15.  Rather, non-Article III judges may only enter final judgments in

5   core proceedings that stem "from the bankruptcy itself or would necessarily be resolved in the

6   claims allowance process."  *Id.* at 2618.  Because Smith's counterclaim involved state law

7   questions that only tangentially related to Marshall's defamation and nondischargeability

8   complaint, the Supreme Court held that the bankruptcy court could not render final judgment, and

9   instead was required to submit proposed findings and conclusions to the district court for *de novo*

10  review and entry of judgment.  *Id.*

11         Here, the Trustee's action against Movants is not a core proceeding stemming from the

12  bankruptcy itself.  The claims do not invoke a substantial right *created by* Title 11; they could

13  exist outside of bankruptcy.  *See Security Farms*, 124 F.2d at 1008.  Although it is captioned as a

14  claim for fraudulent transfers, a close examination of the complaint reveals that the Trustee is

15  actually seeking declaratory relief.  RJN, Ex. 4.  The Trustee contends the loan transfers and

16  equity transfers were not effective under applicable Australian law, but seeks a declaration that *if*

17  the transfers are found to be effective, *then* they were fraudulent.  *Id.*  The answer to the first

18  question depends entirely on the application of Australian law, or California corporate law.  It is,

19  therefore, a quintessentially private dispute "brought by a bankruptcy corporation to augment the

20  bankruptcy estate" rather than one that seeks "a pro rata share of the bankruptcy res."  *See*

21  *Granfinanciera*, 492 U.S. at 56.

22         Moreover, the fact that the complaint is captioned as a fraudulent transfer action does not

23  change its character into a claim that may adjudicated by a non-Article III court.  *Id.* at 56, 61

24  (holding that a fraudulent transfer action was a quintessential common law suit that must be

25  determined by an Article III court, despite the nomenclature assigned to it by Congress).  As the

26  Supreme Court has now repeatedly held, the fact that something is labeled a "core" matter in the

27  Bankruptcy Code is not determinative.  *Stern*, 131 S. Ct. at 2618.  The fraudulent transfer claims

28  are in no way dependent upon bankruptcy law for their resolution, and in fact can be resolved

MOTION FOR ORDER WITHDRAWING REFERENCE OF          - 17 -
BANKRUPTCY ADVERSARY PROCEEDING                                                    27019\2749438.2

1  entirely by reference to Australian and California law.  It therefore cannot constitutionally be

2  adjudicated by a bankruptcy court, and the reference should be withdrawn.

3      **B.     Movants Have A Constitutional Right To A Jury Trial, And Do Not Consent**
        **To Having The Instant Action Tried In The Bankruptcy Court.**

4

5      Where a party has a right to trial by jury, that trial may only be conducted in a bankruptcy

6  court "with the express consent of all the parties."  28 U.S.C. § 157(e); *Knupfer v. Lindblade (In*

7  *re Dyer)*, 322 F.3d 1178, 1194 (9th Cir. 2003) ("bankruptcy court is unable to preside over a jury

8  trial absent explicit consent from the parties and the district court.").  Although Movants have not

9  yet responded to the complaint,[6] their right to a jury trial is certain, and they will invoke that right.

10 *See Granfinanciera*, 492 U.S. at 47-49 (when an action is one for money damages, the action is

11 legal and the parties have a right to a jury trial).

12     Cause for withdrawal of the reference within the meaning of Section 157(d) exists where,

13 as here, a party has a right to a jury trial and does not consent to trial or entry of a final order of

14 the bankruptcy court.  *See In re Cinematronics, Inc.*, 916 F.2d 1444, 1451 (9th Cir. 1990).  Here,

15 Movants' right to jury trial weighs heavily in favor of immediate withdrawing the reference to

16 avoid duplication of efforts in both the bankruptcy court and this Court.  Leaving a case in the

17 Bankruptcy court until a case is ready for trial forces both the bankruptcy court and the district

18 court to "learn" the case and puts a double burden on Movants to prepare the case for two courts.

19 Because it is early in the adversary proceeding, withdrawal of the reference now will conserve

20 judicial resources.

21     **C.     Withdrawal Of The Reference Of The Instant Action Would Promote The**
        **Efficient Use Of Judicial Resources.**

22

23     Not only should the reference to the Instant Action be withdrawn on the basis of *Stern* and

24 *Granfinanciera*, but it also should be withdrawn to preserve judicial resources.  As described

25 above, there are twelve adversary proceedings pending against Movants and related parties.  Of

26 those, most – if not all – will be subject to withdrawal of the reference once the stays are lifted.

27

28 [6]  The Trustee has not effectively served process on the SSC&L 2007 Trust. *See, supra*, note 4.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF       - 18 -
BANKRUPTCY ADVERSARY PROCEEDING                                    27019\2749438.2

1  In particular, the Quiet Title Action, the Breach of Fiduciary Duty Action, the Unjust Enrichment

2  Action and the third-party claims against Mr. Salyer in the Frito-Lay Action all involve only non-

3  core, state law claims, and cannot be finally determined by the bankruptcy court.  As the Ninth

4  Circuit has said, "Inasmuch as a bankruptcy court's determinations on non-core matters are

5  subject to de novo review by the district court, unnecessary costs could be avoided by a single

6  proceeding in the district court."  *Security Farms*, 124 F.3d at 1008 (internal citations omitted).

7        Here, the Instant Action is in its infancy; neither the Bankruptcy Court nor this Court has

8  the advantage of being more familiar with the issues.  To the contrary, those few issues that have

9  been definitely resolved in the Bankruptcy Court in related proceedings, have all been appealed to

10  this Court and consolidated in front of the Honorable Lawrence K. Karlton.  Accordingly, the

11  Bankruptcy Court does not have any greater familiarity than this Court with the factual

12  background and legal issues underscoring the Instant Action.

13        Since the Bankruptcy Court can only issue findings and recommendation to this Court for

14  final resolution, judicial economy would be served by withdrawing the reference to the Instant

15  Action (and the Related Adversary Proceedings as well, when that issue is raised), so that there is

16  no duplication of efforts or risk of interfering with the administration of the bankruptcy estate.  In

17  such circumstances, "good cause" is more than amply shown to justify removal of the reference

18  of the Instant Action.

19

20

21

22

23

24

25

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING        - 19 -        27019\2749438.2

1

**IV.   CONCLUSION**

2      This Court reversed the Bankruptcy Court's orders and held that the various adversary

3  proceedings pending against Mr. Salyer and his related entities should be stayed. The intent and

4  spirit of this Court's orders applies equally to the present matter as well. For the reasons set forth

5  above, these moving defendants respectfully request that this Court withdraw the reference of this

6  bankruptcy adversary proceeding.

7

8  Dated: September 7, 2011                    FARELLA BRAUN + MARTEL LLP

9                                             By:  /s/ Kelly A. Woodruff
                                                  Kelly A. Woodruff
10

11                                            Attorneys for Defendants
                                              SKPM Corp., SSC&L 2007 Trust, Monterey
12                                            Peninsula Farms, LLC, Scott Salyer, in his
                                              capacity as Trustee of the SSC&L 2007 Trust
13                                            and the Scott Salyer Revocable Trust, and the
                                              Scott Salyer Revocable Trust

14

15

16                         This is to certify that this is a true and correct copy
                                              of the original 24 page(s) filed on 9/7/11
17                                            in the office of the Clerk, U.S. Bankruptcy Court.

18                                                   WAYNE BLACKWELDER
                                                      U.S. Bankruptcy Court
19
                                              By
20                                                      Deputy Clerk

21

22

23

24

25

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

MOTION FOR ORDER WITHDRAWING REFERENCE OF
BANKRUPTCY ADVERSARY PROCEEDING          - 20 -                    27019\2749438.2

FILED
September 07, 2011
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003752041

1  DEAN M. GLOSTER, State Bar No. 109313
2  MARK D. PETERSEN, State Bar No. 111956
   KELLY A. WOODRUFF, State Bar No. 160235
3  FARELLA BRAUN + MARTEL LLP
   235 Montgomery Street, 17th Floor
4  San Francisco, California 94104
   Telephone:   (415) 954-4400
5  Facsimile:    (415) 954-4480
   dgloster@fbm.com
6  mpetersen@fbm.com
   kwoodruff@fbm.com
7

**FILED**

SEP 0 8 2011

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
       DEPUTY CLERK

8  Attorneys for Defendants
   SKPM Corp., SSC&L 2007 Trust, Monterey
9  Peninsula Farms, LLC, Scott Salyer, in his capacity
   as Trustee of the SSC&L 2007 Trust and the Scott
10 Salyer Revocable Trust, and the Scott Salyer
   Revocable Trust

11              UNITED STATES BANKRUPTCY COURT

12              EASTERN DISTRICT OF CALIFORNIA

13                  SACRAMENTO DIVISION

14

15  In re:                              Case No. 09-29162

16  SK Foods, LP, ,                     Chapter 11

17              Debtor.

18  Bradley D. Sharp, et al.,           Adversary Proceeding No. 11-02337

19              Plaintiff

20          v.                          **DECLARATION OF KELLY A.**
                                        **WOODRUFF IN SUPPORT OF**
    SKPM Corp., et al.,
21                                      **DEFENDANTS' MOTION FOR ORDER**
                Defendants.             **WITHDRAWING REFERENCE OF**
22                                      **BANKRUPTCY ADVERSARY**
                                        **PROCEEDING**
23

24                                      *[Hearing Date and Time to be Provided Upon*
25                                      *Assignment of a District Court Judge and*
                                        *Establishment of a Hearing Date]*
26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DECLARATION OF KELLY A. WOODRUFF /
Adv. Case No. 11-02337                              27019\2750711.1

1    I, Kelly A. Woodruff, declare as follows:

2       1.    I am an attorney at law licensed to practice in the State of California and a member

3    of the law firm of Farella Braun & Martel LLP ("Farella"), counsel in this action for Scott Salyer,

4    as Trustee of the Scott Salyer Revocable Trust, the SSC&L 2007 Trust, SKPM Corp., Monterey

5    Peninsula Farms, LLC and the Scott Salyer Revocable Trust. Except as otherwise indicated, all

6    statements in this Declaration are based on my personal knowledge or my review of relevant

7    documents, and if called and sworn as a witness, I could and would competently testify to the

8    facts set forth herein.

9       2.    Farella has recently substituted as counsel of record in this action for Felderstein

10   Fitzgerald Willoughby & Pascuzzi LLP ("Felderstein").

11      3.    Attached as **Exhibit 1** is a true and correct copy of an email dated July 12, 2011

12   from Paul Pascuzzi of Felderstein to Gregory Nuti and Kevin Coleman, counsel for the Trustee,

13   and Mr. Coleman's July 13, 2011 response to Mr. Pascuzzi.

14      4.    Attached as **Exhibit 2** is a true and correct copy of an email dated August 19, 2011

15   from me to Kevin Coleman, and Mr. Coleman's August 22, 2011 response.

16      5.    Attached as **Exhibit 3** is a true and correct copy of a letter dated August 23, 2011

17   from my partner, Dean Gloster, to Gregori Nuti and Natalie Bush-Lents.

18      6.    Attached as **Exhibit 4** is a true and correct copy of an email dated September 1,

19   2011 from me to Kevin Coleman and Gregory Nuti, and Mr. Nuti's September 1, 2011 response.

20      7.    On August 31, 2011, at approximately 9:30 a.m., I received a call from

21   Mr. Coleman and Mr. Nuti advising me that the Trustee would be seeking a temporary restraining

22   order ("TRO") and order to show cause re preliminary injunction the next morning at 10:00 a.m.

23   Shortly thereafter, I received a copy of the Trustee's motion, along with approximately 2,000

24   pages of declarations and exhibits. Therefore, I prepared a brief response to the Trustee's motion

25   for a TRO on behalf of Movants and filed it with the bankruptcy court at approximately 4:00 p.m.

26   the same day.

27      8.    At the hearing on the Trustee's motion for a TRO on September 1, 2011, the

28   bankruptcy court advised the parties that it had neither received nor reviewed the opposition the

DECLARATION OF KELLY A. WOODRUFF /     - 2 -                          27019\2750711.1
Adv. Case No. 11-02337

1    Movants had filed.  Despite not having received Movants' opposition papers, the bankruptcy

2    court indicated it was inclined to grant the TRO to "preserve the status quo".

3         9.     In light of the bankruptcy court's inclination to issue the TRO, and because

4    Movants had previously moved to stay all proceedings in this adversary proceeding, Movants

5    requested that the bankruptcy court move the hearing on Movants' motion to stay the adversary

6    proceeding to September 15, 2011 to be decided before the preliminary injunction.  The

7    bankruptcy court refused.  However, the he court indicated that if the parties stipulated to

8    continue the TRO until September 28, it would set the order to show cause hearing for September

9    28 at the same time as the motion to stay.

10        I declare under penalty of perjury under the laws of the State of California that the

11   foregoing is true and correct.

12

13   DATED:  September 7, 2011

14

15                                    /s/ Kelly A. Woodruff
                                      Kelly A. Woodruff

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF KELLY A. WOODRUFF /
Adv. Case No. 11-02337                      - 3 -                              27019\2750711.1

# WOODRUFF DECLARATION

# EXHIBIT 1

**From:** Coleman, Kevin [mailto:KColeman@Schnader.com]
**Sent:** Wednesday, July 13, 2011 3:58 PM
**To:** Paul Pascuzzi; Nuti, Gregory
**Cc:** "Jim Keowen' (jimkeowen@nmlawfirm.com)'; 'Malcolm Segal (MSegal@segalandkirby.com)'; 'Durrer II, Van C (Van.Durrer@skadden.com)'
**Subject:** RE: Further stay of SKPM matter

Paul,

We would consent to a further stay identical to those issued in the other cases, subject to three conditions:

1. Our entry into the stipulated stay does not prejudice our appeal rights;
2. All defendants, including Fast Falcon, consent to entry of a preliminary injunction protecting the Cedenco equity and intercompany debt against any disposition/dissipation pending resolution of this avoidance action. That is, assuming John Sheahan and/or courts in Australia were to determine that the alleged transfer to SKPM Corp. and the Scott Salyer Revocable Trust occurred, nothing would happen to the funds Sheahan is holding until the Bankruptcy Court can resolve the avoidance claim; and
3. If Fast Falcon intends to contest jurisdiction, the stay would not apply to any proceedings on that question, including any discovery that may need to be undertaken on the issue of jurisdiction.

Let me know if you are prepared to proceed on this basis. Obviously, we would need to formalize these terms, and we reserve all of our rights with respect thereto.

Also, turning to the BMO compromise, we interpret LKK's July 11 order to require Judge Bardwil to consider the Brinkco direct testimony contained in his declaration, subject to our right to cross-examine him. And after considering the Brincko testimony, the Court can amend its findings/ruling. Can you let me know what dates Mr. Brinkco would make himself available for a deposition, and what dates we might propose to the Court for a hearing at which we can cross-examine him?

--Kevin

**From:** Paul Pascuzzi [mailto:PPascuzzi@ffwplaw.com]
**Sent:** Tuesday, July 12, 2011 11:37 AM
**To:** Nuti, Gregory; Coleman, Kevin
**Cc:** 'Jim Keowen' (jimkeowen@nmlawfirm.com); Malcolm Segal (MSegal@segalandkirby.com); Durrer II, Van C (Van.Durrer@skadden.com)
**Subject:** Further stay of SKPM matter

Greg and Kevin,

1

In anticipation of July 31 coming soon and the status conferences later this week, we wanted to know if you are willing to extend the stay of this matter further. Given Judge Bardwil's decision on these stay matters, we believe a further motion would be successful. Please let us know at your earliest convenience.

Best regards,

Paul J. Pascuzzi
Felderstein Fitzgerald Willoughby & Pascuzzi LLP
400 Capitol Mall, Suite 1450, Sacramento, CA 95814
Phone: (916) 329-7400 ext. 222, Fax: (916) 329-7435
webpage: ffwplaw.com
Notice to recipient: This E-mail is meant for only the intended recipient of the transmission and may be a communication privileged by law. If you receive this E-mail in error, any review, use, dissemination, distribution, or copying of this E-mail or any of the attachments is strictly prohibited. Please notify us immediately of the error by return E-mail and please delete the message from your system. Thank you in advance for your cooperation.

IRS Circular 230 Disclosure. To ensure compliance with any requirements imposed by the IRS, we inform you that the federal tax advice (if any) contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# WOODRUFF DECLARATION

# EXHIBIT 2

**From:** Coleman, Kevin [mailto:KColeman@Schnader.com]
**Sent:** Monday, August 22, 2011 12:40 PM
**To:** Woodruff, Kelly (30) x4403
**Cc:** Gloster, Dean (19) x4472; Petersen, Mark (22) x4406; Nuti, Gregory
**Subject:** RE: Sharp v. SKPM, USBC Adv. Proc. No. 11-02337

Kelly,

Moving for a stay and a stay are two different things. However, my client is willing to extend the time for a response until September 12, which is 3 weeks from today.

--Kevin

**From:** KWoodruff@fbm.com [mailto:KWoodruff@fbm.com]
**Sent:** Friday, August 19, 2011 4:56 PM
**To:** Coleman, Kevin
**Cc:** DGloster@fbm.com; MPetersen@fbm.com; Nuti, Gregory
**Subject:** Sharp v. SKPM, USBC Adv. Proc. No. 11-02337

Kevin,

You mentioned today that the Trustee's view is that the time to respond to the complaint in the above adversary proceeding has expired now that the stipulated stay of proceedings has expired. We had understood that the stipulation allowed the defendants to file a renewed motion to stay by August 15, which would be considered timely, and that if they did, it would continue to toll the time to respond.

In any event, would the Trustee be willing to extend the time to respond to the complaint until after the hearing on the renewed motion to stay? We set it for the first available date, September 28.

Thanks for your courtesy,
Kelly


**Kelly A. Woodruff**
Litigation Partner

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor, San Francisco, CA 94104
**D** 415.954.4403   **O** 415.954.4400   **F** 415.954.4480

1

kwoodruff@fbm.com | www.fbm.com
Please consider the environment before printing this email.

IRS Circular 230 Disclosure. To ensure compliance with any requirements imposed by the IRS, we inform you that the federal tax advice (if any) contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# WOODRUFF DECLARATION

# EXHIBIT 3

# FARELLA BRAUN + MARTEL LLP

**Attorneys At Law**

Russ Building / 235 Montgomery Street
San Francisco / CA 94104

T 415.954.4400 / F 415.954.4480
www.fbm.com

DEAN M. GLOSTER
dgloster@fbm.com
D 415.954.4472

August 23, 2011

*Via email and mail*
Mr. Gregory C. Nuti
Ms. Natalie Bush-Lents
Schander Harrison Segal & Lewis LLP
One Montgomery Street, Suite 2200
San Francisco, CA 94104

Re:   *Sharp v. SKPM Corp. Inc., et al.*, USBC Adv. Proc. No. 11-02337

Dear Mr. Nuti and Ms. Bush-Lents:

As you know, our firm represents certain of the defendants in the above-captioned matter. Today we received an ECF notification that your firm filed a Certificate of Service, purporting to have completed service on defendant Fast Falcon, Inc. by sending me, by first class mail and certified mail, a copy of the summons and complaint.

Farella Braun + Martel LLP is not authorized to accept service on behalf of Fast Falcon, LLC, which is a foreign entity not authorized to do business in California. Accordingly, your attempted service of process on Fast Falcon, Inc. by serving me is ineffective.

Federal Rule of Bankruptcy Procedure ("FRBP") 7004(b)(3) provides for service of process on domestic or foreign corporations and partnerships by mailing a copy of the summons and complaint within the United States to an "officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process." Further, FRBP 7004(a) incorporates Federal Rule of Civil Procedure ("FRCP") 4(f) and (h). FRCP 4(h) allows service on a corporation outside of the United States in any manner prescribed by FRCP 4(f) other than personal delivery, and FRCP 4(f) provides the method for serving a defendant in a foreign country. Again, I am not authorized to accept service.

Because your Certificate of Service does not indicate you complied with either FRBP 7004(b)(3) or FRCP 4(f), service of process on Fast Falcon, Inc. has not yet been effectuated.

Sincerely yours,

Dean M. Gloster

DMG:mb
27019\2722192.1

WOODRUFF DECLARATION

# EXHIBIT 4

**From:** Nuti, Gregory [mailto:GNuti@Schnader.com]
**Sent:** Thursday, September 01, 2011 4:27 PM
**To:** Woodruff, Kelly (30) x4403
**Cc:** Gloster, Dean (19) x4472; Petersen, Mark (22) x4406; Coleman, Kevin; 'Bradley Sharp'
**Subject:** RE: Sharp v. SKPM Corp.: TRO/Preliminary Injunction

Kelly:

     We have no objection to your proposal on the condition that Fast Falcon also stipulates to extending the TRO beyond the initial 14 day period. Without Fast Falcon's consent we run the risk that it will later argue no good cause existed to extend the TRO and the TRO lapsed after 14 days. I believe the Court had this concern when it declined your same suggestion during the hearing. It is not our intention to ruin peoples' long weekend, but the Trustee simply cannot take this risk.

Gregory C. Nuti
Schnader
  ATTORNEYS AT LAW
Schnader Harrison Segal & Lewis LLP
One Montgomery Street, Suite 2200
San Francisco, California 94104-5501
Telephone: (415) 364-6700
Facsimile: (415) 364-6785
**gnuti@schnader.com**
www.schnader.com

**From:** KWoodruff@fbm.com [mailto:KWoodruff@fbm.com]
**Sent:** Thursday, September 01, 2011 12:54 PM
**To:** Coleman, Kevin; Nuti, Gregory
**Cc:** DGloster@fbm.com; MPetersen@fbm.com
**Subject:** Sharp v. SKPM Corp.: TRO/Preliminary Injunction

Kevin and Greg,

As the Court suggested in the hearing today, defendants Scott Salyer, as trustee of the Scott Salyer Revocable Trust, SSC&L 2007 Trust, SKPM Corp. and Monterey Peninsula Farms, LLC will stipulate to extend the TRO in place until September 28, in order to have the hearing set at the same time as the hearing on the motion to stay.  We would correspondingly request that the deadlines for briefing be put back, so that our opposition is not due until September 14, and your reply is not due until September 21, so that we are not jammed over Labor Day weekend, and you have more than 2 days to reply.  To the extent the Court believes the TRO applies to Fast Falcon or Henry Heath, it can extend the TRO as to them on its own for good cause, which we understand would be necessary for you to stipulate.

Please let me know.  Thank you.

**Kelly A. Woodruff**
Litigation Partner

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor, San Francisco, CA 94104
**D** 415.954.4403  **O** 415.954.4400  **F** 415.954.4480
kwoodruff@fbm.com  |  www.fbm.com
Please consider the environment before printing this email.

IRS Circular 230 Disclosure. To ensure compliance with any requirements imposed by the IRS, we inform you that the federal tax advice (if any) contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.



This is to certify that this is a true and correct copy of the original __14__ page(s) filed on __9/7/11__ in the office of the Clerk, U.S. Bankruptcy Court.

WAYNE BLACKWELDER
U.S. Bankruptcy Court

By _____
Deputy Clerk

2

FILED
September 07, 2011
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003752035

1  DEAN M. GLOSTER, State Bar No. 109313
2  MARK D. PETERSEN, State Bar No. 111956
   KELLY A. WOODRUFF, State Bar No. 160235
3  FARELLA BRAUN + MARTEL LLP
   235 Montgomery Street, 17th Floor
4  San Francisco, California 94104
   Telephone:    (415) 954-4400
5  Facsimile:    (415) 954-4480
   dgloster@fbm.com
6  mpetersen@fbm.com
   kwoodruff@fbm.com
7

8  Attorneys for Defendants
   SKPM Corp., SSC&L 2007 Trust, Monterey
9  Peninsula Farms, LLC, Scott Salyer, in his capacity
   as Trustee of the Scott Salyer Revocable Trust, and
10  the Scott Salyer Revocable Trust

**FILED**

SEP 0 8 2011

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
         DEPUTY CLERK

11              UNITED STATES BANKRUPTCY COURT

12              EASTERN DISTRICT OF CALIFORNIA

13                   SACRAMENTO DIVISION

14

15  | In re:                           | Case No. 09-29162 |
16  |                                  | Chapter 11 |
    | SK Foods, LP, a California limited |    |
17  | partnership, *et al.*,            |    |
18  |          Debtors.                 |    |

19  | Bradley D. Sharp, Chapter 11 Trustee, | Adversary Proceeding No. 11-02337 |
20  |          Plaintiff                     | **REQUEST FOR JUDICIAL NOTICE IN** |
    |              v.                        | **SUPPORT OF DEFENDANTS' MOTION** |
21  | SKPM Corp., *et al.*,                  | **FOR ORDER WITHDRAWING** |
    |                                        | **REFERENCE OF BANKRUPTCY** |
22  |          Defendants.                   | **ADVERSARY PROCEEDING** |
23

24              *[Hearing Date and Time to be Provided Upon*
                *Assignment of a District Court Judge and*
25              *Establishment of a Hearing Date].*

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

REQUEST FOR JUDICIAL NOTICE I/S/O MOTION FOR
ORDER WITHDRAWING REFERENCE - AP 11-02337

27019\2750728.1

1    Defendants SKPM Corp., SSC&L 2007 Trust, Monterey Peninsula Farms, LLC, Scott

2    Salyer, in his capacity as Trustee of the Scott Salyer Revocable Trust, and the Scott Salyer

3    Revocable Trust, hereby request the Court to take judicial notice of the following documents in

4    support of their Motion For Order Withdrawing Reference Of Bankruptcy Adversary

5    Proceeding motion for stay of the above-captioned adversary proceeding pending before this

6    Court. The attached documents are court orders in related actions, which this Court can

7    properly take judicial notice of. *U.S. ex rel Robinson Rancheria Citizens Council v. Borneo,*

8    *Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (*citing St. Louis Baptist Temple, Inc. v. FDIC,* 605 F.2d

9    1169 (10th Cir. 1979)) ("[W]e 'may take notice of proceedings in other courts, both within and

10    without the federal judicial system, if those proceedings have a direct relation to matters at

11    issue.'").

12    True and correct copies of the following documents are attached hereto:

| Exhibit | Description |
|---------|-------------|
| 1. | December 10, 2010 District Court Stay Order, *Sharp v. SSC Farms 1, LLC, et al.*, Case No. 10-1492 LKK |
| 2. | April 14, 2011 District Court Remand Order, *Sharp v. SSC Farms 1, LLC, et al.*, Case No. 10-1492 LKK |
| 3. | July 11, 2011 District Court Order reversing BMO settlement, *In re SK Foods, L.P.*, Case No. 10-3467 LKK |
| 4. | Complaint in *Sharp vs. SK PM Corp, et al.*, Adv. P. No. 11-02337 (the "Instant Action") |
| 5. | Complaint in *Sharp v. Salyer, et al.*, Adv. P. No. 11-02014 (the "Substantive Consolidation Action") |
| 6 | Complaint in *Sharp v. Salyer, et al.*, Adv. P. No. 11-02015 (the "Breach of Fiduciary Action") |
| 7. | Joint Omnibus Petition for Certification of the Order Staying Proceedings for Direct Appeal to the US Court of Appeals for the Ninth Circuit |
| 8. | Opposition to Joint Omnibus Certification for Certification of the Order Staying Proceedings for Direct Appeal to the US Court of Appeals for the Ninth Circuit. |

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

REQUEST FOR JUDICIAL NOTICE I/S/O MOTION FOR
ORDER WITHDRAWING REFERENCE - AP 11-02337
- 2 -
27019\2750728.1

| Exhibit | Description |
|---------|-------------|
| 9. | Stipulation and Order Staying Proceeding, *Sharp v. SKPM Corp.*, Adv. P. No. 11-02337, dated June 3, 2011 |
| 10. | Ex Parte Application to Shorten Time for Hearing on Motion to Stay Adversary Proceeding, *Sharp v. SKPM Corp.*, Adv. P. No. 11-02337, dated August 22, 2011 |
| 11. | Bankruptcy Court Order Denying Application to Shorten Time on Motion to Stay, *Sharp v. SKPM Corp.*, Adv. P. No. 11-02337, dated August 23, 2011 |
| 12. | Memorandum of Points and Authorities in Support of Motion for a Temporary Restraining Order and Order to Show Cause re Preliminary Injunction, *Sharp v. SKPM Corp.*, Adv. P. No. 11-02337, dated August 31, 2011 |
| 13. | Movants' Opposition to Trustee's *Ex Parte* Motion for a Temporary Restraining Order and Order to Show Cause re Preliminary Injunction, *Sharp v. SKPM Corp.*, Adv. P. No. 11-02337, dated August 31, 2011 |
| 14. | Temporary Restraining Order and Order to Show Cause re Preliminary Injunction, *Sharp v. SKPM Corp.*, Adv. P. No. 11-02337, dated September 1, 2011 |
| 15. | Movants' *Ex Parte* Application to Continue Hearing on Order to Show Cause re Preliminary Injunction, dated September 1, 2011 |
| 16. | Order Denying *Ex Parte* Application to Continue Hearing on Order to Show Cause re Preliminary Injunction, dated September 2, 2011 |

Dated: September 7, 2011                      FARELLA BRAUN + MARTEL LLP


                                             By: /s/ Kelly A. Woodruff
                                                  Kelly A. Woodruff

                                             Attorneys for Defendants
                                             SKPM Corp., SSC&L 2007 Trust, Monterey
                                             Peninsula Farms, LLC, Scott Salyer, in his
                                             capacity as Trustee of the Scott Salyer
                                             Revocable Trust, and the Scott Salyer
                                             Revocable Trust

This is to certify that this is a true and correct copy of the original ___ page(s) filed on 9/7/11 in the office of the Clerk, U.S. Bankruptcy Court

WAYNE BLACKWELDER
U.S. Bankruptcy Court

By _____
   Deputy Clerk

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

REQUEST FOR JUDICIAL NOTICE I/S/o MOTION FOR
ORDER WITHDRAWING REFERENCE - AP 11-02337          - 3 -                    27019\2750728.1

FILED
September 07, 2011
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0003752036

# FILED

SEP 0 8 2011

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

2:11-cv-2369 JAM EFB (PS)

# RJN
# EXHIBIT 1



This is to certify that this is  a true and correct copy
of the original __7/2__ page(s) filed on __9/7/11__
in the office of the Clerk, U.S. Bankruptcy Court.

WAYNE BLACKWELDER
U.S. Bankruptcy Court

By _____
Deputy Clerk

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    EASTERN DISTRICT OF CALIFORNIA

8  IN RE:

9  SK FOODS, L.P.

10          Debtor.

11 BRADLEY SHARP,                          CIV. NO. S-10-1492 LKK

12          Plaintiff,

13              v.

14 SSC FARMS 1, LLC, et al.,

15          Defendants.
                                        /
16 IN RE:

17 SK FOODS, L.P.                          CIV. NO. S-10-1493 LKK

18          Debtor.
                                        /
19 IN RE:

20 SK FOODS, L.P.

21          Debtor.

22 BRADLEY SHARP,                          CIV. NO. S-10-1496 LKK

23          Plaintiff,

24              v.

25 CSSS, L.P., et al.,

26          Defendants.
                                        /

1   IN RE:

2   SK FOODS, L.P.

3           Debtor.

4   BRADLEY SHARP,                              CIV. NO. S-10-1497 LKK

5           Plaintiff,

6               v.

7   FRED SALYER IRREVOCABLE
    TRUST, et al.,
8
            Defendants.
9   _____/

10  IN RE:

11  SK FOODS, L.P.

12          Debtor.

13  BRADLEY SHARP,                              CIV. NO. S-10-1498 LKK

14          Plaintiff,

15              v.

16  SKF AVIATION, LLC., et al.,

17          Defendants.
    _____/
18
    IN RE:
19
    SK FOODS, L.P.
20
            Debtor.
21
    BRADLEY SHARP,                              CIV. NO. S-10-1499 LKK
22
            Plaintiff,
23
                v.
24
    SCOTT SALYER, et al.,
25
            Defendants.
26  _____/

                              2

1  IN RE:

2  SK FOODS, L.P.

3        Debtor.

4  BRADLEY SHARP,              CIV. NO. S-10-1500 LKK

5        Plaintiff,

6           v.

                        O R D E R

7  SCOTT SALYER, et al.,

8        Defendants.

9  _____/

10      Before the court are several appeals of an order of the

11  Bankruptcy Court denying Appellants' motion for a stay of

12  proceedings pending resolution of a related criminal matter also

13  before this court, U.S.A. v. Salyer, No. 2:10-cr-00061-LKK. The

14  Appellee moves to dismiss the appeal on jurisdictional grounds and

15  opposes the appeal on the merits. For the reasons described below,

16  the order of the Bankruptcy Court is reversed.

17                  **I. BACKGROUND**

18    **A.    The Criminal Proceeding**

19      On January 5, 2010, the government filed a sealed complaint

20  against Frederick Scott Salyer ("Salyer"). An arrest warrant was

21  issued by a magistrate judge later that day. On February 4,

22  2010, Federal Bureau of Investigations ("FBI") officers arrested

23  Salyer. On February 18, 2010, the U.S.A. filed an indictment.

24      On April 29, 2010, the government filed a superseding

25  indictment. It brings twelve counts and two forfeiture

26  allegations against Salyer. These include two counts under 18

3

1   U.S.C § 1962(c) for conducting and conspiring to conduct the

2   affairs of an enterprise though a pattern on racketeering

3   activity, three counts under 18 U.S.C. § 1343 for wire fraud,

4   one count under 18 U.S.C. § 1519 for destruction, alteration, or

5   falsification of records in a federal investigation, and five

6   counts under 15 U.S.C. § 1 for conspiracy in restraint of

7   trade.[1]

8       With respect to the first count of racketeering, the

9   government alleges that Salyer was the primary leader of SK

10  Foods. Superceding Indictment 3. It claims that Salyer was part

11  of an enterprise that, *inter alia*, "increas[ed] SK Foods'

12  profits by fraudulently inducing certain of SK Foods' customers

13  to pay for adulterated and misbranded processed tomato products

14  by causing the falsification of . . . grading factors and data

15  contained on the quality control documents that accompanied

16  customer-bound shipments of processed tomato products that were

17  produced, purchased, and sold by SK Foods . . . ." Id. at 10.

18  The U.S.A. alleges that Salyer engaged in these activities from,

19  approximately, January 1998 through April 2008. Id. at 13. The

20  government further alleges numerous acts that it claims

21  constitute a pattern of racketeering activity. These include

22  several claims of wire and mail fraud relating to the sale of

23  tomato products to various entities, including creditors in the

24

25      [1] As is almost self evident the court has found the case
    complex within the meaning of the Speedy Trial Act, which results
26  in the case not subject to the time strictures of the act.

4

1  instant bankruptcy proceedings, and claims of bribery.

2      In the second count of racketeering, the government claims

3  that Salyer conspired with persons employed by and associated

4  with SK Foods to conduct the acts described above during the

5  same time period. Id. at 39-40.

6      The three counts of wire fraud include communications to

7  purchasers of SK Foods' tomato product. Id. at 40-49. Each

8  concerns allegations of bribery of certain employees of the

9  purchasing companies. These companies include creditors in the

10  instant bankruptcy proceedings.

11      With respect to the count of destruction, alteration, or

12  falsification of records in a federal investigation, the

13  government alleges that Salyer altered and falsified, or caused

14  others to alter and falsify, the minutes of a December 14, 2007

15  Board of Directors meeting for the SK Foods Entities. Id. at 51.

16  It claims that he caused the removal of references to Randy

17  Rahal as a Director and Officer of SK Foods several months after

18  Rahal pled guilty to a three count information in this court.

19  Id. at 50. The factual basis for Rahal's plea indicated that he

20  served on the SK Foods Board of Directors from 2004 to 2008 and

21  routinely paid bribes on behalf of SK Foods. Id. at 50-51.

22      The five counts of price fixing concern alleged

23  conspiratorial activity to fix the price of SK Foods tomato

24  products for several companies, including creditors in the

25  instant bankruptcy proceedings. Id. at 52-61.

26      The two forfeiture allegations seek recovery of all real

1   and personal property that constitute or is derived from the
2   proceeds traceable to the racketeering and wire fraud counts,
3   which would apparently include property and proceeds otherwise
4   subject to the bankruptcy proceeding.

5       **B.   The Bankruptcy Proceedings**

6       On appeal is an order of the Bankruptcy Court denying
7   Appellants' motion to stay proceedings in seven adversarial
8   actions. These include (1) an action to substantively
9   consolidate various non-debtor SK Foods entities with the SK
10  Foods estate, No. 10-02014; (2) an action to avoid a fraudulent
11  transfer of a drum line to CSSS, an Appellant entity, pursuant
12  to a written contract, No. 09-02543; (3) an action seeking title
13  to three parcels of real property on the grounds that SK Foods
14  provided funds for the purchase of the property and was not
15  repaid, No. 09-02692; (4) a claim of breach of fiduciary duty
16  against Salyer premised on the allegations in the previous three
17  actions, No. 10-02015; (5) an action to avoid allegedly
18  preferential and fraudulent transfers, No. 10-02016; (6) an
19  action to recover money that was allegedly loaned by SK Foods to
20  Salyer to pay for a life insurance policy, No 10-02017; and (7)
21  an action for substantive consolidation of the SK Foods and the
22  RHM Estates, No. 09-29162. The RHM Estates are not parties to
23  this appeal.

24      **C.   Procedural Posture**

25      On April 28, 2010, Salyer, the Scott Salyer Revocable
26  Trust, SK PM Corp., SKF Canning, LLC, Blackstone Ranch

6

1 | Corporation, Monterey Peninsula Farms, LLC, Salyer Management
2 | Company, LLC, SK Farms Services, LLC, SK Frozen Foods, LLC, SS
3 | Farms, LLC, SSC Farms I, LLC, SSC Farms II, LLC, SSC Farms III,
4 | LLC, SKF Aviation, LLC, CSSS, LP, Fred Salyer Irrevocable Trust,
5 | and Gerard Rose as Trustee of Fred Salyer Irrevocable Trust
6 | ("Appellants") filed a motion to stay the seven adversary
7 | proceedings discussed above pending resolution of the criminal
8 | proceedings against Salyer. They argued that a stay should be
9 | issued, *inter alia*, to protect Salyer's Fifth Amendment rights
10 | and the due process rights of the other Appellants who, they
11 | contend, require Salyer's testimony to mount a defense to the
12 | adversary proceedings. On May 4, 2010, Appellants filed in the
13 | bankruptcy proceedings a request for judicial notice of the
14 | Superceding Indictment of Salyer, which was filed on April 29,
15 | 2010. They did not attempt to amend or revise their motion in
16 | light of the Superceding Indictment.

17 | On May 12, 2010, the Official Committee of Unsecured
18 | Creditors filed an opposition to Appellants' motion to stay.[2]
19 | Also on May 12, 2010, Bradley Sharp, the Bankruptcy Trustee
20 | ("Appellee" or "Trustee") filed a response to the motion to
21 | stay. The Trustee argued, *inter alia*, that the indictment and
22 | the adversary proceedings are not based on the same matter or
23 | same or closely related facts, that prosecution of the adversary
24 | proceedings will not impair Salyer's Fifth Amendment rights, and
25 |

26 | [2] Only the Trustee has opposed the instant appeal.

7

1  that a stay is otherwise not appropriate.

2      On June 1, 2010, the Bankruptcy Court denied Appellants'
3  motion for a stay. It decided, *inter alia*, that, with one minor
4  exception, the factual allegations in the adversary proceedings
5  bear no significant relationship to the allegations in the
6  indictment. The court continued to balance the so-called Keating
7  factors, from which it determined that a stay of proceedings was
8  not proper. See *infra* Section III.B.1 (discussion of Keating
9  factors). This order was issued in all of the seven adversarial
10 proceedings discussed above.

11     On June 16, 2010, Appellants filed notices of appeal of
12 this order in each of the seven proceedings. On June 17, 2010,
13 Salyer filed in the criminal action an Emergency Application to
14 Enjoin and Stay Discovery of the bankruptcy proceedings. On June
15 18, 2010, the court temporarily stayed discovery in the
16 bankruptcy proceedings in light of the June 17, 2010 motion. On
17 August 3, 2010, the court held a hearing on the emergency
18 application. As a result of the hearing, the court continued the
19 stay until resolution of the instant appeals.

20     On August 4, 2010, Appellants filed an opening brief. They
21 argue that, *inter alia*, the criminal indictment and the
22 adversary proceedings overlap, that the denial of the stay
23 offends the due process rights of the non-debtor entities, and
24 that the Bankruptcy Court did not properly apply the Keating
25 factors. On August 19, 2010, the Trustee filed a brief in
26 opposition. He contended that the Appellants failed to show that

1  the Bankruptcy Court abused its discretion in denying the stay
2  of proceedings. Appellants filed a reply on August 3, 2010.

3     The Trustee also filed two motions relating to the appeals.
4  First, on August 16, 2010, the Trustee filed a motion to dismiss
5  the appeals on the grounds that the court lacks jurisdiction to
6  hear them. Second, the Trustee filed a motion to strike a
7  declaration filed in support of Appellants' brief on the ground
8  that the evidence was not presented to the Bankruptcy Court. The
9  court heard oral argument on the appeals and motions on October
10 12, 2010.

11                        **II. STANDARD**

12     The standard of review of bankruptcy court decisions by
13 district courts is well-established, and uncontested in the
14 instant action. <u>See</u> Appellants' Opening Brief re: Stay at 4;
15 Appellants' Opening Brief re: Preliminary Injunction at 2;
16 Appellee's Opening Brief re: Stay at 2-3. When reviewing
17 decisions of a bankruptcy court, district courts apply standards
18 of review applicable to the courts of appeals when reviewing
19 district court decisions. <u>In re Baroff</u>, 105 F.3d 439, 441 (9th
20 Cir. 1997); <u>see also In re Fields</u>, No. CIV. S-09-2930 FCD, 2010
21 WL 3341813, *2 (E.D. Cal. 2010) ("A district court's standard of
22 review over a bankruptcy court's decision is identical to the
23 standard used by circuit courts reviewing district court
24 decisions.") (citation omitted).

25     The bankruptcy court's conclusions of law are reviewed <i>de</i>
26 <i>novo</i>. <u>In re Sunnymead Shopping Center Co.</u>, 178 B.R. 809, 814

                              9

1  (9th Cir. 1995) (citing In re Pecan Groves of Arizona, 951 F.2d
2  242, 244 (9th Cir. 1991)). District courts review the bankruptcy
3  court's findings of fact for clear error. In re Sunnymead
4  Shopping Center Co., 178 B.R. at 814 (citing In re Siriani, 967
5  F.2d 302, 303-04 (9th Cir. 1992)); see also Fed. R. Bank. P.
6  8013 ("Findings of fact, whether based on oral or documentary
7  evidence, shall not be set aside unless clearly erroneous . . .
8  .")

9       District courts review a "bankruptcy court's choice of
10  remedies . . . for an abuse of discretion, since it has broad
11  equitable remedial powers." In re Sunnymead Shopping Center Co.,
12  178 B.R. at 814 (citing In re Goldberg, 168 B.R. 382, 284 (9th
13  Cir. 1994) (other citations omitted.). The Ninth Circuit has
14  held that, "Under this standard, 'a reviewing court cannot
15  reverse unless it has a definite and firm conviction that the
16  court below committed a clear error of judgment in the
17  conclusion it reached upon a weighing of the relevant factors."
18  In re Sunnymead Shopping Center Co., 178 B.R. at 814 (quoting In
19  re Goldberg, 168 B.R. at 384). With respect to review of a
20  denial of a motion to stay, district courts review a bankruptcy
21  court's "ruling on a party's request to stay proceedings for an
22  abuse of discretion." Fed. Sav. & Loan Ins. Corp. v. Molinaro,
23  889 F.2d 899, 902 (9th Cir. 1989) (citing Mediterranean
24  Enterprises, Inc. v. Ssangyong Corp., 708 F.2d 1458, 1465 (9th
25  ////
26  ////

1  Cir. 1983)).[3]

2                          **III. ANALYSIS**

3        **A.   Motion to Dismiss**

4        The Trustee moves to dismiss the instant appeal on the

5  grounds that this court lacks jurisdiction to hear it.[4]

6  Specifically, the Trustee contends that the order denying the

7  stay is not a final order and is not appropriate for

8  interlocutory review. Appellants argue that this court has

9  jurisdiction because this order is final under the irreparable

10 injury doctrine and the pragmatic approach to assessing finality

11 in bankruptcy proceedings. They further argue that the appeal is

12 properly subject to interlocutory review.

13       Under 28 U.S.C. § 158(a), "district courts . . . have

14 jurisdiction to hear appeals . . . with leave of the court, from

15 interlocutory orders and decrees, of bankruptcy judges entered

16 in cases and proceedings referred to the bankruptcy judges under

17

18  _____

19       [3] It appears to this court quite odd that district courts
    review decisions of bankruptcy courts in this manner given that
20  bankruptcy courts are a subsidiary division of district courts. It
    may be that the restricted standards of review are merely a way of
21  protecting both courts from unnecessary repetition of frivolous
    contentions, and that in more serious matters district courts
22  should not apply such a deferential review. Nonetheless, this court
    does not consider whether district courts may depart from this
23  standard of review in unusual circumstances because all parties
    agree as to the applicable standard and there appears to be no
24  support for that position, in any event.

25       [4] The Trustee has also moved to strike a declaration filed in
    support of the appeal. The court will consider this motion along
26  with its discussion of the merits of the appeal itself.

                              11

1   section 157 of this title."[5] Section 157 allows district courts

2   to refer any or all cases under title 11 to a bankruptcy court.

3   The district court here so referred the instant matters on

4   appeal to the bankruptcy court. Accordingly, district courts

5   have "discretionary appellate jurisdiction over . . .

6   interlocutory order[s] of a bankruptcy court." In re Kassover,

7   343 F.3d 91, 94 (2d Cir. 2003); see Matter of Texas Extrusion

8   Corp., 844 F.2d 1142, 1156 (5th Cir. 1988) (same); In re

9   Laurent, 149 Fed. Appx. 833, 835 (11th Cir. 2005); see also

10  Fondiller v. Robertson (In re Fondiller), 707 F.2d 441, 441 n.1

11  (9th Cir. 1983) (interpreting similar language that was part of

12  28 U.S.C. § 1334(b) prior to 1984 modification).

13      This type of appellate jurisdiction differs significantly

14  from the jurisdiction granted to Courts of Appeal to hear

15  appeals of interlocutory orders. See In re Kassover, 343 F.3d at

16  94; Fondiller, 707 F.2d at 441 n.1. Specifically, the district

17  court maintains original jurisdiction over bankruptcy

18  proceedings, and merely refers such proceedings to bankruptcy

19  courts. In re Combustion Engineering, Inc., 391 F.3d 190, 225

20  (3d Cir. 2004) (citing 28 U.S.C. §§ 151, 157(a)); 28 U.S.C. §

21  1334(b) ("[T]he district courts shall have original but not

22

23      [5] The court notes that Appellants did not file a motion for
    leave to appeal the denial of their motion for a stay of
24  proceedings. Under Fed. R. Bank. 8003(c), "If a required motion for
    leave to appeal is not filed, but a notice of appeal is timely
25  filed, the district court . . . may consider the notice of appeal
    as a motion for leave to appeal." The court so considers the notice
26  of appeal in this case.

1  exclusive jurisdiction of all civil proceedings arising under

2  title 11, or arising in or related to cases under title 11.");

3  28 U.S.C. § 157 ("Each district court may provide that any or

4  all cases under title 11 and any or all proceedings arising

5  under title 11 or arising in or related to a case under title 11

6  shall be referred to the bankruptcy judges for the district.").

7  Thus, a district court may decide to hear an interlocutory

8  appeal of any order of a bankruptcy court subject only to review

9  by the Court of Appeals for abuse of discretion.

10      In light of this broad authority to hear interlocutory

11  appeals, the court does not decide whether the order at issue is

12  final nor does it determine whether it falls within any of the

13  exceptions briefed by the parties. Rather, the court grants

14  Appellants leave to appeal the Bankruptcy Court's order on the

15  grounds that determining whether to stay the proceedings will

16  significantly effect the nature of the bankruptcy proceedings

17  and, conceivably, the criminal proceedings pending in this

18  court. Thus, the Trustee's motion to dismiss is denied.

19      **B.   Merits of the Appeal**

20          **1.   Standard to Stay Proceedings**

21      Stays of civil proceedings pending the outcome of criminal

22  proceedings are not ordinarily required by the Constitution.

23  Keating v. Office of Thrift Supervision, 45 F.3d 322, 324 (9th

24  Cir. 1995) (citations omitted). The Ninth Circuit has held that,

25  "[I]n the absence of substantial prejudice to the rights of the

26  parties involved, [simultaneous] parallel [civil and criminal]

13

1  proceedings are unobjectionable under our jurisprudence." Id.

2  (quoting S.E.C. v. Dresser Indust., Inc., 628 F.2d 1368, 1374

3  (D.C. Cir. 1980)). A court may, however, decide in its

4  discretion to stay civil proceedings "when the interests of

5  justice seem [] to require such action." Id. (internal citations

6  omitted).

7       When deciding whether to stay civil proceedings, courts

8  should consider "the particular circumstances and competing

9  interests involved in the case[s]." Id. (quoting Federal Sav. &

10 Loan Ins. Corp. v. Molinaro, 889 F.2d 899, 902 (9th Cir. 1989)).

11 The Circuit has instructed the court to consider "the extent to

12 which the defendant's fifth amendment rights are implicated."

13 Id. (internal quotation omitted).

14      Additionally, courts "should generally consider the

15 following factors:

16      (1)   the interest of the plaintiffs in proceeding

17            expeditiously with this litigation or any particular

18            aspect of it, and the potential prejudice to

19            plaintiffs of a delay;

20      (2)   the burden which any particular aspect of the

21            proceedings may impose on defendants;

22      (3)   the convenience of the court in the management of its

23            cases, and the efficient use of judicial resources;

24      (4)   the interests of persons not parties to the civil

25            litigation; and

26 ////

1          (5)   the interest of the public in the pending civil and
2                criminal litigation."

3    Id. at 324-25 (citing Molinaro, 889 F.2d at 903).

4         The Ninth Circuit has cautioned, however, that, "A
5    defendant has no absolute right not to be forced to choose
6    between testifying in a civil matter and asserting his Fifth
7    Amendment privilege. Not only is it permissible to conduct a
8    civil proceeding at the same time as a related criminal
9    proceeding, even if that necessitates invocation of the Fifth
10   Amendment privilege, but it is even permissible for the trier of
11   fact to draw adverse inferences from the invocation of the Fifth
12   Amendment in a civil proceeding." Id. at 326. Despite the
13   generosity of the standard, it is nonetheless true that
14   permitting simultaneous proceedings may seriously undermine the
15   ability of a person presumed innocent to defend himself and may
16   provide the prosecution with an undue advantage because it will
17   have access to the evidence tendered in the bankruptcy
18   proceedings.

19        **2.   Factual Findings**

20        While this court reviews the Bankruptcy Court's decision to
21   deny the stay on an abuse of discretion standard, it may
22   nonetheless review the factual findings of the Bankruptcy Court
23   for clear error. Consequently, if the court finds any of the
24   Bankruptcy Court's findings of fact to be clearly erroneous, it
25   may reverse those findings and any order premised on the
26   findings.

15

1    In its order denying Appellants' motion for a stay, the
2  Bankruptcy Court made the following findings of fact:

3    (1)  That the adversary proceedings bear no significant
4         relationship to the allegations in the superceding
5         indictment against Salyer. Memorandum Opinion at 3-6.

6    (2)  That the court does not foresee any testimony Salyer
7         might give in the adversary proceedings that would
8         legitimately be subject to Salyer's Fifth Amendment
9         rights. Memorandum Opinion at 5.

10   (3)  That the longer the adversary proceedings are delayed,
11        the less likely it is that the Trustee will be able to
12        recover the assets he seeks because there is a real
13        risk that Appellants would dissipate the assets of the
14        debtor entities. Memorandum Opinion at 8-9.

15   (4)  That the public's interests in ensuring that aggrieved
16        persons are made whole as rapidly as possible and in
17        the prompt resolution of civil cases far outweighs the
18        public's interest in the integrity of criminal cases
19        here because the government has not sought to
20        intervene in these adversary actions.[6] Memorandum
21        Opinion at 10.

22

---

23   [6]  The government has intervened in non-bankruptcy civil
proceedings relating to U.S.A. v. Salyer, and a stay is in place
for those cases. See Morning Star Packing Company v. SK Foods LP,
24  2:09-cv-00208-MCE (E.D. Cal.); Four In One Company, Inc. v. SK
Foods, LP, 2:08-cv-03017-MCE (E.D. Cal.). Stays are also in effect
25  for two other non-bankruptcy civil case. See Brewer v. Salyer,
1:06-cv-01324-AWI-DLB (E.D. Cal.); Morning Star Packing Company v.
26  SK Foods, Merced County Superior Court Case No. CU 151242.

1        (5)   That the interest of the Trustee and the creditors in

2               a speedy resolution of the adversary proceedings is of

3               prime importance in this case. Memorandum Opinion at

4               6.

5        (6)   That the joint plan of liquidation proposed by the

6               secured creditors and the unsecured creditors are

7               often fragile and, thus, any delays in the adversary

8               proceedings would "almost certainly be to the

9               detriment of creditors." Memorandum Opinion at 9-10.

10    The court finds that the fifth and sixth findings of fact

11 are not clearly erroneous. However, the court determines that

12 the first four findings are clearly erroneous in whole or in

13 part.

14              **i.**    **Relationship Between Adversary Proceedings**
                      **and Criminal Indictment, Implication of**

15                      **Fifth Amendment**

16    The Bankruptcy Court correctly noted that, "the strongest

17 case for deferring civil proceedings until after completion of

18 criminal proceedings is where a party under indictment for a

19 serious offense is required to defend a civil or administrative

20 action involving the same matter." _Dresser Indust., Inc._, 628

21 F.2d at 1375-76. Specifically, "[t]he noncriminal proceeding, if

22 not deferred, might undermine the party's Fifth Amendment

23 privilege against self-incrimination, expand rights of criminal

24 discovery beyond the limits of Federal Rule of Criminal

25 Procedure 16(b), expose the basis of the defense to the

26 prosecution in advance of criminal trial, or otherwise prejudice

1  the case." Id. at 1376. In Dresser, the Court of Appeals
2  reasoned that, "[t]he case at bar is a far weaker one for
3  staying the administrative investigation [because no indictment
4  has been filed and, thus,] no Fifth Amendment privilege
5  threatened." The Ninth Circuit adopted this reasoning in
6  Molinaro, where it held that the district court did not abuse
7  its discretion by deciding that the burden on the defendant's
8  Fifth Amendment privilege was negligible because no related
9  criminal indictments were pending against him at the time of its
10  ruling. 889 F.2d at 903.

11      Ultimately, when considering a motion to stay proceedings,
12  courts must determine "the extent to which the defendant's fifth
13  amendment rights are implicated." Id. at 902. Here, the
14  Bankruptcy Court conducted a technical comparison of the
15  specific allegations in the criminal indictment and the
16  adversary proceedings. Accordingly, it "conclude[d] that, with
17  one minor exception, the factual allegations in the adversary
18  proceedings bear no significant relationship to the allegations
19  in the indictment." Memorandum Opinion at 3. The Bankruptcy
20  Court continued to reject Appellants' contention that the
21  reference to an enterprise in some of the adversary complaints
22  is the same enterprise alleged in the criminal proceeding. It
23  found that the enterprise alleged in the indictment was premised
24  upon allegations of "mail fraud, wire fraud, and bribery with
25  respect to the prices charged and quality of product sold to its
26  customers, whereas the adversary complaints allege inter-company

18

1  transfers among the Salyer entities themselves, commingling of
2  assets, common ownership, management, and control, intermingling
3  of business operations and activities, and so on." Id. at 4.
4       While the Bankruptcy Court may be correct that specific
5  allegations of the criminal indictment are, for the most part,
6  distinct from the specific allegations of the adversary
7  proceedings, its conclusion that these distinctions demonstrate
8  that Salyer's Fifth Amendment rights are not implicated is
9  clearly erroneous. As an initial matter, the assets sought in
10 the criminal forfeiture proceedings overlap to a significant
11 degree with the assets sought in the adversary proceedings.
12 Moreover, Salyer's Fifth Amendment rights are implicated any
13 time that he testifies or responds to discovery requests that
14 are admissible to prove that he engaged in the conduct alleged
15 in the indictment. This conduct can exceed the specific
16 allegations of the indictment. Specifically, under Fed. R. Evid.
17 404(b), evidence of crimes, wrongs, and acts not alleged in the
18 indictment, may be used to prove "motive, opportunity, intent,
19 preparation, plan, knowledge, identity, or absence of mistake or
20 accident." Under this rule, for example, evidence that Salyer
21 fraudulently transferred assets might be used to prove that
22 Salyer intended to commit the fraudulent acts alleged in the
23 indictment, or had a plan to conceal fraudulently obtained
24 assets. Indeed the asserted concealment of assets was a
25 predominant governmental theme relative to bail.
26      Put directly, even though the specific allegations of the

19

1  indictment and the adversary proceedings may differ, the

2  bankruptcy litigation seriously implicates Salyer's Fifth

3  Amendment rights. He has been criminally accused of engaging in

4  an enterprise though which he allegedly obtained assets, which

5  the Trustee is now seeking to recover and to prevent fraudulent

6  transfer of them. Accordingly, the Bankruptcy Court's finding

7  that the proceedings do not overlap and that Salyer's Fifth

8  Amendment rights are not implicated in the adversary proceedings

9  is clearly erroneous.[7]

10              **ii.  Risk that Appellants will Dissipate Assets**

11      When considering whether the Trustee and creditors would

12  suffer prejudice if a stay were to issue, the Bankruptcy Court

13  reasoned as follows:

14          In the present case, the court has already been
            sufficiently persuaded of a . . . risk of dissipation
15          of assets to issue a preliminary injunction against
            the defendants in the adversary proceedings, who are
16          moving parties in this motion, from transferring
            assets previously transferred to them by or through
17          the debtor. The moving parties now argue that the
            injunction would protect the trustee and creditors
18          from any risk of further dissipation of assets during
            the pendency of a stay. The court concludes to the
19          contrary – the findings and conclusions upon which the
            injunction is based persuade the court that a real
20          risk continues to exist.

21  _____

22       [7] The court notes that the Trustee objects to the declaration
    of counsel for Appellants filed in support of the appeal on the
23  grounds that it was not raised before the Bankruptcy Court. The
    Trustee is correct that this court should not consider evidence
24  that was not before the Bankruptcy Court. Appellants agree that the
    evidence was not presented to the Bankruptcy Court, but rather was
25  provided to this court to provide an overview of matters of which
    the Bankruptcy Court was aware. Because this court has not relied
26  on the affidavit in reaching its conclusions, the motion to strike
    is granted.

20

1   Memorandum Opinion at 9. The Bankruptcy Court does not in any

2   way address why the entrance of the preliminary injunction will

3   not protect the Trustee and the creditors. Appellants raised

4   this serious concern before the Bankruptcy Court. Failure to

5   provide any explanation as to why the preliminary injunction is

6   insufficient to protect the Trustee and creditors from

7   dissipation of assets due to debtor conduct is clear error.[8]

8                   **iii. Balance of Public Interests**

9        In applying the Keating test, the Bankruptcy Court was

10  tasked to evaluate the public interest. It explained that while

11  it recognizes the public's interest in the integrity of criminal

12  cases, that interest is relatively low in the instant case

13  because the government has chosen not to intervene in the

14  adversary proceedings. The court has been unable to find any

15  case to support the contention that the weight of the public's

16  interest in the integrity of criminal proceedings is somehow

17  influenced by the prosecutor's decision to intervene. See, e.g.,

18  Taylor, Bean & Whitaker Mortg. Corp. v. Triduanum, 2:09-cv-0954-

19  FCD-EFB, 2009 U.S. Dist. LEXIS 60849, at *10 (E.D. Cal. Jul. 15,

20

21          [8] The Bankruptcy Court may have been had in mind the Drum Line
        issue. But that itself requires testimony that may involve Salyer's
22      Fifth Amendment rights. While the court may share some of the same
        concern about that single incident, it is, at this stage, unclear
23      as to whether there was a violation of the temporary restraining
        order and, thus, relying on it seems misplaced in light of the
24      serious adverse consequences. Furthermore, the parties have
        represented that the only remaining assets are real property and
25      money. These assets, unlike the Drum Line, cannot be transferred
        without the approval of the Bankruptcy Court and, thereby, then
26      present little or no risk that they will be wrongfully transferred
        while the preliminary injunction is in effect.

                                    21

1   2009) (Court does not mention intervention by government); James

2   v. Conte, No. C. 04-5312 SI, 2005 U.S. Dist. LEXIS 46962, *5

3   (N.D. Cal. Apr. 19, 2005) (same); Javier H. v. Garcia-Botello,

4   218 F.R.D. 72, 75-76 (W.D.N.Y 2003), (court simultaneously

5   granted a stay of proceedings and denied a motion to intervene

6   by the government). Indeed, it seems misplaced to suggest that

7   the prosecutor's view demonstrates the public interest in light

8   of the constitutionally protected right of presumed innocence·

9   and the obligation of proof which falls only on the prosecution.

10  The Bankruptcy Court has not identified any other reasons why

11  the public interest in the integrity of this criminal case is

12  relatively low. This conclusion is also in clear error. There is

13  no factual basis to support the Bankruptcy Court's conclusion

14  that the public interest in the integrity of the criminal case

15  is "far outweighed in this case by the public's countervailing

16  interests in ensuring that aggrieved persons are made whole as

17  rapidly as possible . . . and by the public's interest in the

18  prompt resolution of civil cases." Memorandum Opinion at 10

19  (citations and internal quotations omitted).[9]

20          **3.   Reversal of Bankruptcy Court's Decision**

21          For the reasons discussed above, the court finds that the

22

23          [9] Appellants also argue that the Bankruptcy Court made an
    error of law in its application of the Keating factors.
24  Specifically, they argue that the court wrongly gave the interests
    of the creditors the weight of the interests of plaintiffs. Given
25  the court's conclusion that there were factual errors that demand
    reversal, the court need not address the merits of this argument.
26

22

1  Bankruptcy Court made several significant erroneous factual

2  findings in its application of the <u>Keating</u> factors. Based on

3  these clearly erroneous factual findings, the court determines

4  that the Bankruptcy Court abused its discretion in denying

5  Appellants' motion for a stay. The remaining question in this

6  appeal is, then, what order the court should issue. Remand with

7  instructions might well be appropriate because this court

8  reviews for abuse of discretion. However, the court finds that

9  it should craft an order staying proceedings in part because it

10 is responsible for the conduct of the criminal trial and is more

11 familiar with the values informing criminal proceedings.

12      Accordingly, the court orders a stay of all further

13 bankruptcy proceedings where Appellants make a credible showing

14 that discovery from or testimony of Scott Salyer or his criminal

15 counsel is relevant to the proceedings. The court wishes to be

16 clear, the orders heretofore issued on a preliminary basis are

17 unaffected by this order.

18                    **IV. CONCLUSION**

19      For the foregoing reasons the court REVERSES the decision

20 of the Bankruptcy Court denying Appellants motion to stay as

21 described above.

22      The court FURTHER ORDERS that the Trustee's motion to

23 dismiss is DENIED and the Trustee's motion to strike is GRANTED.

24      IT IS SO ORDERED.

25      DATED:   December 9, 2010.

26

                          23      LAWRENCE K. KARLTON
                                  SENIOR JUDGE
                                  UNITED STATES DISTRICT COURT

# RJN
# EXHIBIT 2

```
 1
 2
 3
 4
 5                         UNITED STATES DISTRICT COURT
 6                         EASTERN DISTRICT OF CALIFORNIA
 7
 8   IN RE:
 9   SK FOODS, L.P.
10          Debtor.
11   BRADLEY SHARP,                        CIV. NO. S-10-1492 LKK
12          Plaintiff,
13               v.
14   SSC FARMS 1, LLC, et al.,
15          Defendants.
                                    /
16   IN RE:
17   SK FOODS, L.P.                        CIV. NO. S-10-1493 LKK
18          Debtor.
                                    /
19   IN RE:
20   SK FOODS, L.P.
21          Debtor.
22   BRADLEY SHARP,                        CIV. NO. S-10-1496 LKK
23          Plaintiff,
24               v.
25   CSSS, L.P., et al.,
26          Defendants.
                                    /
```

1  IN RE:

2  SK FOODS, L.P.

3          Debtor.

4  BRADLEY SHARP,                          CIV. NO. S-10-1497 LKK

5          Plaintiff,

6              v.

7  FRED SALYER IRREVOCABLE
   TRUST, et al.,
8
           Defendants.
9  _____/

10 IN RE:

11 SK FOODS, L.P.

12         Debtor.

13 BRADLEY SHARP,                          CIV. NO. S-10-1498 LKK

14         Plaintiff,

15             v.

16 SKF AVIATION, LLC., et al.,

17         Defendants.
   _____/
18
   IN RE:
19
   SK FOODS, L.P.
20
           Debtor.
21
   BRADLEY SHARP,                          CIV. NO. S-10-1499 LKK
22
           Plaintiff,
23
               v.
24
   SCOTT SALYER, et al.,
25
           Defendants.
26 _____/

                           2

1   IN RE:

2   SK FOODS, L.P.

3        Debtor.

4   BRADLEY SHARP,                CIV. NO. S-10-1500 LKK

5        Plaintiff,

6          v.

                         O R D E R

7   SCOTT SALYER, et al.,

8        Defendants.
  _____/

9

10      Before the court is a motion for rehearing on this court's

11   December 10, 2010 order reversing the denial of a stay of

12   proceedings before the Bankruptcy Court, brought by the Bankruptcy

13   Trustee ("Trustee"). The court resolves the ambiguity in its prior

14   order below.

15                  **I. BACKGROUND**

16      On December 10, 2010, the court reversed a decision of the

17   bankruptcy court denying a motion to stay adversarial proceedings.[1]

18   As to remedy, the court ordered "a stay of all further bankruptcy

19   proceedings where Appellants make a credible showing that discovery

20   from or testimony of Scott Salyer or his criminal counsel is

21   relevant to the proceedings. The court wishes to be clear, the

22   orders heretofore issued on a preliminary basis are unaffected by

23   this order." Order at 23. The court did not indicate what issues,

24   if any, were to be remanded to the Bankruptcy Court.

25   _____

26      [1] The court incorporates its December 10, 2010 order.

1    Initially, the court set this motion to be heard on January
2   31, 2011. On January 25, 2011, however, the Trustee and Appellants
3   filed a stipulation to continue the hearing to a date no later than
4   March 31, 2011 so that the parties could engage in mediation. On
5   January 27, 2011, the court continued the hearing to April 11,
6   2011. On March 28, 2011, Appellants filed a supplemental objection
7   to the Trustee's motion. On April 4, 2011, the Trustee filed a
8   reply brief and the unsecured creditors joined the Trustee's
9   motion.[2] The motion was heard on April 11, 2011.

10                            **II. ANALYSIS**

11    The Trustee has moved for a rehearing on three issues, all
12   of which concern interpretation of the court's order on remedy.
13   Specifically, he requests clarification as to whether the
14   December 10, 2010 order constitutes an entry of a stay in the
15   bankruptcy proceedings. He further requests that this court
16   establish a procedure and time frame for the parties to submit
17   evidence in support of and in opposition to the specific stays.
18   Additionally, he argues that the court should amend the standard
19   set forth in the prior order to require a stay where testimony
20   of Scott Salyer ("Salyer") or his criminal counsel is necessary,
21   rather than relevant, to the proceedings.[3]

22

23       [2] The committee of unsecured creditors requests permission to
24   file a brief as unofficial amicus curiae and for permission to
     appear for oral argument. The court grants this request.

25       [3] The Trustee has also argued, in the alternative, that if the
26   December 10, 2010 order was to operate as a stay, that it should
     only apply to the adversary proceedings where Salyer is a party.

                                    4

1   The court acknowledges that its prior order was ambiguous
2 as to the remedy it issued. Accordingly, the court clarifies[4]
3 the remedy as follows: The court found that the due process
4 rights of Appellants may be infringed if they cannot adequately
5 defend themselves in the adversary proceedings without discovery
6 from or testimony of Salyer, who cannot be compelled to testify
7 under the Fifth Amendment, or his criminal counsel, who cannot
8 be compelled to violate the attorney-client privilege.
9 Nonetheless, the court recognizes that it is possible for the
10 adversary proceedings to continue without offending these
11 rights. Thus, the court is remanding the case to the Bankruptcy
12 Court to decide, in the first instance, whether discovery from
13 or testimony of Salyer or his criminal counsel is reasonably
14 necessary[5] to dispose of a particular matter before the
15 Bankruptcy Court in the adversary proceedings. A matter is
16 reasonably necessary if Appellants cannot adequately defend
17 themselves in an adversary proceeding without evidence from
18 Salyer or his criminal counsel. The Bankruptcy Court's decisions
19 on these matters may be directly appealed to this court on the

20

21  [4] Appellants challenge this court's jurisdiction to clarify
its prior order. Under Fed. R. Civ. P. 60(a), "the court may
22 correct . . . a mistake arising from oversight or omission whenever
one is found in a judgment, order, or other part of the record."
23 Under this rule, the court may amend its prior order to better
reflect its understanding of the issues and appropriate remedy.

24  [5] Upon further reflection, the court finds that the relevance
standard it previously ordered is too broad. Given the significant
25 overlap between testimony in the adversary proceedings and the
criminal proceedings, discovery from or testimony of Salyer or his
26 criminal counsel would almost necessarily be relevant.

5

1  same grounds that the court had jurisdiction to hear the appeal
2  of the first order denying a stay of proceedings.

3      Further, Appellants shall file their initial motions to
4  stay before the Bankruptcy Court within fourteen (14) days of
5  the issuance of this order.[6] These motions must be set for
6  hearing as early as practicable under the Bankruptcy Court's
7  local rules and procedures. The Bankruptcy Court shall issue
8  written orders explaining the basis for its decisions to stay or
9  not to stay the proceedings. Additionally, the court recognizes
10 that an adversary proceeding may not be subject to a stay at
11 this time, but may, through the course of litigation, require a
12 stay under the standard set forth above. In this situation,
13 Appellants shall file a motion to stay proceedings within
14 fourteen (14) days of their discovery of new evidence or
15 circumstances, which they contend reasonably requires evidence
16 from Salyer or his criminal counsel to adequately defend
17 themselves. This motion must also be set for hearing as early as
18 practicable. In addition to the burden set forth above,
19 Appellants must also demonstrate why the new facts or
20 circumstances that are claimed to exist were not shown at the
21 time of the initial motion and were only reasonably discovered
22 within fourteen (14) days of the filing of the motion.
23 Appellants may not sit on their rights. Failure to bring a

24
25     [6] The court assumes that Appellants intend to stay all
   adversary proceedings due to their representations at oral
   argument. The court is in no way requiring the Appellants to seek
26 such stays.

6

1   timely motion to stay will result in denial of the motion.

2       Moreover, in his reply, the Trustee attempts to introduce

3   new evidence in support of his argument that the court amend its

4   prior order. Specifically, the court concluded that the

5   Bankruptcy Court's finding that the preliminary injunction will

6   not protect the Trustee and creditors was in clear error because

7   the Bankruptcy Court presented no explanation as to why the

8   preliminary injunction was insufficient to protect those

9   interests. The Trustee now attempts to seek this court's

10  consideration of recent events to suggest that the preliminary

11  injunction may actually be insufficient. This evidence must

12  first be brought before the Bankruptcy Court in a motion to

13  amend or lift a stay. If the Trustee decides to bring such a

14  motion, the losing party may appeal the Bankruptcy Court's order

15  on the motion to this court, as is customary in this case. At

16  this time, however, it is not appropriate for the court to

17  consider this new evidence.[7]

18      IT IS SO ORDERED.

19      DATED:   April 13, 2011.

20                                          LAWRENCE K. KARLTON
                                            SENIOR JUDGE
21                                          UNITED STATES DISTRICT COURT

_____

22      [7] The court notes that in its prior order affirming the
    Bankruptcy Court's preliminary injunction, the court decided an
23  issue that was not previously raised before the Bankruptcy Court:
    namely, whether counsel for the non-debtor entity-Appellants could
24  recover fees. The court only did so pursuant to stipulation of the
    parties and in light of the unique relationship between the
25  Bankruptcy and District Courts. No such stipulation exists here
    and, thus, the court declines to decide this question in the
26  instant motion.

7

# RJN
# EXHIBIT 3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

IN RE:

SK FOODS, L.P.,

     Debtor.

_____/

SCOTT SALYER,                                            CIV. S-10-3467 LKK

     Plaintiff,

        v.

SK FOODS, L.P.,                                               O R D E R

     Defendants.

_____/

    Before the court are the appeals of two Bankruptcy Court orders issued in connection with the Trustee's motion to approve a compromise with a creditor, the Bank of Montreal ("BMO"):[1] (i) the December 7, 2010 order granting BMO's *in limine* motion to exclude the declaration of John P. Brincko; and (ii) the

///

---

[1] BMO is also the agent for other banks who loaned money to the debtors prior to the bankruptcy. BMO and the other banks are referred to, collectively, as "BMO" or the "Secured Lenders."

1  December 13, 2010 order granting the Trustee's motion to approve
2  the compromise.

3       For the reasons described below, the exclusion motion is
4  reversed, and the order approving the compromise is vacated.

5                        I.   BACKGROUND
6  A. The Bankruptcy

7       This is a return visit of the Chapter 11 consolidated
8  bankruptcy case of SK Foods, L.P. and RHM Industrial/Specialty
9  Foods, Inc.[2]  BMO is a principal creditor of the bankruptcy
10 estate,[3] having loaned the Debtor $193 million about seven
11 months before the bankruptcy petitions were filed.

12      1.   BMO's $200 Million Claim

13      To secure the $193 million loan, BMO obtained a security
14 interest in "substantially all of the Debtors' assets" (the
15 "Pre-petition Collateral").[4]  Excerpts of Record ("ER"):24-25;

16  _____

17  [2] This court substantially affirmed the Bankruptcy Court's
    preliminary injunction relating to the disposition of certain
    non-debtor assets, Sharp v. Salyer (In re SK Foods, L.P.), 2010
18  WL 5136187, 2010 U.S. Dist. LEXIS 136178 (E.D. Cal. December 10,
    2010); and ordered a stay of all bankruptcy court proceedings
19  where there was a credible showing that "discovery from or
    testimony of Scott Salyer or his criminal counsel is relevant to
20  the proceedings" Sharp v. SSC Farms 1 (In re SK Foods, L.P.),
    2010 WL 5136189, 2010 U.S. Dist. LEXIS 136188 (E.D. Cal.
21  December 10, 2010), modified on rehearing, 2011 WL 1442332, 2011
    U.S. Dist. LEXIS 42766 (April 14, 2011).
22
    [3] An "estate" is created when a bankruptcy petition is filed.
23  11 U.S.C. § 541(a).  The estate consists of all the property
    belonging to the debtor, unless exempt.  11 U.S.C. § 541(a)(1).
24
    [4] A "security interest" is a "lien" created by an agreement.
25  11 U.S.C. § 101(51).  A "lien" is an interest in property to
    secure payment of a debt or performance of an obligation.  Id.,
26  § 101(37).

                              2

1  Trustee's Brief on Appeal at 8.   The security interest included

2  all the "proceeds and products" of the Debtor's assets.   See

3  Bankr. Dkt. No. 193, p.3  ¶ D (Bankr. Ct. Order, June 22, 2009).

4  In addition, BMO asserted that all the Debtor's cash, and all

5  the cash proceeds of the secured collateral, were its "Cash

6  Collateral" pursuant to 11 U.S.C. § 363(a).[5]  Id.

7      Based upon this security interest, BMO asserts a claim in

8  excess of $200 million against the estate, pursuant to 11 U.S.C.

9  § 506(a) ("Determination of secured status").

10         2.   BMO's $26.77 Million "Super-Priority" Claim

11      In May and June 2009, the Bankruptcy Court issued orders

12  providing "adequate protection" to the secured creditors,

13  including BMO, pursuant to 11 U.S.C. § 361.   Bankr. Dkt. Nos. 20

14  ("Interim Order"), 30 ("Interim Order") & 193 ("Final Order").

15  "Adequate protection" is intended to protect a creditor's

16  interest from diminution in the value of its collateral when the

17  Trustee uses or sells the creditor's collateral.   See 11 U.S.C.

18  § 363(b)(1); see In re Hawaiian Telcom Communications, Inc.,

19  430 B.R. 564, 604 (Bkrtcy. D. Hawai'i 2009) ("An undersecured

20  creditor is entitled to adequate protection payments to the

21  extent that its collateral suffers from diminution in value").

22
   ――――――――――――――――
   [5] "Cash collateral" is the cash (and equivalents), "in which the
23  estate and an entity other than the estate have an interest."
   11 U.S.C. § 363(a).   If the pre-petition security interest
24  includes proceeds of the collateral, then the post-petition
   proceeds of the collateral are also subject to the security
25  interest.   11 U.S.C. § 552(b)(1).   The Bankruptcy Court may
   authorize the Trustee to use the Cash Collateral for the benefit
26  of the estate.   11 U.S.C. § 363(c)(1) & (2).

                                 3

1    As adequate protection, the Bankruptcy Court granted BMO
2   "valid and perfected, replacement security interests in and
3   liens (the 'Replacement Liens') on all prepetition and
4   postpetition assets and properties ... of the Debtors of any
5   kind or nature ...."[6]  Bankr. Dkt. No. 193, p.5-6, ¶ 4(a).

6    On June 17, 2009, the Bankruptcy Court granted the
7   Trustee's motion to approve the "Going Concern Sale of
8   Substantially All Operating Assets" of the estate, pursuant to
9   11 U.S.C. § 363.[7]  Bankr. Dkt. No. 325.  BMO asserts that
10  pursuant to that authorization, $102 million worth (or as much
11  as $129 million) of its secured collateral was sold. ER:12-13
12  ¶ 16 (Bankr. Ct. Decl. of Stan Speer).  However, BMO asserts
13  that the sale realized only $67 million in proceeds.  Id.

14    The difference between the value of the collateral and what
15  was realized in the sale (less the $3 million to $13 million BMO
16  anticipates receiving from the compromise under appeal here), is
17  a "diminution in value" in BMO's collateral, of $22 million to
18  $59 million, according to BMO.  Id.  BMO therefore asserts that
19  it is entitled to a "super-priority claim"  to the extent of the
20  diminution in value.[8]  After negotiations, BMO and the Trustee

21  ────────────────────
22  [6] "Adequate protection" may take the form of replacement liens,
    cash payment(s) to the creditor, or other relief.  11 U.S.C.
23  § 361.

24  [7] The Trustee, Bradley B. Sharp, was appointed on May 18, 2009.
    Bankr. Dkt. No. 127.

25  [8] If the "adequate protection" proves inadequate to protect the
    creditor's interest, the creditor may assert a "super-priority
26  claim" in the amount that his interest is left unprotected.

4

1    agreed on a BMO "super-priority claim" of $27.66 million.   ER:16
2    ¶ 21.

3              **3.    The Unsecured Claim**

4        BMO's third claim is an unsecured claim for whatever of the
5    Credit Agreement amount is still due after BMO collects on the
6    secured claim and the super-priority claim.   ER:3.

7    **C. The Motion To Approve the Compromise.**

8        On September 29, 2010, the Trustee filed a motion, pursuant
9    to Fed. R. Bankr. P. 9019, before the Bankruptcy Court, to
10   approve a compromise (the Settlement Agreement) between the
11   Trustee and BMO.[9]   The Bankruptcy Court heard the motion on

12   _____

13   11 U.S.C. § 507(b).  The Fifth Circuit put it this way:

14           adequate protection of a secured creditor's collateral and
             its fallback administrative priority claim are tradeoffs
15           for the automatic stay that prevents foreclosure on
             debtors' assets: the debtor receives "breathing room" to
16           reorganize, while the present value of a creditor's
             interests is protected throughout the reorganization. ...
17           A secured creditor whose collateral is subject to the
             automatic stay may first seek adequate protection for
18           diminution of the value of the property, 11 U.S.C. §§
             362(d)(1), 363(e), 364(d), and then, if the protection
19           ultimately proves inadequate, a priority administrative
             claim under § 507(b). Section 507(b) of the Bankruptcy Code
20           allows an administrative expense claim under § 503(b) where
             adequate protection payments prove insufficient to
21           compensate a secured creditor for the diminution in the
             value of its collateral.  "It is an attempt to codify a
22           statutory fail-safe system in recognition of the ultimate
             reality that protection previously determined the
23           'indubitable equivalent' ... may later prove inadequate."

24   In re Scopac, 624 F.3d 274, 282 (5th Cir. 2010).

25   [9] "On motion by the trustee and after notice and a hearing, the
     court may approve a compromise or settlement."  Fed. R. Bankr.
26   P. 9019(a).

                                    5

1  October 27, 2010, whereupon it requested further briefing and
2  the submission of "additional evidence."  ER:270.

3        **1.   The Revised Settlement Agreement and the Trustee's**
           **Declaration in Support of the Compromise.**
4

5        On November 3, 2010, the Trustee filed his Second
6  Supplemental Declaration in support of the motion to approve the
7  compromise.  ER:271.  The Declaration attached the Revised
8  Settlement Agreement, ER:276, which is the subject of this
9  appeal.

10       Pursuant to the Revised Settlement Agreement, which was
11 contingent upon the approval of the Bankruptcy Court, the
12 Trustee will "abandon, transfer and convey" to BMO: certain
13 accounts receivables, trade receivables and related litigation;
14 proceeds from the sale of certain property; the Trustee's right
15 to recover from certain litigation; tax refunds; the Trustee's
16 right to collect pursuant to the Credit Agreement; refunds;
17 certain "reserves;" certain reimbursements; and certain
18 "Assigned Rights."  In addition, BMO will receive a $2.3939
19 million payment from sales and proceeds of Estate Assets, plus
20 80% of all such proceeds until its super-priority claim is paid
21 in full.  Finally, BMO will get in line with all other
22 unsecured, non-priority creditors to receive the remainder of
23 the money owed to it on the Credit Agreement, out of whatever is
24 left of the Estate.  ER:276-82 (Trustee's Second Supplemental
25 Declaration, Exh. A).
26 ///

6

1      **2. The Brincko Declaration**

2          On November 17, 2010, the Objecting Parties filed the

3      Declaration of John P. Brincko in support of their Supplemental

4      Objection to approving the compromise.[10]  ER:293, 321.

5      **3. The Trustee's Reply**

6          On November 24, 2010, the Trustee filed his Reply, noting

7      that it did "not object" to the bankruptcy court's considering

8      the Brincko Declaration "for the purpose of showing that there

9      is a factual dispute over the value of BMO's collateral as of

10     the date of the motion."  ER:626.  However, the Trustee did "not

11     concede that Mr. Brincko is qualified to provide expert

12     testimony or that his conclusions and methodology are correct."

13     Id.

14     **4. The Motion To Exclude the Brincko Declaration.**

15         On November 24, 2010, The Bank of Montreal filed a motion

16     *in limine* to exclude the Brincko Declaration, arguing that

17     (i) his declaration was not properly and timely noticed and

18     disclosed under Fed. R. Civ. P 26; and (ii) even if Rule 26

19     doesn't apply,[11] Brincko's opinion is neither reliable nor

20     relevant, and thus fails the test of Daubert v. Merrell Dow

21     Pharmaceuticals, Inc., 509 U.S. 579 (1993).  ER:630.

22

23     [10] The scope of the Brincko declaration was limited to
       establishing "the amount of any super priority claim of the
24     Lenders pursuant to Section 507(b) of the Bankruptcy Code due to
       the diminution in value of the Lenders' Prepetition Collateral."
25     ER:324.

26     [11] See Bankr. E.D. Cal. R. 7026-1(b).

**D. The Bankruptcy Court Rulings**

On December 6, 2010, the Bankruptcy Court held its second hearing on the motion to approve the compromise. ER:655. On December 7, 2010, the Bankruptcy Court issued its order granting BMO's *in limine* motion to exclude the Brincko Declaration. On December 13, 2010, the Bankruptcy Court issued its order granting the Trustee's Rule 9019 motion to approve the compromise, on the grounds that it was "fair and equitable." On December 27, 2010, the Objecting Parties timely filed their Notice of Appeal.[12]

## II. ANALYSIS

**A.   Mootness[13]**

The Trustee argues that the appeal is moot because the Revised Settlement Agreement "has been fully implemented (*i.e.* cash and litigation claims have been transferred to BMO, and releases of claims which would now be time-barred have now been granted)."

///

///

///

---

[12] See Fed. R. Bankr. P. 8002(a).

[13] The Trustee raises mootness in his brief opposing the appeal. This order will address the mootness issue first because equitable mootness is considered to be jurisdictional in the Ninth Circuit. See Sherman v. SEC (In re Sherman), 491 F.3d 948, 965 n.20 (9th Cir. 2007). Section 363(m) mootness presents similar issues.

1   **1. Equitable Mootness**

2       **a.   The Standard for Equitable Mootness in the**
3           **bankruptcy context.**

4       Bankruptcy appeals may become equitably moot when events

5   occur "that make it impossible for the appellate court to

6   fashion effective relief."   Focus Media, Inc. V. NBC Inc. (In re

7   Focus Media, Inc.), 378 F.3d 916, 922 (9th Cir. 2004).   This

8   includes cases where the settlement transaction is too "complex

9   or difficult to unwind."   See Lowenschuss v. Selnick (In re

10  Lowenschuss), 170 F.3d 923, 933 (9th Cir. 1999).   Moreover, if

11  appellants did not diligently pursue a stay of the objected-to

12  order in the bankruptcy court, thus permitting "a comprehensive

13  change of circumstances to occur," it may be "inequitable" to

14  consider the appeal.   In re Focus Media, 378 F.3d at 923.   The

15  "heavy" burden of establishing mootness is on the party

16  advocating its application.   Id.

17      **b.   The mootness standard is not met here**

18          **i.   The Trustee has not shown that the Revised**
19              **Settlement Agreement has been "fully**
                **implemented"**

20      The Trustee argues that the settlement under appeal has

21  been "fully implemented."   Trustee's Brief on Appeal at 1.   He

22  states that "cash and litigation claims have been transferred to

23  BMO, and releases of claims which would now be time-barred have

24  now been granted."   Id.   Accordingly, he argues, "it would be

25  impossible for a court to restore the status quo that existed

26  prior to the entry into and approval of the settlement."   Id.

1      In support of these assertions, the Trustee cites his

2  Request for Judicial Notice, asserting that documents submitted

3  there establish that BMO has been substituted for the Trustee in

4  four adversary proceedings within Case No. 09-29162-D-11 (In re

5  SK Foods).[14]  However, the Trustee does not address the fate of

6  the rest of the Revised Settlement Agreement, that is, all the

7  other Revised Settlement Agreement Items that are not covered by

8  the Request for Judicial Notice, namely claims:

9  2(A) (unspecified accounts receivable, trade receivables and

10 "the related Accounts Receivable litigation"); 2(C) & (I)

11 (proceeds of sales); 2(D) (equipment related to the Drum Line

12 Litigation);[15] 2(E) (tax refunds other than those from IRS and

13 State tax avoidance actions); 2(F) (BMO's Cash Collateral

14 claims); 2(G) (refunds from "Split Dollar Life Receipts");

15

---

16 [14] See Request for Judicial Notice, Tabs 1-4: (i) Sharp v. CSS,
   LP, Adv. Proc. No. 09-02543, the "Drum Line Litigation," which
17 appears to correspond to Item 2(D) of the Revised Settlement
   Agreement; (ii) Sharp v. Salyer, Adv. Proc. No. 10-02015, a
18 "Breach of Fiduciary Duty Action" which appears to correspond to
   an entry in Item 3 of the Revised Settlement Agreement ("Salyer
19 Breach of Fiduciary Duty Litigation"); (iii) Sharp v. IRS, Adv.
   Proc. No. 10-02117, an action to recover $5.1 million in
20 fraudulent conveyances, which appears to correspond to part of
   an entry in Item 3 of the Revised Settlement Agreement ("IRS and
21 State Tax Avoidance Actions"); and (iv) SK Foods, L.P. ex rel.
   Sharp v. Lidestri Foods, Adv. Proc. No. 10-02163, the "Frito Lay
22 Action," which appears to correspond to Item 2(B) of the Revised
   Settlement Agreement. These judicial documents are "verifiable
23 with certainty" and Appellant does not challenge them;
   accordingly, the court takes judicial notice of them.  See U.S.
24 v. Camp, 723 F.2d 741, 744 (9th Cir. 1984).

25 [15] The Tab 1 Adversary Proceeding appears to cover the proceeds,
   recovery and right to recovery from the litigation, but it makes
26 no mention of this equipment.

1   2(H) ("Westland Insurance Claims"); 2(J) & (K) (reserves); 2(L)

2   (the "BMO Distribution"); 3 (claims against accountants and the

3   "New Zealand Claims").

4       Accordingly, the Trustee has simply asserted, but not

5   provided any supporting documentation or other evidence, that

6   the Revised Settlement Agreement has been "fully implemented."

7               ii.   The Trustee has not shown that the Revised
                      Settlement Agreement cannot be undone.
8

9       Under the Revised Settlement Agreement, the Trustee

10  transferred several assets to BMO, some of which are causes of

11  action.   The Trustee asserts that in those causes of action, BMO

12  has already been substituted in as plaintiff in the place of the

13  Trustee.

14      But the Trustee does not argue with any specificity that

15  any specific aspect of the Revised Settlement Agreement cannot

16  be undone.   These substitutions occurred in Adversary

17  Proceedings before the Bankruptcy Court.   The Trustee does not

18  explain why this court is incapable of issuing an order vacating

19  the Bankruptcy Court order substituting parties.   Indeed, it

20  appears that this court has the authority to do so.   See Fed. R.

21  Bankr. P. 8013 (district court may "affirm, modify, or reverse"

22  or remand the bankruptcy court order).   Accordingly, the Trustee

23  has not identified "specific events or developments in the

24  proceedings that preclude relief."   See In re Focus Media,

25  378 F.3d at 923-924.

26  ///

                            11

1     The Trustee does assert that one of the Adversary
2 Proceedings is nearing settlement.  But he does not explain why
3 the Trustee cannot be substituted back in as plaintiff prior to
4 the settlement.  Nor does he explain why, if it is too late to
5 re-substitute the Trustee back in, the Bankruptcy Court (under
6 direction from this court), could not simply order BMO to pay
7 the settlement proceeds over to the Trustee.

8     As for the asserted transfer of items other than causes
9 of action, the Trustee similarly does not show why these transfers
10 could not be reversed.  There is no explanation, for example, of
11 why the Drum Line equipment cannot simply be returned under
12 order of the bankruptcy court.  Nor does the Trustee show why
13 accounts receivable, trade receivables, reserves, reimbursements
14 and causes of action cannot be transferred back, nor why refunds
15 and sale proceeds cannot be re-paid.[16]  Accordingly, the Trustee
16 has not shown that any portion of the settlement, even if it has
17 been executed, is too "complex or difficult to unwind."  See In
18 re Lowenschuss, 170 F.3d at 933.[17]

19

20 [16] There may very well be good reasons why these transactions, if
they have already occurred, cannot be undone, but the Trustee
21 has not met his burden to demonstrate it.

22 [17] It is true that the Objecting Parties have not sought a stay
pending appeal, for reasons that are unexplained here.  This is
23 a key factor in considering equitable mootness.  See Suter v.
Goedert, 504 F.3d 982, 990 (9th Cir. 2007) ("the cases dealing
24 with mootness under the bankruptcy code recite the general rule
that an appeal is moot if the appellant fails to obtain a stay
25 of the order permitting sale of an asset").  However, this
factor only arises if failure to obtain a stay has led to "such
26 a comprehensive change of circumstances" that considering the
appeal is inequitable.  In re Focus Media, 378 F.3d at 923.  The

12

1    **2. Section 363(m) Mootness.**

2       The Trustee argues that the appeal is also moot pursuant to

3    11 U.S.C. § 363(m).  That bankruptcy provision provides:

4       The reversal or modification on appeal of an authorization

5       under subsection (b) or (c) of this section of a sale or

6       lease of property does not affect [its] validity ... to an

7       entity that purchased or leased such property in good

8       faith, ... unless such authorization and such sale or lease

9       were stayed pending appeal.

10   11 U.S.C. § 363(m).  By its terms, the provision applies "when

11   an appellant has failed to obtain a stay from an order *that*

12   *permits a sale of a debtor's assets.*"  Onouli-Kona Land Co. v.

13   Estate of Richards (In re Onouli-Kona Land Co.), 846 F.2d 1170,

14   1171 (9th Cir. 1988) (emphasis added).

15       The order appealed from, however, grants a Rule 9019 motion

16   to approve a settlement.  Section 363(m) mootness does not, by

17   its terms, apply to orders approving compromises, it applies to

18   orders granting Section 363(b) or (c) motions to sell assets.

19   See 11 U.S.C. § 363(m) (applying stay rule to "authorization

20   under subsection (b) or (c) of this section of a sale or lease

21   of property").

22   ///

23   ────────────────

24   Trustee has not established the predicate "comprehensive change"
     in this case.  Of course, this ruling is based upon the state of
25   affairs as they are presented to this court when the appeal was
     filed and oral argument was presented.  It is not intended to
26   preclude the same argument on any subsequent appeal, should
     Objecting Parties persist in not seeking a stay.

13

1     The Trustee nevertheless argues that "it is well

2 recognized" that orders approving compromises under Rule 9019

3 are actually orders authorizing asset sales, pursuant to

4 Section 363.  However, it is clear from the record that in the

5 Trustee's motion to approve <u>this</u> compromise, the motion was not

6 identified as a Section 363 asset sale, it was not briefed as

7 such a sale, and the Bankruptcy Court did not indicate that it

8 was deciding the issue under Section 363.[18]  This court therefore

9 will not hold Objecting Parties to its standards.

10 **B. Exclusion of the Brincko Declaration**

11     **1.   Standard of Review**

12     The bankruptcy court's evidentiary rulings are reviewed for

13 abuse of discretion.  <u>California State Board of Equalization v.</u>

14 <u>Renovisor's, Inc. (In re Renovizor's, Inc.)</u>, 282 F.3d 1233, 1237

15 n.1 (9th Cir. 2002).  To reverse on the basis that an

16 evidentiary ruling was erroneous, the court must conclude not

17 only that the bankruptcy court abused its discretion, but also

18 that the error was prejudicial.  <u>See McEuin v. Crown Equip.</u>

19 <u>Corp.</u>, 328 F.3d 1028, 1032 (9th Cir. 2003).

20 ///

21 ///

22

---

23 [18] Clearly, the Trustee knew how to present such a motion.  The
Bankruptcy Court record shows that on several occasions, the
24 Trustee filed applications to conduct a Section 363 sale.  They
were clearly identified as such; they were not identified as
25 Rule 9019 motions.  <u>See, e.g.</u>, Bankr. Dkt. No. 118
("Motion/Application for Order Approving Going Concern Sale of
26 Substantially All Operating Assets Pursuant to 11 U.S.C. Section
363").

14

2. **The Brincko Declaration Was Offered In Accordance with the Scheduling Order**

The Bankruptcy Court excluded the Brincko Declaration on the grounds that it was offered after the evidentiary record had closed.  The Objecting Parties persuasively argue that the court's exclusion of the Brincko Declaration was erroneous because the evidentiary record had not closed before the declaration was offered.

On October 27, 2010, the Bankruptcy Court held a hearing on the Trustee's motion to approve the compromise.  The court opened with its views of some of the "fatal" and other flaws in the compromise, and ways those flaws could be cured.  See ER:235-37.  Although the Bankruptcy Court then stated that it did not believe an evidentiary hearing was called for, it later did call for more evidence to be developed.  The court made clear that the Objecting Parties had a right to take depositions of the Trustee and the declarants who gave evidence in support of the compromise.  See ER:237-40.  The court clearly expected that the Trustee would submit a revised settlement agreement and that other declarations would be filed in advance of the next hearing.  See ER:264.  After the October 27, 2010 hearing, the Bankruptcy Court issued a Scheduling Order giving the Trustee until November 3, 2010 "to submit supplemental briefs and/or declarations *and other evidence* in support of the Motion." ER:270 (emphasis added).  The same order gave the Objecting Parties until November 17, 2010 to file "supplemental

15

1 │ objections" to the motion.  Nothing in the order indicated that
2 │ the Trustee *could* file additional "declarations" and "additional
3 │ evidence" in support of the motion, but that the Objecting
4 │ Parties were *precluded* from filing declarations or other
5 │ evidence in opposition to the motion.

6 │     The Trustee cites the local bankruptcy rules to argue that
7 │ the evidentiary record closed when he filed his Reply on
8 │ October 20, 2010.  That rule provides:

9 │     Unless the Court determines that an evidentiary hearing is
10 │     necessary, the evidentiary record closes upon expiration of
11 │     the time for the filing of the reply.
12 │ Bankr. E.D. Local R. 9014-1(f)(iii).  In this case, however, the
13 │ Bankruptcy Court specifically requested the submission of
14 │ "additional evidence."  It gave the parties until November 17,
15 │ 2010 to submit it, and the Brincko Declaration was submitted
16 │ within that time.

17 │     The Trustee argues that the supplemental declarations and
18 │ "additional evidence" the Bankruptcy Court was referring to was
19 │ intended to refer solely to the Objecting Parties' right to
20 │ depose the Trustee's declarants, and that the Brincko
21 │ Declaration was beyond the "limited scope" of the upcoming
22 │ hearing.  But this argument does not accord with either the
23 │ order itself or the transcript of the hearing.

24 │     During the hearing, the Bankruptcy Judge made clear that
25 │ the Trustee would have to submit a revised agreement and
26 │ declarations in order to fix the "fatal" and other flaws he saw

16

1  in it.  See ER:235-37.  In accordance with those instructions,

2  the Trustee filed a new declaration; he did not simply make

3  himself and his other declarants available to be deposed.  And,

4  the Bankruptcy Court must have considered that new evidence from

5  the Trustee, because it is the only place in the record where

6  the Revised Settlement Agreement - the subject of the Bankruptcy

7  Court's order - appears.  Objecting Parties assert that the

8  Brincko Declaration was submitted to rebut the new declaration

9  submitted by the Trustee, and to rebut the super-priority claim

10  contained in the Revised Settlement Agreement.

11      In short, the Bankruptcy Court requested "additional

12  evidence," and that is what the Objecting Parties submitted.

13  The court cannot schedule the submission of additional evidence,

14  accept evidence submitted by one side, and then simply reject as

15  untimely the timely-filed evidence submitted by the other side

16  in rebuttal.[19]  Accordingly, it was an abuse of the Bankruptcy

17  Court's discretion to exclude the Brincko Declaration as

18  untimely, when in fact it was timely submitted in accordance

19  with the court's instructions.[20]

20  _____

21  [19] The Trustee relies upon Reed v. Anderson (In re Reed),
   422 B.R. 214 (C.D. Cal. 2009).  In that case, the Bankruptcy
22  Court excluded evidence because "'it was not submitted pursuant
   to the specified procedure.'"  Id.  In this case, the Objecting
23  Parties proffered the Brincko Declaration pursuant to the
   procedure specified by the Bankruptcy Court, both at the hearing
24  and in its subsequent order.

25  [20] This court takes no position on whether it might be proper for
   the Bankruptcy Court to reject the proffered declaration on
   other grounds.  For example, BMO argued in the Bankruptcy Court
26  that the Brincko Declaration should be excluded for failure to

3.  **Exclusion of the Brincko Declaration Was Not Harmless.**

The Trustee argues that the exclusion of the Brincko Declaration was at worst, harmless error, because the only thing the Declaration revealed was that litigation over the super-priority claim would be long, complex and costly.  In order to determine whether the exclusion was harmless error, it is necessary to examine the Bankruptcy Court's decision to approve the compromise, and whether the proffered declaration could reasonably be excluded from that process, given this court's ruling, <u>supra</u>, that the declaration was properly offered.

In deciding on the motion to approve the BMO compromise, the Bankruptcy Court has "great latitude."  <u>Woodson v. Fireman's Fund Ins. Co. (In re Woodson)</u>, 839 F.2d 610, 620 (9th Cir. 1988).  Nevertheless, it can approve the compromise "only if it is 'fair and equitable.'"  <u>Id.</u>  The Bankruptcy Court makes this determination by considering the following:

> "(a) The probability of success in the litigation;
>
> (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the

///

---

meet the requirements of <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579(1993).  However, the Bankruptcy Court did not make a determination under <u>Daubert</u>, and there has been no briefing or oral argument regarding the issue on this appeal. It is for the Bankruptcy Court to make this determination in the first instance.

18

1    paramount interest of the creditors and a proper

2    deference to their reasonable views in the premises."

3 Id., quoting Martin v. Kane (In re A & C Properties), 784 F.2d

4 1377, 1380-81 (9th Cir.), cert. denied sub nom. Martin v.

5 Robinson, 479 U.S. 854 (1986).

6   The very first consideration, then, is the probability of

7 success in the litigation.  In the context of the compromise on

8 appeal here, the Bankruptcy Court was required to consider the

9 probability that BMO would be able to establish that its super-

10 priority claim was worth $22 to $59 million, if it had to

11 litigate the issue.  See In re A & C Properties, 784 F.2d at

12 1382 (the Bankruptcy Court must apprise itself "'of all facts

13 necessary for an intelligent and objective opinion of the

14 probabilities of ultimate success should the claim be

15 litigated'").

16   The Bankruptcy Court determined that this factor weighed

17 "in favor of the compromise."  ER:733.  In reaching this

18 conclusion, the Bankruptcy Court considered BMO and the

19 Trustee's valuation of the claim, noting that "BMO contends the

20 SPC is somewhere between $22 million and $59 million," and that

21 "the compromise reflects a highly beneficial outcome for the

22 estate."  ER:734.  Implicitly then, the Bankruptcy Court found

23 that BMO was likely to prevail in litigation on the claim, at

24 least at the low end of its estimate.  But in reaching this

25 conclusion, the Bankruptcy Court did not consider the Objecting

26 Parties' position.  While noting that the Objecting Parties had

1  a different valuation,[21] the Bankruptcy Court simply "decline[d]

2  the Salyer entities' invitation to resolve these disputes."

3  ER:752.

4      This misconceives the Bankruptcy Court role in ruling on a

5  Rule 9019 motion.  Under the proper standard, the Bankruptcy

6  Court was not called upon to <u>resolve</u> the dispute about the

7  proper valuation of the claim, but it was required to <u>consider</u>

8  <u>the likelihood</u> that BMO would succeed in litigation over it.[22]

9  It could not give the issue proper considering by relying only

10 on the evidence presented by one side of the litigation.  To

11 illustrate, the Bankruptcy Court considered whether a settlement

12 was fair and equitable if the range of super-priority claim

13 possibilities was from $22 million on the low end, and

14 $59 million on the high end.  Given this range, it determined

15

16 [21] The Bankruptcy Court did acknowledge Objecting Parties'
   position that BMO suffered "no significant loss" on its
17 collateral, and that they asserted that liquidation value, not
   "going concern" value was the appropriate measure of such a
18 loss.

19 [22] At oral argument, the Trustee relied on <u>In re A & C Properties</u>
   and <u>Port O'Call Investment Co. V. Blair (In re Blair)</u>, 538 F.2d
20 849 (9th Cir. 1976) for the proposition that the Bankruptcy
   Court was not required to conduct a "mini-trial" on the super-
21 priority claim.  It is true that the Bankruptcy Court did not
   have to conduct a mini-trial, but it did have to consider what
22 was the likelihood of success of any litigation over the super-
   priority claim.  This consideration turns on the legal
23 uncertainty pointed out by counsel at oral argument, the
   uncertainty in the valuation of the claim, and possibly other
24 factors.  Since there does not appear to be controlling Ninth
   Circuit authority on the issue, it is not simply a legal issue
25 which this court could resolve here and now.  Rather, it is a
   factor in the "likelihood of success" consideration, which is
26 best determined in the first instance by the Bankruptcy Court.

1 │ that it was reasonable to accept BMO's generous offer to value

2 │ its own claim at the "lowest end of its own range of values,

3 │ such that the compromise reflects a highly beneficial outcome

4 │ for the estate." ER:734-35. But it cannot be determined

5 │ whether a settlement is fair and equitable by looking only at

6 │ the range of outcomes asserted by one side of that litigation.[23]

7 │ The only evidence of the other side's range of outcomes,

8 │ however, is contained in the Brincko Declaration, which was

9 │ erroneously excluded from consideration.

10 │     As noted, the Bankruptcy Court did acknowledge that the

11 │ Objecting Parties asserted a different view of the possible

12 │ outcome of the litigation. But the court's role at that point

13 │ was to include these assertions in its consideration of the

14 │ probability of success in the litigation. The Bankruptcy Court

15 │ did not do so. Instead, it used those assertions only to

16 │ conclude that the litigation would be "long, complex, difficult,

17 │ and costly." ER:752. This observation could well be correct,

18 │ but it does not relieve the Bankruptcy Court of its obligation

19 │ to consider the likelihood of success in litigation.

20 │     By erroneously excluding the Brincko Declaration, and by

21 │ further declining to consider which valuation method

22 │ (liquidation or "going concern") was likely to prevail in

23 │ ///

24 │

25 │ [23] This is highlighted by the fact that, according to the
26 │ evidence offered by Objecting Parties, the low end of the range
    │ of litigation outcomes is $0.00, not $22 million.

21

1  litigation,[24] the Bankruptcy Court could not properly consider

2  the "likeliness of success in litigation" factor it was required

3  to consider under In re A & C Properties.  The court indicated

4  that it did not need to determine the value of the super-

5  priority claim, but only whether "the compromise, on balance,

6  falls below the lowest point in the range of reasonableness."

7  ER:734.  The problem here is that the "range of reasonableness"

8  the Bankruptcy Court was considering was based upon a possible

9  litigation outcome range of $22 million to $59 million.  It may

10  well have reached a different conclusion if the litigation

11  outcome range it considered was from $0.00 to $59 million.[25]

12  Accordingly, this court cannot say that the error was harmless.

13  

14  [24] There appears to be no controlling authority on the valuation
    question, and the non-controlling cases come out on both sides.
15  See United Missouri Bank v. Federman (In re Modern Warehouse,
    Inc.), 74 B.R. 173 (W.D. Mo. 1987) (liquidation value).  See
16  also, In re Scopac, 624 F.3d 274, 285 (5th Cir. 2 010) ("In
    general, when valuing a secured claim under 11 U.S.C.
17  § 506(a)(1), fair-market value is the appropriate measure").
    The Ninth Circuit in Crocker Nat'l Bank v. American Mariner
18  Industries, Inc. (In re American Mariner Industries, Inc.),
    734 F.2d 426, 435 (1984), seems to hold that the court should
19  look to "liquidation" value when considering "adequate
    protection."  But that case was overruled by United Savings
20  Ass'n v. Timbers of Inwood, 484 U.S. 365 (1988), on a closely
    related point, see Cimarron Investors v. Wyid Properties (In re
21  Cimarron Investors), 848 F.2d 974, 976 (9th Cir. 1988), and it
    is not clear that In re American Mariner can now be relied upon
22  on this issue.

23  [25] It is worth noting that the BMO estimate is based, at least in
    part, on "reports prepared pre-petition by the debtor's
24  financial advisors."  ER:734.  However, no party disputes on
    appeal that those reports were based upon a "going concern"
25  valuation, rather than the liquidation valuation that Objecting
    Parties claim is the proper valuation for determining the super-
26  priority claim in this case.

22

1

**III. CONCLUSION**

2      For the foregoing reasons, (i) the appeal of Objecting

3 Parties is not moot; and (ii) the Bankruptcy Court erred by

4 excluding the Brincko Declaration on the basis that it was

5 submitted after the close of the evidentiary period.  Therefore,

6 IT IS ORDERED that the matter is REMANDED to the Bankruptcy

7 Court for further proceedings consistent with this order.

8      IT IS SO ORDERED.

9      DATED:   July 8, 2011.

10

11                          LAWRENCE K. KARLTON
                            SENIOR JUDGE
12                          UNITED STATES DISTRICT COURT

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# RJN
# EXHIBIT 4

2011-02337
FILED
May 04, 2011
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003469724

1  Gregory C. Nuti (CSBN151754)
   E-Mail: gnuti@schnader.com
2  Christopher H. Hart (CSBN 184117)
   E-Mail: chart@schnader.com
3  Natalie Bush-Lents (CSBN 253124)
   E-Mail: nbush-lents@schnader.com
4  SCHNADER HARRISON SEGAL & LEWIS LLP
   One Montgomery Street, Suite 2200
5  San Francisco, California 94104-5501
   Telephone: 415-364-6700
6  Facsimile: 415-364-6785

7  Attorneys for Bradley D. Sharp,
   Chapter 11 Trustee
8

9

10                UNITED STATES BANKRUPTCY COURT

11                 EASTERN DISTRICT OF CALIFORNIA

                        SACRAMENTO DIVISION
12

13  In re:                                   Case No. 09-29162-D-11

14  SK FOODS, L.P., a California limited      Chapter 11
    partnership,
15                                            Adversary Proceeding No.
                            Debtor.
16

17  BRADLEY D. SHARP, Chapter 11 Trustee,     COMPLAINT FOR:

18            Plaintiff,                      1.  AVOIDANCE AND RECOVERY OF
                                                  TRANSFERS OF PROPERTY
19       vs.                                       PURSUANT TO 11 U.S.C. §§ 544, 548,
                                                  AND 550 AND CALIFORNIA CIVIL
20  SKPM Corp., Inc., SSC&L 2007 Trust,           CODE  §§3439.04, 3439.05, AND
    Monterey Peninsula Farms, LLC, Fredrick        3439.07;
21  Scott Salyer aka Scott Salyer in his capacity  2.  WILLFUL VIOLATION OF THE
    as trustee of the Scott Salyer Revocable          AUTOMATIC STAY
22  Trust and trustee of the SSC&L 2007 Trust,
    Scott Salyer Revocable Trust, Fast Falcon,
23  LLC, Henry John Heath, and Does 1-5,

24            Defendants.

25

26       Bradley D. Sharp (the "Trustee" or "Plaintiff"), the duly appointed and acting chapter

27  11 trustee for substantively consolidated debtors SK Foods, L.P., a California limited

28  partnership ("SK Foods"), and RHM Industrial/Specialty Foods, Inc., a California corporation,

PHDATA 3369682_1

COMPLAINT

1  d/b/a Colusa County Canning Co. ("RHM" and collectively with SK Foods, the "Debtors"),

2  alleges as follows:

### INTRODUCTION

4  1.  By this complaint, the Trustee seeks to recover certain transfers of SK Foods'

5  property to the extent that such transfers occurred. Specifically, the Trustee seeks to recover

6  SK Foods' equity interest in SK Foods Australia Pty Ltd. ("Cedenco") that was allegedly

7  transferred to or by various entities owned and controlled by Scott Salyer as set forth below.

8  Additionally, the Trustee seeks to recover an intercompany claim for a loan that SK Foods

9  made to Cedenco that was also allegedly transferred to or by various entities owned and

10 controlled by Scott Salyer as set forth below.

11 2.  In connection with attempting to effectuate the alleged transfers, Henry John

12 Heath, a former director of Cedenco took actions post-petition in an attempt to effectuate the

13 alleged transfers describes herein in violation of 11 U.S.C. § 362.

### JURISDICTION AND VENUE

15 3.  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

16 §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(H).

17 4.  Venue properly lies in this judicial district pursuant to 28 U.S.C. §1409(a) in

18 that the instant adversary proceeding is related to the above-captioned case under Title 11 of

19 the United States Code.

### THE PARTIES

21 5.  Plaintiff Bradley D. Sharp is the duly appointed and acting Chapter 11 Trustee

22 in the cases of SK Foods, L.P., a California limited partnership ("SK Foods"), and RHM

23 Industrial Specialty Foods, Inc., a California corporation, d/b/a Colusa County Canning Co.

24 ("RHM") (collectively, "the Debtors").

25 6.  Fredrick Scott Salyer aka Scott Salyer ("Salyer") is an individual residing in the

26 State of California. The Trustee is informed and believes and thereon alleges that Salyer is

27 trustee of Scott Salyer Revocable Trust and the SSC&L 2007 Trust.

28

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

2

PHDATA 3369682_1

**COMPLAINT**

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

7.    The Trustee is informed and believes and thereon alleges that the Scott Salyer Revocable Trust ("SSRT") is a California trust whose beneficiary is Salyer.  SSRT is the sole limited partner of SK Foods.

8.    The Trustee is informed and believes and thereon alleges that SKPM Corporation ("SKPM"), a California corporation, is the general partner of SK Foods and is wholly owned by the Scott Salyer Revocable Trust.

9.    The Trustee is informed and believes and thereon alleges that the SSC&L 2007 Trust ("SSC&L") is a California trust whose beneficiary is Salyer.

10.    The Trustee is informed and believes and thereon alleges that Fast Falcon, LLC is an entity of unknown capacity whose address is 3450 21st Street, San Francisco, California 94104.  Cary S. Collins is its manager.

11.    Monterey Peninsula Farms, LLC ("MPF") is a California limited liability company.  Salyer, SKPM, SSRT, SSC&L, MPF, Fast Falcon, and MPF are collectively referred to as the "Salyer Defendants".

12.    Henry John Heath ("Heath") is an individual and resident of Australia.  Heath is a former director of Cedenco.

13.    The true names and capacities of Defendants DOES 1 through 5, inclusive, are unknown to Plaintiff at this time.  Therefore, the Trustee sues said Defendants by such fictitious names.  The Trustee believes that each of these fictitiously named Defendants is responsible in some manner for the occurrences alleged herein and is believed to have proximately caused damages.  The Trustee will seek leave of Court to amend this Complaint to insert the true names and capacities of said fictitiously named Defendants when the same have been ascertained.

## GENERAL ALLEGATIONS

14.    On May 5, 2009 (the "Petition Date"), involuntary bankruptcy petitions were filed against Debtors SK Foods and RHM.  Thereafter, on May 7, 2009, the Debtors filed a voluntary petition for relief (the "Bankruptcy Case") under chapter 11 of Title 11 of the United

PHDATA 3369682_1

COMPLAINT

1  States Code, 11 U.S.C. § 101, et. seq. (the "Bankruptcy Code"). The Plaintiff was appointed
2  the chapter 11 trustee in the Bankruptcy Case and presently serves in that capacity.

### The Intercompany Loan

4       15.    On February 27, 2002, SK Foods transferred US$6,250,000.00 from Mid–
5  Peninsula Bank to Banc One, NA Australian Branch for the benefit of Cedenco. At the
6  exchange rate at that time, that resulted in a deposit of AU$12,131,152.95. Cedenco entered
7  this transaction on its books as a loan from SK Foods. Scott Salyer signed a promissory note
8  payable to SK Foods from Cedenco dated February 25, 2002 for AU$12,131,152.95
9  ("Intercompany Loan").

10       16.    Cedenco at all times treated the Intercompany Loan as a loan from SK Foods.

11       17.    The amount owing on the Intercompany Loan as of the date of this complaint is
12  in excess of US$17,074,283.00 plus accruing interest and other charges.

### Equity Interest in Cedenco

14       18.    In January 2002, Cedenco issued 100 shares to SK Foods and SK Foods
15  consented to becoming a member of Cedenco. Attached as Exhibit A is Cedenco's statutory
16  register indicating SK Foods ownership of 100 shares of Cedenco.

17       19.    On February 28, 2002, SK Foods instructed Banc One, NA Australian Branch
18  to transfer AU$12,040,438.02 from Cedenco to Cerebosa, the then other interest holder in
19  Cedenco in full satisfaction of Cerebosa's interest in Cedenco. Thereafter, SK Foods held
20  99.01% of the equity in Cedenco ("Equity Interest").

### Liquidation of Cedenco

22       20.    Cedenco is subject to liquidation proceedings in Australia which has resulted in
23  its sale ("Australian Liquidation"). The Australian Liquidation has produced proceeds
24  sufficient to pay all creditors of Cedenco in full, including the Intercompany Loan, and provide
25  payment on account of SK Food's Equity Interest in an amount in excess of $32 million.

26       21.    The Australian Liquidation is currently being administered by Sheahan Lock
27  Partners in Adelaide, Australia ("Liquidator"). The Liquidator has requested anyone asserting
28  a claim to the proceeds of the Australian Liquidation to submit such claims to the Liquidator.

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

COMPLAINT

1    22.    The Trustee has submitted claims to the Liquidator for payment on account of

2    the Intercompany Loan and the Equity Interest.

3    23.    The Salyer Defendants have also submitted claims to the Liquidator for

4    payment on account of the Intercompany Loan and Equity Interest claiming SK Foods

5    transferred these assets pre-petition as set forth below.

6    ### ALLEGED TRANSFER OF INTERCOMPANY LOAN

7    24.    The Trustee is informed and believe and thereon alleges that the Salyer

8    Defendants claim SK Foods transferred the Intercompany Loan to SSC&L ("Initial

9    Intercompany Loan Transfer"). Although the Salyer Defendants do not disclose the date of the

10   alleged transfer, the earliest this transfer could have occurred, if at all, is December 18, 2007.

11   25.    The Trustee is informed and believe and thereon alleges that SSC&L did not

12   pay any consideration to SK Foods for the Initial Intercompany Loan Transfer.

13   26.    The Trustee is informed and believe and thereon alleges that the Salyer

14   Defendants claim that SSC&L thereafter transferred the Intercompany Loan to Fast Falcon

15   ("Subsequent Intercompany Loan Transfer").

16   27.    The Trustee is informed and believe and thereon alleges that Fast Falcon did not

17   pay any consideration to SSC&L for the Subsequent Intercompany Loan Transfer.

18   28.    The Trustee contends the Initial Intercompany Loan Transfer and Subsequent

19   Intercompany Loan Transfer (collectively, "Loan Transfers") each were invalid and of no

20   effect such that SK Foods at all relevant times retained complete ownership and title to the

21   Intercompany Loan. Whether the Loan Transfers transferred the Intercompany Loan is an

22   issue being decided in the context of the Australian Liquidation. In the event the Liquidator

23   finds either or both of the Loan Transfers valid, then the Trustee may avoid either or both Loan

24   Transfer as fraudulent conveyances as set forth below.

25   ### ALLEGED TRANSFER OF THE EQUITY INTEREST

26

27   29.    The Trustee is informed and believe and thereon alleges that the Salyer

28   Defendants claim SK Foods transferred the Equity Interest to SKPM and SSRT, transferring

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

5

**COMPLAINT**

1  54.45% to SKPM ("SKPM Interest") and 45.55% to SSRT ("SSRT Interest"). The transfer of

2  the SKPM Interest and SSRT Interest shall be referred to collectively as the "Initial Equity

3  Transfer". The Initial Equity Transfer could not have occurred, if at all, prior to March 28,

4  2008.

5       30.    The Trustee is informed and believe and thereon alleges that SK Foods did not

6  receive any consideration for the Initial Equity Transfer.

7       31.    The Trustee is informed and believe and thereon alleges that the Salyer

8  Defendants claim that SKPM thereafter transferred the SKPM Interest to MPF on or about

9  January 17, 2009 (the "SKPM Subsequent Transfer").

10      32.    The Trustee is informed and believe and thereon alleges that SKPM did not

11 receive any consideration in exchange for the SKPM Subsequent Transfer.

12      33.    The Trustee is informed and believe and thereon alleges that the Salyer

13 Defendants claim that SSRT thereafter transferred the SSRT Interest to MPF on or about

14 January 17, 2009 (the "SSRT Subsequent Transfer").

15      34.    The Trustee is informed and believe and thereon alleges that SSRT did not

16 receive any consideration in exchange for the SSRT Subsequent Transfer.

17      35.    The Trustee is informed and believe and thereon alleges that the Salyer

18 Defendants claim that MPF thereafter transferred the SKPM Interest and SSRT Interest to Fast

19 Falcon on or about June 29, 2009 (collectively, the "MPF Subsequent Transfers").

20      36.    The Trustee is informed and believe and thereon alleges that MPF did not

21 receive any consideration in exchange for the MPF Subsequent Transfers.

22      37.    The Trustee contends the Initial Equity Transfer, SKPM Subsequent Transfer,

23 SSRT Subsequent Transfer and MPF Subsequent Transfer (collectively, "Equity Transfers")

24 each were invalid and of no effect such that SK Foods at all relevant times retained complete

25 ownership and title to the Australian Equity. Whether the Equity Transfers transferred the

26 Australian Equity is an issue being decided in the context of the Australian Liquidation. In the

27 event the Liquidator finds any or all of the Equity Transfers valid, then the Trustee may avoid

28 any and all of the Equity Transfers as fraudulent conveyances as set forth below.

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

COMPLAINT

1    38.    Realizing the documentation of the Initial Equity Transfer was insufficient to

2  effectuate a transfer of the Equity Interest, on or about July 10, 2009, Heath prepared and filed

3  an Australian Securities & Investments Commission form entitled "Change to company

4  details" (the "ASIC Form"). A copy of the ASIC form is attached as Exhibit B. Heath

5  prepared and filed the ASIC Form with the intent to cure a legal defect in the documentation of

6  Initial Equity Transfer and thus effectuate the intended transfer.

**COUNT I**
**To Avoid and Recover Fraudulent Transfers**
**(Loan Transfers)**
**11 U.S.C. §§548(a)(1)(B) and 550(a) and Cal. Civil Code §§3439.05 and 3439.07**
**Against Defendant SSC&L 2007 Trust, Fast Falcon and Does 1 through 5**

11    39.    The Trustee hereby refers to Paragraphs 1 through 38, inclusive, and by such

reference hereby incorporates and re-alleges them herein.

40.    To the extent they occurred, the Loan Transfers were transfers of SK Foods'

property.

41.    To the extent they occurred, the Loan Transfers were made within four years of

the date of the Petition.

42.    To the extent they occurred, the Loan Transfers were made without SK Foods

receiving a reasonably equivalent value from the SSC&L or Fast Falcon in exchange for the

Loan Transfers.

43.    To the extent the Loan Transfers occurred, SK Foods was insolvent on the date

of the Initial Loan Transfer was made or became insolvent as a result of the Initial Loan

Transfer, or was engaged in business or a transaction, or was about to engage in business or a

transaction, for which any property remaining with SK Foods was unreasonably small capital,

or intended to incur, or believed that SK Foods would incur debts that would be beyond SK

Foods' ability to pay such debts as they matured.

44.    To the extent the Loan Transfers occurred, the Trustee is entitled to avoid and

recover the Loan Transfers or the value of the Loan Transfers from SSC&L and Fast Falcon

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3369682_1

**COMPLAINT**

1  for the benefit of the estate pursuant to the provisions of 11 U.S.C. §§548(a)(1)(B) and 550(a)

2  and California Civil Code §§3439.07 and 3439.05.

3      Wherefore, the Trustee prays for judgment as set forth below.

4                              **COUNT II**
                **To Avoid and Recover Fraudulent Transfers**
5                          **Equity Transfers**
          **11 U.S.C. §§548(a)(1)(B) and 550(a) and Cal. Civil Code §§3439.05 and 3439.07**
6        **Against Defendants SKPM, SSRT, MPF, Fast Falcon, and Does 1 through 5**

7      45.    The Trustee hereby refers to Paragraphs 1 through 44, inclusive, and by such

8  reference hereby incorporates and re-alleges them herein.

9      46.    To the extent they occurred, the Equity Transfers were transfers of SK Foods'

10 property.

11     47.    To the extent they occurred, the Equity Transfers were made within four years

12 of the date of the Petition.

13     48.    To the extent they occurred, the Equity Transfers were made without SK Foods

14 receiving a reasonably equivalent value from SKPM.

15     49.    To the extent the Equity Transfers occurred, SK Foods was insolvent on the

16 date of the Initial Equity Transfer was made or became insolvent as a result of the Initial

17 Equity Transfer, or was engaged in business or a transaction, or was about to engage in

18 business or a transaction, for which any property remaining with SK Foods was unreasonably

19 small capital, or intended to incur, or believed that SK Foods would incur debts that would be

20 beyond SK Foods' ability to pay such debts as they matured.

21     50.    To the extent the Equity Transfers occurred, Plaintiff is entitled to avoid and

22 recover the Equity Transfers or the value of the Equity Transfers from SSC&L, SSRT, MPF

23 and Fast Falcon for the benefit of the estate pursuant to the provisions of 11 U.S.C.

24 §§548(a)(1)(B) and 550(a) and California Civil Code §§3439.07 and 3439.05.

25                              **COUNT III**
        **Damages for Willful Violation of the Automatic Stay Pursuant to 11 U.S.C. § 362**
26          **Against Defendant Henry John Heath and Does 1 through 5**

27     51.    The Trustee hereby refers to Paragraphs 1 through 50, inclusive, and by such

28 reference hereby incorporates and re-alleges them herein.

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

8

PHDATA 3369682_1

COMPLAINT

52.    Pursuant to 11 U.S.C. § 362(a) the filing of the Debtor's bankruptcy petition stayed any act by the Salyer Defendants and Heath to, *inter alia,* obtain possession of, perfect an interest in, enforce a lien against, or take any other action to deprive SK Foods of the Equity Interest.

53.    Salyer Defendants and Heath had actual or constructive knowledge of SK Foods' bankruptcy case and the existence of the automatic stay.

54.    By filing the ASICS Form Heath willfully attempted to perfect or effectuate the Equity Transfers or obtain possession or title to the Equity Interest in violation of 11U.S.C § 362(a).

55.    Heath's actions have caused damage to the SK Foods and the estate.

Wherefore, the Trustee prays for judgment as set forth below.

### PRAYER

WHEREFORE, the Trustee prays for judgment as follows:

1.    On the First Count, against SSC&L and Fast Falcon, jointly and severally:

   i.   For judgment avoiding and preserving for the benefit of the estate the Loan Transfers, including both the Initial Loan Transfer and Subsequent Loan Transfer;

   ii.  For judgment against SSC&L and Fast Falcon, jointly and severally in an amount not less than $17,074,283.00 together with prejudgment and post judgment interest thereon at the legal rate allowed under 28 U.S.C. §1961 from the date of the Initial Loan Transfer;

2.    On the Second Count against SKPM, SSRT, MPF, and Fast Falcon, jointly and severally:

   i.   For judgment avoiding and preserving for the benefit of the estate the Equity Transfers, including the Initial Equity Transfer, SKPM Subsequent Transfer, SSRT Subsequent Transfer and MPF Subsequent Transfer;

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

9

PHDATA 3369682_1

**COMPLAINT**

1         ii.  For judgment against SKPM, SSRT, MPF, and Fast Falcon in an amount

2    equal to the value of the Equity Transfers to be proved at trial together

3    with prejudgment and post judgment interest thereon at the legal rate

4    allowed under 28 U.S.C. §1961 from the date of the Initial Equity

5    Transfer;

6       3.    On the Third Count against Heath and Does 1 through 5:

7         i.  For judgment finding Heath and Does 1 through 5 willfully violated 11

8    U.S.C. § 362(a) and awarding damages according to proof at trial .

9       4.    For costs of suit herein;

10      5.    For such other and further relief as the Court may deem just and proper.

11

12   Dated: May 4, 2011                    SCHNADER HARRISON SEGAL & LEWIS LLP

13

14                       /s/ *Gregory C. Nuti*

                        Gregory C. Nuti

15                           Kevin W. Coleman

                        Attorneys for Bradley D. Sharp,

16                           Chapter 11 Trustee

17

18

19

20

21

22

23

24

25

26

27

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE (415) 364-6700
FAX: (415) 364-6785

10

PHDATA 3369682_1

**COMPLAINT**

# EXHIBIT A

# SK Foods Australia Pty Ltd

A.C.N.: 099 245 735

## Members Register 7/03/2002

**Ordinary**

**SK Foods LP**

| Fair Value | Amount Due | Certificate Number | Transaction | | | Registration Date | Number | | Balance Held | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Type | Date | | | Acquired | Disposed | Beneficially | Non-Beneficially |
| $1.00 | $0.00 | 1 | Allotment | 11/01/2002 | | 11/01/2002 | 100 | | 100 | |

# SK Foods Australia Pty Ltd (Company)

# Member's consent

## 1      Consent to become a member

SK Foods LP of Suite 203, 300 Sky Park Drive, Monetcrey, California, USA 93940 consents to become a member of the Company and being named in an application for registration of the Company as a proposed member.

## 2      Agreement to the terms of the constitution

SK Foods LP agrees to the terms of the proposed constitution of the Company dated          January 2002.

## 3      Agreement to take up shares

SK Foods LP agrees to take up 100 shares in the capital of the Company at a price of $1.00 per share and agrees to pay the full amount for the shares on registration of the Company.

**Dated:**

**Signed by**

**SK Foods LP**

by:

_Richard B. Washburn_ (signature)

Secretary/Director

_Richard B. Washburn_

Name (please print)

_Scott Salyer_ (signature)

Director

_Scott Salyer_

Name (please print)

(c) The offices and property that I hold where duties or interests might be created in conflict with my duties or interests as a director of the company, and the nature, character and extent of the conflict, are:

(d) Details of the nature and extent of interests in matters that relate to the affairs of the company not disclosed above are as follows:

## 3 Notification of change in personal details

I agree to notify the company of any change in my personal details within 7 days after the change.[4]

Signature:  Date: 4-10-02

[1] If you need more space attach a separate page. This information in paragraph 1 of the Consent is required so that the company can notify the ASIC of the personal details of each director of the company within 14 days of appointment, as required by section 205B of the Corporations Act.

A company will be in breach of section 201D of the Corporations Act if a person does not give the company a signed consent to act as a director of the company before being appointed.

[2] A person's address must be their usual residential address, unless either:

(a) their name, but not their residential address, is on an electoral roll under the Commonwealth Electoral Act 1918 because of section 104 of that Act (which allows a person to request that his or her name not appear on an electoral roll on the grounds that it would place that person or a member of that person's family at risk); or

(b) their name is not on an electoral roll under that Act and the ASIC has determined, in writing, that including their residential address in the notices required by section 205B of the Corporations Act would put at risk their personal safety or that of their family. A person may apply to use an alternative address using form 378: (see section 205D(2)).

If either (a) or (b) applies, you are entitled to provide an alternative address which must be in Australia and be one at which documents can be served on you. A person who is entitled to use an alternative address

# EXHIBIT B

**Australian Securities &**
**Investments Commission**

**Form 484**
Corporations Act 2001

# Change to company details

Sections A, B or C may be lodged independently with this signed cover page to notify ASIC of:

| | | |
|---|---|---|
| A1 Change of address | B1 Cease company officeholder | C1 Cancellation of shares |
| A2 Change of name - officeholders and proprietary company members | B2 Appoint company officeholder | C2 Issue of shares |
| A3 Change - ultimate holding company | B3 Special purpose company | C3 Change to share structure |
| | | C4 Changes to the register of members for proprietary companies |

If there is insufficient space in any section of the form, you may photocopy the relevant page(s) and submit as part of this lodgement

| **Company details** | | |
|---|---|---|
| | Company name | |
| | SK FOODS AUSTRALIA PTY LTD | |
| Refer to guide for information about corporate key | ACN/ABN | Corporate key |
| | 099 245 735 | 52792603 |

| **Lodgement details** | |
|---|---|
| | Who should ASIC contact if there is a query about this form? |
| | Firm/organisation |
| | DELOITTE PRIVATE PTY LIMITED |
| | Contact name/position description |
| | |
| | ASIC registered agent number (if applicable) |
| | 321 |
| | Telephone number |
| | |
| | Postal address or DX address |
| | LEVEL 9 550 BOURKE STREET |
| | MELBOURNE, VIC, 3000 |
| | Total number of pages including this cover sheet |
| | |

## Signature
This form must be signed by a current officeholder of the company.

I certify that the information in this cover sheet and the attached sections of this form are true and complete.

Name

HEATH, HENRY JOHN

Capacity

[✓] Director

[ ] Company secretary

Signature

Date signed

| 1 | 0 | | 0 | 7 | | 0 | 9 |
|---|---|---|---|---|---|---|---|
| [D | D] | | [M | M] | | [Y | Y] |

| **Lodgement** | | |
|---|---|---|
| | Send completed and signed forms to: | For help or more information |
| | Australian Securities and Investments Commission, | Telephone   1300 300 630 |
| | PO Box 4000, Gippsland Mail Centre VIC 3841. | Email   info.enquiries@asic.gov.au |
| | | Web   www.asic.gov.au |
| | Or lodge the form electronically by visiting the ASIC website www.asic.gov.au | |

ASIC Form 484    Reference: 8515055    6 September 2007    Trace:    Cover page

## C4 Changes to the register of members for proprietary companies

Use this section to notify changes to the register of members for your proprietary company (changes to the shareholdings of members):
- If there are 20 members or less in a share class, all changes need to be notified
- If there are more than 20 members in a share class, only changes to the top twenty need be notified (s 788)
- If shares are jointly owned, you must also provide names and addresses of all joint owners on a separate sheet (annexure), clearly indicating the share class and with whom the shares are jointly owned

**The changes apply to**
Please indicate the name and address of the member whose shareholding has changed

Family name

Given names

OR

☑ Company name

SK PM CORPORATION

ACN/ARBN/ ABN

Office, unit, level, or PO Box number
21 LOWER RAGSDALE DRIVE

Street number and Street name
MONTEREY

Suburb/City
CALIFORNIA 93940

State/Territory

Postcode

Country (if not Australia)
UNITED STATES OF AMERICA

**Earliest date of change**
Please indicate the earliest date that any of the following changes occurred.

Date of change
| 0 | 1 | , | 1 | 1 | , | 0 | 6 |
| [D | D] | [M | M] | [Y | Y] |

**The changes are**

| Share class code | Shares increased by . . . (number) | Shares decreased by . . . (number) | Total number now held | Total $ paid on these shares | Total $ unpaid on these shares | Fully paid (y/n) | Beneficially held (y/n) | Top 20 member (y/n) |
|---|---|---|---|---|---|---|---|---|
| ORD | 55 | | 55 | 3,490,058.55 | 0.00 | Yes | Yes | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Date of entry of member's name in register**
(New members only)

Date of entry
| 0 | 1 | 1 | 1 | 0 | 6 |
| [D | D] | [M | M] | [Y | Y] |

## C4 Changes to the register of members for proprietary companies

Use this section to notify changes to the register of members for your proprietary company (changes to the shareholdings of members):

- If there are 20 members or less in a share class, all changes need to be notified
- If there are more than 20 members in a share class, only changes to the top twenty need be notified (s178B)
- If shares are jointly owned, you must also provide names and addresses of all joint owners on a separate sheet (annexure), clearly indicating the share class and with whom the shares are jointly owned

| | |
|---|---|
| The changes apply to<br>Please indicate the name and address of the member whose shareholding has changed | ☑ Family name **SALYER**  Given names **SCOTT** |
| | OR |
| | ☐ Company name |
| | ACN/ARBN/ABN |
| | Office, unit, level, or PO Box number **200 SKY PARK DRIVE** |
| | Street number and Street name **MONTEREY** |
| | Suburb/City **CALIFORNIA 93940**  State/Territory |
| | Postcode  Country (if not Australia) **UNITED STATES OF AMERICA** |

Earliest date of change
Please indicate the earliest date that any of the following changes occurred.

Date of change
| 0 | 1 | / | 1 | 1 | / | 0 | 6 |
| [D | D] | | [M | M] | | [Y | Y] |

The changes are

| Share class code | Shares increased by ... (number) | Shares decreased by ... (number) | Total number now held | Total $ paid on these shares | Total $ unpaid on these shares | Fully paid (y/n) | Beneficially held (y/n) | Top 20 member (y/n) |
|---|---|---|---|---|---|---|---|---|
| ORD | 45 | | 45 | 2,855,502.45 | 0.00 | Yes | No | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Date of entry of member's name in register
(New members only)

Date of entry
| 0 | 1 | / | 1 | 1 | / | 0 | 6 |
| [D | D] | | [M | M] | | [Y | Y] |

## C4 Changes to the register of members for proprietary companies

Use this section to notify changes to the register of members for your proprietary company (changes to the shareholdings of members):
- If there are 20 members or less in a share class, all changes need to be notified
- If there are more than 20 members in a share class, only changes to the top twenty need be notified (s178B)
- If shares are jointly owned, you must also provide names and addresses of all joint owners on a separate sheet (annexure), clearly indicating the share class and with whom the shares are jointly owned

**The changes apply to**
Please indicate the name and address of the member whose shareholding has changed

| | |
|---|---|
| ☐ Family name | Given names |

OR

☑ Company name

SK FOODS LP

ACN/ARBN/ ABN

Office, unit, level, or PO Box number

SUITE 203

Street number and Street name

300 SKY PARK DRIVE

Suburb/City: MONTEREY, CALIFORNIA, 93940     State/Territory

Postcode     Country (if not Australia): UNITED STATES OF AMERICA

**Earliest date of change**
Please indicate the earliest date that any of the following changes occurred.

Date of change
| 0 | 1 | / | 1 | 1 | / | 0 | 6 |
| [D | D] | | [M | M] | | [Y | Y] |

**The changes are**

| Share class code | Shares increased by ... (number) | Shares decreased by ... (number) | Total number now held | Total $ paid on these shares | Total $ unpaid on these shares | Fully paid (y/n) | Beneficially held (y/n) | Top 20 member (y/n) |
|---|---|---|---|---|---|---|---|---|
| ORD | | 100 | 0 | 0.00 | 0.00 | Yes | Yes | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Date of entry of member's name in register**
(New members only)

Date of entry
| | | / | | | / | | |
| [D | D] | | [M | M] | | [Y | Y] |

FILED
September 07, 2011
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0003752037

**FILED**

SEP 0 8 2011

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

# RJN

# EXHIBIT 5



This is to certify that this is a true and correct copy
of the original _____ page(s) filed on _9/7/11_
in the office of the Clerk, U.S. Bankruptcy Court.

WAYNE BLACKWELDER
U.S. Bankruptcy Court

By _____
Deputy Clerk

2010-02014
FILED
January 11, 2010
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002339953

57 Pages

1  Gregory C. Nuti, (SBN 151754)
   E-Mail: gnuti@schnader.com
2  Kevin W. Coleman (SBN 168538)
   E-Mail: kcoleman@schnader.com
3  SCHNADER HARRISON SEGAL & LEWIS LLP
4  One Montgomery Street, Suite 2200
   San Francisco, California 94104-5501
5  Telephone: 415-364-6700
   Facsimile: 415-364-6785
6
   John K. Gisleson (Pro Hac Vice)
7  E-Mail: jgisleson@schnader.com
   Keith E. Whitson (Pro Hac Vice)
8  E-Mail: kwhitson@schnader.com
   SCHNADER HARRISON SEGAL & LEWIS LLP
9  Fifth Avenue Place
   120 Fifth Avenue, Suite 2700
10 Pittsburgh, Pennsylvania 15222-3001
   Telephone: 412-577-5200
11 Facsimile: 412-765-3858
   Attorneys for Plaintiff Bradley D. Sharp,
12 Chapter 11 Trustee

13              UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF CALIFORNIA
14                  SACRAMENTO DIVISION

15 | In re                                    | Case No.: 09-29162
16 |                                           | Chapter 11
   | SK Foods, LP, a California limited partnership, |
17 |                                           | A.P. No.
   |              Debtor.                      |
18 |-------------------------------------------|
19 | Bradley D. Sharp, Chapter 11 Trustee of SK | **ADVERSARY COMPLAINT FOR**
   | Foods, L.P., a California limited partnership, | **(1) AVOIDANCE OF PREFERENTIAL**
20 |                                           | **PAYMENTS PURSUANT TO 11**
   |              Plaintiff,                    | **U.S.C. § 547**
21 | vs.                                       | **(2) AVOIDANCE OF FRAUDULENT**
   |                                           | **TRANSFERS PURSUANT TO 11**
22 | Scott Salyer as trustee of the Scott Salyer | **U.S.C. § 548**
   | Revocable Trust, SK PM Corp., SK Foods, LLC, | **(3) AVOIDANCE OF FRAUDULENT**
23 | SKF Canning, LLC, Scott Salyer Revocable  | **TRANSFERS PURSUANT TO 11**
   | Trust, Blackstone Ranch Corporation, Monterey | **U.S.C. §§ 544(B) AND 550(A) AND**
24 | Peninsula Farms, LLC, Salyer Management    | **CALIFORNIA CIVIL CODE §§**
   | Company, LLC, SK Farms Services, LLC, SK   | **3439.07, 3439.04 AND 3439.05**
25 | Frozen Foods, LLC, SS Farms LLC, SSC      | **(4) SUBSTANTIVE CONSOLIDATION**
   | Farming, LLC, SSC Farms I, LLC, SSC Farms | **(5) DECLARATORY RELIEF**
26 | II, LLC, SSC Farms III, LLC ,             | **(6) RECOVERY OF FRAUDULENT**
   |                                           | **TRANSFERS; AND**
27 |              Defendants.                  | **(7) TURNOVER OF PROPERTY OF**
   |                                           | **THE ESTATE**
28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE (415) 364-6700
FAX (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

1    Bradley D. Sharp, the duly appointed and acting Chapter 11 Trustee (the "Trustee") in the

2  cases of SK Foods, L.P., a California limited partnership ("SK Foods" or "Debtor"), hereby files

3  this Adversary Complaint, and in support thereof, avers as follows:

## INTRODUCTION

5    This adversary proceeding seeks to substantively consolidate and otherwise recover for

6  the benefit of the Debtor's estate assets transferred to or otherwise in the possession of the

7  Defendants.[1]  The Debtor created, funded and operated many of the Defendants to such an extent

8  that their financial affairs and identities are entangled with those of the Debtor.  The Defendants

9  have little if any operations outside of their relationships with the Debtor, never dealt with the

10  Debtor at arms-length, relied on the Debtor to create, store and maintain their records and to

11  provide management and administrative services, never observed corporate formalities separate

12  and apart from the Debtor, and generally existed solely to benefit the operations of the Debtor

13  and to shelter assets from creditors of the various Defendants.  Funds were transferred between

14  Debtor and Defendants whenever one entity needed funds or whenever it suited the tax planning

15  purposes of Scott Salyer, the ultimate owner of all Defendants.  A review of SK Foods' general

16  ledger alone reveals net transactions to the named defendants and certain other related parties of

17  over $200 million.  *See* Exhibit A, attached hereto.  At present, it is not reasonably possible to

18  reverse all these transactions and ascertain which entity owns which assets without depleting all

19  available assets.  There is such an identity of assets and interests that Debtor is rightfully deemed

20  the owner of all assets of the Defendants, and the Defendants should be substantively

21  consolidated with the Debtor's estate so that creditors of all these various entities may be treated

22  equitably.  Alternatively, the many transfers from Debtor to Defendants should be avoided and

23  those assets returned to the Debtor.

---

[1] In a separate proceeding, Debtor will seek to substantively consolidate with the Debtor's Estate the Estate of RHM Industrial Specialty Foods, Inc., a California corporation doing business as Colusa County Canning Co. ("RHM").

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE (415) 364-6700
FAX: (415) 364-6785

## THE PARTIES

1.      Plaintiff Bradley D. Sharp is the duly appointed and acting Chapter 11 Trustee in the cases of SK Foods, L.P., a California limited partnership ("SK Foods" or " Debtor").

2.      SK Foods is a California limited partnership with a principal office at 1175 19th Avenue, Lemoore, California.  Its registered agent is Scott Salyer.

3.      Scott Salyer ("Salyer") is an individual residing in the State of California.  The Trustee is informed and believes and thereon alleges that Scott Salyer is trustee of Scott Salyer Revocable Trust.

4.      The Trustee is informed and believes and thereon alleges that the Scott Salyer Revocable Trust ("SSR Trust") is a California trust whose beneficiary is Salyer.

5.      The Trustee is informed and believes and thereon alleges that SK PM Corporation ("SKPM") is a California corporation with is principal place of business located at 21 Lower Ragsdale Drive, Monterey, California.  Its registered agent is Mark McCormick.

6.      The Trustee is informed and believes and thereon alleges that SKF Canning, LLC ("SKF Canning") is a Nevada limited liability company.

7.      The Trustee is informed and believes and thereon alleges that SK Foods, LLC is a Nevada limited liability company.

8.      Defendants identified in paragraphs 3 through 7 are collectively referred to herein as the "Owner Defendants."

9.      Blackstone Ranch Corporation ('Blackstone") is a California corporation with a principal place of business at 1175 S. 19th Avenue, Lemoore, California.  Its registered agent is Mark McCormick.

10.      SS Farms LLC ("SS Farms") is a California limited liability company with a principal address of 1175 19th Avenue, Lemoore, California.  Its registered agent is Scott Salyer.

11.      SSC Farming, LLC ("SSC Farming") is a California limited liability company with a principal address of 1175 S. 19th Avenue, Lemoore, California.

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

1       12.    SSC Farms I, LLC ("SSC I") is a California limited liability company with a
2   principal address of 200 Sky Park Drive, Monterey, California. Its registered agent is Scott
3   Salyer.

4       13.    SSC Farms II, LLC ("SSC II") is a California limited liability company with a
5   principal address of 200 Sky Park Drive, Monterey, California. Its registered agent is Scott
6   Salyer.

7       14.    SSC Farms III, LLC ("SSC III") is a California limited liability company with a
8   principal address of 200 Sky Park Drive, Monterey, California. Its registered agent is Scott
9   Salyer.

10       15.    The Trustee is informed and believes and thereon alleges that Monterey Peninsula
11   Farms, LLC ("Monterey") is a California limited liability company.

12       16.    Salyer Management Company, LLC ("SMC") is a California limited liability
13   company with a principal place of business at 200 Sky Park Drive, Monterey, California. Its
14   registered agent is Scott Salyer.

15       17.    SK Farms Services, LLC ("SK Farms Services") is a California limited liability
16   company with a principal place of business at 200 Sky Park Drive, Monterey, California. Its
17   registered agent is Mark McCormick.

18       18.    SK Frozen Foods, LLC ("SK Frozen Foods") is a California limited liability
19   company with is principal place of business located at 200 Sky Park Drive, Monterey, California.
20   Its registered agent is Mark McCormick.

21       19.    Defendants identified in paragraphs 9 through 18 are collectively referred to
22   herein as the "Affiliated Defendants".

23                             **JURISDICTION AND VENUE**

24       20.    On or about May 7, 2009, the Debtor filed a voluntary petition for relief under
25   Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et. seq.* (the "Bankruptcy
26   Code."). An involuntary petition was filed with respect to the Debtor on or about May 5, 2009
27   ("Petition Date").

28

4

1    21.    This Court has jurisdiction over this adversary proceeding under 28 U.S.C.

2    §§ 1334 and 157, and Rule 7001(7) and (9) of the Federal Rules of Bankruptcy Procedure.

3    22.    This is a core proceeding under 28 U.S.C. §§ 1408 and 1409.

4    23.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5                              **BACKGROUND**[2]

6    **Common ownership, management and control**

7    24.    SK Foods is owned 45.55% directly by the SSR Trust.  The other 54.45% is

8    owned by SKPM, which in turn is owned 100% by the SSR Trust.

9    25.    RHM is owned 60% by SKF Canning, which in turn is owned 100% by the SSR

10   Trust.  Two trusts set up for Mr. Salyer's daughters (the Stephanie Ann Salyer 2007 Trust ("SAS

11   2007 Trust") and the Caroline Gazelle Salyer 2007 Trust ("CGS 2007 Trust")) own 20% each of

12   RHM as well.

13   26.    Mr. Salyer and his daughters, or trusts for which they are beneficiaries, own,

14   directly or indirectly in various combinations, 100% of each of the Owner Defendants and the

15   Affiliated Defendants.

16   27.    Blackstone, SKF Canning and SKPM are owned 100% by the SSR Trust.

17   28.    SK Foods, LLC is owned 45.55% directly by the SSR Trust, and 54.45% by

18   SKPM, which in turn is owned 100% by the SSR Trust.

19   29.    SS Farms and SSC Farming are each owned 60% by the SSR Trust, with the

20   Stephanie Ann Salyer Trust ("SAS Trust") and the Caroline Gazelle Salyer Trust ("CGS Trust")

21   each owning 20% as well.

22   30.    SSC I and SSC II are owned 50% by the SSR Trust and 50% by the SAS Trust.

23

24

25

26   _____

     [2] The allegations set forth herein are based on the Trustee's investigation and review of
     SK Foods' documents in compliance with all court orders currently in effect.  The Trustee
27   reserves the right to amend or supplement these allegations as appropriate as additional
     information becomes available.
28

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE (415) 364-6700
FAX (415) 364-6785

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

31.   SSC III is owned 33.34% by the SSR Trust and 33.33% each by Stefanie Salyer and Caroline Salyer.  Monterey is owned 61.52% by SSC Farming, 10.49% by SS Farms and 13.99% by SSC I, and 13.99% by SSC II.

32.   SK Frozen Foods and SMC are each owned 60% by the SSR Trust, and 20% each by the SAS 2007 Trust and the CGS 2007 Trust.

33.   SK Farms Services is owned 100% by SMC, which as set forth above, is owned by the SSR Trust, the SAS 2007 Trust and the CGS 2007 Trust.

34.   At all relevant periods Scott Salyer, by or through entities he owned and controlled, controlled, operated and managed the Debtor and each of the Owner Defendants and Affiliated Defendants.

35.   Salyer is the Trustee and beneficiary of the SSR Trust.

36.   Salyer was, at all relevant times, the President/Chief Executive of SKPM, the general partner of SK Foods.

37.   Salyer has represented himself at various points in time as Chief Executive Officer, Director and President of SK Foods.  He has also signed documents on behalf of SK Foods in his capacity as President of SKPM, its general partner.

38.   Salyer was at all relevant times Chief Executive Officer of RHM.

39.   Upon information and belief, Salyer was at all relevant times a principal officer of SKPM.

40.   Salyer controls the Owner Defendants through his direct or indirect ownership interests and his positions as an officer, manager, director or trustee of the Owner Defendants.

41.   Upon information and belief, Salyer is the Manager of, or has ultimate control over, SKF Canning, SK Foods, LLC, Blackstone, SS Farms, SSC Farming, SSC I, SSC II, SSC III, SK Frozen Foods, SMC, SK Farms Services and Monterey.

42.   Upon information and belief, Salyer controlled each of the Affiliated Defendants directly or indirectly by virtue of his ownership and/or management of the various trusts and companies named as Defendants.  He directly interacted with officers and managers and gave

6

1 instructions to them concerning operation and management of the Debtor and the Defendants,

2 and those officers and managers followed Salyer's instructions.

3 **Single Enterprise**

4     43.    The Debtor and the Defendants at all relevant times formed a cohesive single

5 enterprise that together enabled the Debtor to grow, harvest, process, ready for shipment and ship

6 tomatoes, other crops and products.

7     44.    Although each Affiliated Defendant claims separate corporate or other separate

8 and distinct legal existence and nominally hold title to separate assets, in reality, each Affiliated

9 Defendant is part of the Debtor's business and operates as part of a coordinated single enterprise.

10     45.    SSC Farming, SSC I, SSC II and SSC III, and for a time Blackstone, held title to

11 certain land and grew tomatoes or other crops on that land. SS Farms would provide farming

12 services, including harvesting, to these other entities. SS Farms would then provide the crops to

13 SK Foods or RHM for processing.

14     46.    In the course of processing tomatoes and other crops, SK Foods and RHM would

15 discharge wastewater on land owned by SSC Farming, SSC I and SSC II. SK Foods also utilized

16 wood bins nominally owned by the SSR Trust.

17     47.    SK Foods utilized assets and services of other entities owned and controlled by

18 Salyer for various transportation purposes, including but not limited to SKF Aviation, LLC and

19 CSSS, LP d/b/a Central Valley Shippers.

20     48.    SS Farms and Blackstone also held title to harvesters, vehicles and other

21 equipment which they made available for use by each other and SK Foods at the discretion of

22 employees of SK Foods. Blackstone also served as a conduit through which funds of SK Foods

23 and/or the Affiliated Defendants flowed to other Defendants, as well as a source of funds for

24 Salyer personally.

25     49.    SMC was formed to receive "management fees" from SS Farms and other

26 entities, allegedly for services provided by SK Foods' employees. In reality, SMC served as a

27 conduit through which funds of SK Foods and/or the Affiliated Defendants flowed to Salyer

28

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE (415) 364-6700
FAX (415) 364-6785

7

1 and/or one of Salyer's ex-wives to satisfy Salyer's personal obligations under a divorce
2 settlement.

3      50.    Monterey was formed for the purposes of pooling available assets of other
4 Affiliated Defendants, including SSC Farming, SSC I and SSC II, as well as other entities in
5 which Salyer had an interest. Upon information and belief, Salyer and the Owner Defendants
6 sought to pool assets within Monterey in order to obtain additional financing against the pooled
7 assets. Upon information and belief, but for aggregating the assets in a separate entity, the.
8 entities holding nominal title to the assets had insufficient equity or income with which to obtain
9 financing.

10      51.    SK Frozen Foods was formed in order to flash freeze vegetables. The Owner
11 Defendants intended SK Frozen Foods to be operated and funded by another Salyer-owned entity
12 (Salyer American Fresh Foods) (which is currently in receivership).

13      52.    SK Farms Services was formed in December 2007 to centralize purchasing for
14 Debtor and the other Defendants. This entity never had any independent operations or assets.

15      53.    SK Foods also owned international operations. These operations took place
16 mainly in New Zealand, Australia and Japan, and the entities involved in these operations are
17 hereinafter referred to as the "Foreign Entities."

18      54.    From a financial perspective, the Defendants and the Foreign Entities were
19 entirely dependent upon continued financing from SK Foods to remain operating.

20      55.    Each year before the start of the new packing season, generally in or about May,
21 Salyer and his management team would hold a "pre-pack meeting." At this meeting the
22 management of SK Foods met to discuss all or substantially all aspects of the season – planting,
23 growing, harvesting, processing, and selling. The pre-pack meeting necessarily required the
24 attendance and participation of the Defendants and their management teams, to the extent there
25 was any distinction. Attendees included individuals responsible for management of each of
26 those components, and the purpose of the meeting was to coordinate operations for the success of
27 the Debtor. The attendees included (among others) Salyer and the individuals responsible for
28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

Adversary Complaint

1  agriculture operations and sales.  The attendees generally discussed (among other things) what

2  customers wanted, what would be grown and packed, what would be processed, and costs.

3      56.    A written pack plan typically was created and distributed to facilitate coordination

4  and thus the operation as a single enterprise.  The pack plan included spreadsheets that identified

5  the anticipated crop yield, processing cost estimates, quantity and quality of customer contracts

6  and demands, and market prices for finished product.

7      57.    During the season, the management teams and individuals responsible for

8  growing, harvesting, processing, and selling would coordinate their effort.  For example, the

9  executive who oversaw operation of SK Foods' and RHM's processing plants would coordinate

10  with the executive responsible for agricultural operations.  Both were employees of SK Foods,

11  but the executive responsible for agricultural operations also had responsibility for certain of the

12  defendants that owned and farmed the land used for produce processed by SK Foods and RHM.

13      58.    SK Foods' Vice President of Ag Operations (Rick Emmett) had the authority to,

14  and did, direct, control, deploy and utilize all assets necessary to effect the pack each season

15  regardless of the entity that nominally held title to the particular assets.

16      59.    Employees of SK Foods could access land and use equipment nominally owned

17  by any particular Affiliated Defendant at their discretion without seeking or needing permission.

18      60.    Salyer and others in management of SK Foods and the Affiliated Defendants held

19  themselves out to the public and their creditors as a single enterprise.  Salyer and others in

20  management of SK Foods and the Affiliated Defendants sometimes referred to SK Foods and the

21  Defendants as "SK Foods Group".  The Debtor's marketing brochures described SK Foods

22  Group as "one of the world's leading international growers and processors of vegetable

23  products," confirming that the Debtor and the Defendants operated as a single enterprise.

24      61.    Salyer and certain management employees working for Salyer also have referred

25  to the various Salyer-owned Defendants, including the Owner Defendants, the Affiliated

26  Defendants and others, as "Salyer Enterprises," confirming the common ownership and control

27  of the various entities.

28

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE (415) 364-6700
FAX (415) 364-6785

9

Adversary Complaint

62.    In 2007, in negotiations with its lenders, SK Foods proposed to include many of the Defendants as co-obligors under the loans and lines of credit it was seeking to obtain. These Defendants included Blackstone, SS Farms, SSC Farming, SKPM, SKF Canning and RHM, and other parties included were RHM, SKF Aviation, LLC and CSSS, LP.

63.    The number of related entities and the relationships between and among the Defendants has caused confusion as to on whose behalf certain acts have been taken.

64.    Salyer purposely blurred the legal distinctions among the Debtor, the Owner Defendants and Affiliated Defendants in order to advance his personal objectives. He failed to maintain any separation of legal representation between and among the Debtor, the Owner Defendants and Affiliated Defendants and allowed sophisticated legal counsel to access confidential information of one entity to be used for the benefit of other entities and himself personally.

### No independent operations

65.    Apart from supporting the Debtor's processing business, the Affiliated Defendants have little or no independent operations and could not exist as a going concern but for the financial and operational assistance provided by the Debtor.

66.    SSC I and SSC II had two sources of revenue. SK Foods paid to discharge wastewater onto land to which they hold title (but which as set forth below was provided to them by SK Foods for no consideration). They also grew crops which they sold exclusively to SK Foods. SSC I and SSC II have no further agricultural operations since the sale of the Debtor's operating assets—their entire business was limited to growing crops for SK Foods and receiving discharged wastewater from SK Foods.

67.    Other than a minor quantity, all of SSC Farming's crops were sold to SK Foods.

68.    Ninety percent or more of crops harvested by SS Farms were processed by SK Foods.

69.    SS Farms performed agricultural services almost entirely for Debtor and other Defendants, such as SSC Farming and Blackstone.

70.    RHM was a contract processor for SK Foods, and had no other operations.

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

1     71.    SKF Aviation, LLC obtained 100% of its operating revenue exclusively from SK

2   Foods and related parties. It had no revenue generated from any third-party source. Strictly for

3   accounting purposes, SKF Aviation's operating costs were intended to be allocated between SK

4   Foods, RHM, SS Farms and Cedenco (one of the Foreign Entities), although SK Foods

5   historically funded substantially all costs and expenses of ownership and operation. Although

6   SKF Aviation provided some aviation transportation to SK Foods employees for business related

7   travel, the amount of such services were grossly in disproportion to the amount of funding

8   provided by SK Foods. Substantially all of CSSS, LP's revenues are derived from services

9   rendered to SK Foods.

10     72.    In fact, many of the Affiliated Defendants did not have any employees. For

11   instance, Blackstone and SSC Farming did not have any employees. The few CSSS and SS

12   Farms employees reported to SK Foods managers.

13     73.    Upon information and belief, all of the other Affiliated Defendants had limited, if

14   any, operations or interactions outside the SK Foods family of companies.

15   **Affiliated Defendants were never capitalized or operated for profit**

16     74.    Many, if not all, of the Affiliated Defendants were never capitalized from funds

17   outside the enterprise. The Debtor directly and indirectly provided "intercompany" transfers,

18   alleged "prepaid expenses" or putative loans in order to capitalize the Affiliated Defendants.

19     75.    For example, the members of SSC I and SSC II never provided any capital in

20   exchange for their membership interests in these limited liability companies. SSC I and SSC II's

21   only assets are the land to which they hold title and the "financial arrangements", e.g. purported

22   contracts, receivables and "prepaid expenses", with SK Foods and other Salyer-related entities.

23     76.    SSC I and SSC II have never operated at a profit, and upon information and

24   belief, were never intended to operate at a profit. In each year of their existence, their expenses

25   were significantly more than their revenue.

26     77.    On information and belief, SK Foods directly or indirectly provided all capital to

27   finance CSSS. CSSS provided shipping services to SK Foods for transportation of SK Food's

28   product. CSSS's only asset was or is a leased railroad spur. CSSS hired haulers as independent

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

1  contractors.  On information and belief, Salyer's goal for CSSS was to generate only enough
2  revenue to pay the premium on a life insurance policy under which he was covered so the cost
3  would not come out of his own pocket.  Since the sale of the Debtors' operating assets, CSSS has
4  ceased all operations.

5         78.     SK Foods provided all the funds to capitalize SK Frozen Foods.  SK Frozen
6  Foods' putative owners, SSR Trust, CGS 2007 Trust, and SAS 2007 Trust, did not provide any
7  capital in exchange for their membership interests.  SK Frozen Foods never had any officers or
8  employees and is a mere shell entity.  SK Foods provided SK Frozen Foods funds to lease
9  premises ("Monterey Fish Company facility") in order to flash freeze broccoli, cauliflower, and
10  peppers.  Another Salyer entity that currently is in receivership (Salyer American Fresh Foods
11  ("SAFF")) was to operate and fund SK Frozen Foods.  Like SK Frozen Foods, SAFF lacked the
12  funds to purchase equipment necessary to flash freeze produce and to retrofit the Monterey Fish
13  Company facility to operate the business.  As a result, SK Foods also provided the funds to
14  purchase the flash freeze equipment and paid approximately $1 million to retrofit the facility.

15         79.     Despite SK Foods investing approximately $2 million into the frozen vegetable
16  business, the business was abandoned before operations began.  Sometime in 2009, assets were
17  transferred from SK Foods to SK Frozen Foods.  SK Frozen Foods sold the assets in May or
18  June 2009 to John Bryce, a former employee of SAFF.  On information and belief, Salyer or
19  another company controlled by him retained the proceeds, and did not repay SK Foods.

20         80.     SK Foods provided $500,000 to SKF Aviation to help fund the $1.5 million
21  acquisition cost of an aircraft.  SK Foods also guaranteed the loan used to finance the purchase
22  price of another aircraft.

23         81.     SK Foods also guaranteed leases issued to SS Farms.

24         82.     Scott Salyer created Monterey in late 2008 or early 2009 to receive assets of the
25  SSC Entities (SSC Farming, SSC I, SSC II and SSC III) because of difficulties he had in
26  obtaining financing for the SSC Entities and for Salyer American Fresh Foods ("SAFF").  As
27  stand-alone entities these companies were not credit worthy without financial backing from SK
28  Foods.  SAFF was unprofitable eight out of the ten years it was in operation and presently is in

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

1   receivership. On information and belief, Salyer sought to pool the assets of SAFF and the SSC

2   Entities in order to obtain additional financing. Through intercompany loans, Monterey could

3   then provide needed financing to SAFF, which it could not otherwise obtain.

4        83.    Upon information and belief, SKPM does not have any business operations. Any

5   corporate officers have resigned.

6        84.    SMC was formed to receive purported "management fees" from SS Farms and

7   other entities for services provided by SK Foods' employees. In reality, the purpose of SMC was

8   a conduit for money from operations of the single enterprise to pay one of Scott Salyer's ex-

9   wives consistent with the terms of a divorce settlement. On information and belief, Salyer's

10   obligation to his ex-wife is approximately $50,000 per month and an annual $1 million payment.

11   SMC did not provide reasonably equivalent value for the monies it received; rather, any services

12   were provided by employees of SK Foods.

13        85.    Upon information and belief, the other Affiliated Defendants similarly were

14   undercapitalized or not capitalized at all.

15        86.    Upon information and belief, many of the Affiliated Defendants were not

16   profitable and were never intended to operate in a fashion that would generate a profit.

17        **Failure to Adhere to Corporate Formalities**

18        87.    Upon information and belief, the Owner Defendants and the Affiliated

19   Defendants did not follow or adhere to corporate formalities.

20        88.    One of the few "board of directors" meeting for any of the entities was held on

21   December 14, 2007. The meeting minutes are entitled "SK Foods Entities" and states "The

22   regular meeting of the SK Foods company including all SK Foods entities was called to

23   order . . ."

24        89.    At this December 14, 2007 meeting, Salyer and several other members of

25   management discussed the possible "collapse" of Blackstone and the "collapse" of RHM. The

26   managers in attendance also heard a presentation regarding the finances of "Central Valley

27   Shippers d/b/a SARS," and approved the "collapse [of] that entity into SK Foods, L.P."

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

1    90.    At the December 14, 2007 meeting, the managers in attendance were presented
2  with information for the new formations of SK Farms Services and SK Frozen Foods and others,
3  and the managers in attendance approved the transfer of assets from SK Foods to SK Frozen
4  Foods.

5    91.    Almost all of the business conducted at this meeting related to Affiliated
6  Defendants, rather than to SK Foods.

7    92.    One of the few, and perhaps the only, partnership meeting of SK Foods took place
8  on May 28, 2008.  The minutes of that meeting declare a quorum based on the presence of Salyer
9  alone.  The purpose of the meeting was simply to "accept the resignation" of Randy Rahal as a
10  Director.

11    93.    Upon information and belief, neither SK Foods nor any of the Owner Defendants
12  or Affiliated Defendants had regular meetings of shareholders, directors, partners or members.

13    94.    Upon information and belief, when meetings were held by owners or
14  management, those meetings were not limited to a single entity, but rather, involved overlapping
15  issues involving many if not all of the Owner Defendants and Affiliated Defendants, as well as
16  other Salyer-related entities.

17    **Shared management and administration**

18    95.    Debtor, the Owner Defendants and the Affiliated Defendants shared management.

19    96.    Management for the Affiliated Defendants were employees of SK Foods and paid
20  by SK Foods, even though they performed services for other Defendants.

21    97.    Shondale Seymour served as Chief Financial Officer of SK Foods and of various
22  Affiliated Defendants, including Blackstone, SS Farms and SSC Farming.

23    98.    Lisa Crist was Executive Vice President of Administration of the Debtors and
24  various Affiliated Defendants.

25    99.    Steve King, SK Foods' former Vice President of Operations also provided senior
26  management oversight for CSSS and for certain activities of SSC Farming, SSC I and SSC II.

27
28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE (415) 364-6700
FAX (415) 364-6785

14                    PHDATA 3265645_3

Adversary Complaint

1      100.    Richard Emmett, SK Foods' former Vice President of Ag Operations, also

2  provided senior management oversight for SS Farms, SSC Farming, SSC I and SSC II.  His

3  business card represented that he was employed by SK Foods.

4      101.    Upon information and belief, Jeanne Johnston was responsible for business

5  development matters for the "SK Foods Group" in its entirety, including marketing materials and

6  also served as Mr. Salyer's executive assistant for all matters relating to the Salyer's business

7  interests.

8      102.    Richard Lawrence was Vice President of SK Foods' International Operations, and

9  also served as Managing Director of certain of the Foreign Entities.

10     103.    Until his resignation effective December 11, 2006, Mark S. Grewal was an

11  officer, manager or director of SK Foods as well as all of the following entities:  SKPM, SKF

12  Aviation, SKF Canning, RHM, SK Foods, LLC, SS Farms, SSC Farming, Blackstone, CSSS,

13  certain of the Foreign Entities and SSC Investments, among others.

14     104.    Until his resignation effective May 6, 2006, Richard Washburn was an officer

15  manager or director of each of the following entities:  SKPM, SKF Aviation, SKF Canning,

16  RHM, SK Foods, SK Foods, LLC, SS Farms, SSC Farming, Blackstone, CSSS, certain of the

17  Foreign Entities and SSC Investments, among others

18     105.    SK Farms Services did not have any officers and relied entirely on SK Foods for

19  its management.

20     106.    As of January 2009, with the exception of one administrative staff and a few farm

21  hands, all other administrative and operations support for SS Farms, SSC Farming, SSC I, SSC

22  II, SK Farms Services, and other Affiliated Defendants were provided for and paid for by SK

23  Foods.  These functions included human resources, administration, IS/IT functions, and

24  accounting.

25     107.    Individuals in SK Foods' accounting department performed accounting functions

26  for many of the Affiliated Defendants, including but not limited to SS Farms, SSC Farming, SSC

27  I and SSC II.

28

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

15

Adversary Complaint

1    108.    SK Foods' Information Services department performed IT functions for the

2  Affiliated Defendants.

3    109.    SK Foods provided management for certain of the Foreign Entities. Although for

4  some time management fees were charged to those Defendants, no effort was ever made to

5  collect the fees.

6    110.    Upon information and belief, SK Foods employees performed management and

7  administrative functions for the other Affiliated Defendants as well.

8    111.    Although SK Foods employees performed accounting and record keeping services

9  for the Affiliated Defendants, neither SK Foods nor the Affiliated Defendants tracked the amount

10  of time or the specific services being provided by SK Foods.

11    112.    In addition, although SK Foods and the Affiliated Defendants purported to

12  allocate administrative expenses to the appropriate company or recipient, the Affiliated

13  Defendants never paid the allocated expenses billed by SK Foods. Nor did SK Foods ever seek

14  to enforce or otherwise obtain payment.

15    113.    After 2007, SK Foods and the Affiliated Defendants stopped allocating

16  administrative expenses because they were never paid in the past and because there was no

17  meaningful way to allocate those expenses.

18    **Shared facilities, records and resources**

19    114.    SK Foods had several physical locations. "SK Foods Group" maintained

20  "Executive Offices" at 200 Sky Park Drive, Monterey, California. SMC, SSC I, SSC II, SSC III,

21  SK Farms Services, SK Frozen Foods and SKF Aviation all listed this address as their primary

22  location.

23    115.    "SK Foods Group" maintained "corporate offices" at 21 Lower Ragsdale Drive,

24  Monterey, California. SKPM also listed this address as its principal location.

25    116.    The SK Foods maintained and operated its processing operations at 1175 S. 19th

26  Avenue, P.O. Box 160, Lemoore, California. RHM, SS Farms, SSC Farming, Blackstone and

27  CSSS all listed this address as their primary location.

28

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

1      117.   Records of the various entities were stored and maintained together.  Paper

2  records of the various entities were stored at SK Foods' places of business or in storage units

3  under SK Foods' control.

4      118.   The Defendants' electronic documents were stored on computer systems owned

5  and maintained by SK Foods.

6      119.   All Defendants and others used the SK Foods email addresses and the SK

7  Foods.com domain name.  The Defendants used SK Foods' e-mail servers to store and maintain

8  all their e-mail correspondence.

9      120.   SK Foods employees had unfettered access to all of the Defendants' paper and

10  electronic records.

11      121.   SK Foods employees also regularly accessed these records for the benefit of, and

12  at the specific request of, the Defendants.

13      122.   Almost all of the Defendants shared insurance coverage with SK Foods for

14  workers' compensation and general liability under policies purchased and paid for by SK Foods.

15  For instance, an insurance policy issued to "SK Foods PM Corp" on February 19, 2009 identified

16  the following entities under the definition of "Company":  SKPM, SK Foods, L.P., Salyer,

17  Blackstone, the SSR Trust, the CGS Trust, the SAS Trust, SS Farms, SARS, LLC, CSSS, SK

18  Foods, LLC, SKF Aviation, SSC Farming, SSC I, SSC II, SSC III, SK Farm Services, SK

19  Frozen Foods, RHM, Carmel Wine Merchants, and others.

20      123.   In 2006, SK Foods prepared consolidated financial statements which included the

21  financial position and results of operations of the Foreign Entities, as well as SKF Aviation and

22  RHM.

23      124.   Assets were purchased for Blackstone, SKF Aviation, the Foreign Entities and

24  other Salyer entities, including Salyer personally, using SK Foods credit cards.

25      **No arms-length dealings between entities**

26      125.   The business relationships among the Debtor and Affiliated Defendants were not

27  negotiated or carried on at "arms length".

28

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

17

PHDATA 3265645_3

1    126.    The Debtor and Affiliated Defendants routinely performed services and

2  exchanged funds in the absence of formal written agreements or in disregard of the terms of

3  existing written agreements.

4    127.    As an example, for some time, the Debtor and RHM discharged wastewater onto

5  land owned by SSC Farming, SSC I and SSC II without any contractual relationship between the

6  parties.  Eventually, "discharge agreements" were drafted, but the terms of those agreements

7  were never enforced and payments purportedly under those discharge agreements were made on

8  an ad hoc basis whenever the Defendants holding title to the land needed funds.

9    128.    At the direction of Salyer and/or the SSR Trust and/or others acting on their

10 behalf or in concert with them and using confidential information, SSC Farming, SSC I and SSC

11 II purportedly terminated the discharge agreements for the purpose of enhancing their own

12 bargaining position vis-à-vis the Debtor and RHM during the anticipated sale of the Debtor's

13 operating assets.  Salyer and/or the SSR Trust caused the termination of the discharge

14 agreements for their own personal benefit and in disregard of the harm to the Debtor.  As a

15 result, Salyer, the SSR Trust, SSC Farming, SSC I and SSC II received in excess of $1.2 million

16 from the Debtor in order to allow for the sale of the Debtor's operating assets.

17   129.    The pricing of products or services provided by one entity to another was not

18 negotiated, but rather, was set by Salyer who controlled both parties.

19   130.    In addition, Salyer from time to time retroactively reset prices charged to SK

20 Foods by the other Defendants.  For instance, near the end of 2008, when SSC III and SS Farms

21 were losing money, Salyer unilaterally caused SSC III and SS Farms to bill SK Foods amounts

22 in excess of the amounts called for in the existing agreements.

23   131.    As a further example, although CSSS provided the fiber drums and rail trans-

24 loading for SK Foods, there was no contract describing the terms of this relationship.

25   132.    As a further example, Salyer American Fresh Foods was nominally the lessee on

26 the DAX software system.  SK Foods paid the vast majority of the initial set up costs and

27 subsequent lease payments. Further, the software ran on servers and computers that SK Foods

28

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

1 owned and maintained.  Yet, there were no written agreements among Salyer American Fresh

2 Foods, SK Foods and the other Defendants for the use of the software and computer system.

3       133.  As a further example, in April 2008, Salyer withdrew $1.7 million from SS Farms

4 and deposited those funds into his personal account.  On information and belief, he represented

5 that he was using those funds to pay down a note on which SSC Farming was an obligor, and

6 that by paying off this note, the SSC Farming land could be used as collateral for a separate loan

7 to another Salyer entity, Salyer American Fresh Foods.

8       134.  Debtor and RHM paid in excess of $1 million annually to SKF Aviation

9 purportedly as advance payment for future business flights for SK Foods' employees.  However,

10 upon information and belief, neither SK Foods nor SKF Aviation kept records of the number of

11 flights provided, the business purposes of each flight or the actual allocated expense of using the

12 aircraft.

13       135.  In many cases in which invoices were generated by a related party, SK Foods

14 overpaid those invoices.  Based on information known to date, more than $2,300,000 was

15 transferred to related parties through overpaid invoices.

16       136.  Upon information and belief, the relationships between Debtor and all the

17 Affiliated Defendants were governed in a similar fashion; that is, without any arms-length

18 negotiations or adherence to contractual terms based on the conduct of the affairs of the different

19 entities as a single enterprise as described above.

20     **Intercompany transfers and commingling of assets**

21       137.  SK Foods effectively served as the bank for the Affiliated Defendants, dispensing

22 funds when necessary for their operation and without regard to whether SK Foods received

23 goods or services with a value reasonably equivalent to the money transferred by SK Foods to

24 the Affiliated Defendants.

25       138.  Upon information and belief, the Affiliated Defendants did not follow or adhere

26 to corporate formalities in connection with the various transfers of funds, major purchases,

27 performance of services, or divestitures of assets.

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

1    139.    Historically, there were a significant number of related party transactions in which
2  funds or other assets were diverted from the Debtor to related parties without an adequate
3  explanation. SK Foods regularly issued checks to Affiliated Defendants, and Affiliated
4  Defendants regularly issued checks to each other and/or to SK Foods without documentation
5  substantiating the purpose of the payment.

6    140.    Money regularly was transferred back and forth between and among Salyer-
7  related Defendants when an entity needed money, not necessarily when it was due under a
8  contract or when an entity provided goods or services to Debtor.

9    141.    At various times, SK Foods provided "loans" to SK Frozen Foods, SKF Aviation,
10  SK Farms Services, and others.

11    142.    Salyer sometimes sought to have the payments by Affiliated Defendants to SK
12  Foods characterized as "loans" from the Affiliated Defendants to SK Foods even though SK
13  Foods was the source of the funds initially.

14    143.    According to financial statements, as of June 30, 2007, transactions by SK Foods
15  with certain of the Affiliated Defendants and others resulted in current related-party receivables
16  of $18,714,000 and non-current related party receivables of $22,070,000. Outstanding debts as
17  of that time included transactions with SK Foods, LLC, RHM, Blackstone, SKF Aviation, SS
18  Farms, SSC Farming, certain Foreign Entities and CSSS, among others. As of June 30, 2008,
19  transactions by SK Foods with certain of the Affiliated Defendants and others resulted in current
20  related-party receivables of $13,534,000 and non-current related party receivables of
21  $22,406,000.

22    144.    As an example of intercompany transfers and non-arms length dealing, SSC
23  Farming which holds title to land for growing tomatoes and for wastewater discharge, owed
24  approximately $12 million to SK Foods as of December 31, 2007 due to intercompany transfers
25  received from SK Foods. That amount included $1.5 million that SK Foods paid to a title
26  company for the benefit of SSC Farming in order for SSC Farming to purchase land used for
27  waste water by RHM. SK Foods also provided $700,000 for the purchase of another parcel of
28  land to which SSC Farming holds title. There was no rational business purpose for SK Foods to

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

1   provide the funds to SSC Farming to purchase land and thereafter agree to pay yearly discharge
2   fees to SSC Farming equal to the initial cost of purchasing fee title to the land. SK Foods could
3   have taken title to the land and eliminated unnecessary and above market discharge fees, and
4   maintain its own control over the land.

5       145.   Based on its dealings with the SSC Entities (which owned land for growing
6   tomatoes and for wastewater discharge) and with SS Farms for harvesting, there was no
7   legitimate business reason for SK Foods to transfer vast sums of money to SSC Farming such
8   that SSC Farming owes in excess of $12 million to SK Foods.

9       146.   As another example, SK Foods entered into an agreement with Westlands Water
10  District to purchase certain parcels of land uniquely situated to SK Foods' processing facility in
11  order to receive waste water discharge. After the contract was negotiated but prior to closing,
12  Salyer and SKPM arranged for SSC I and SSC II to take title to the property. SSC I and SSC II
13  did not provide any consideration to SK Foods for this purported assignment of the rights to
14  purchase this land, the assignment was not documented, and the funds to purchase that land came
15  from yet other Defendants. There was no benefit to, or legitimate business purpose associated
16  with, SK Foods allowing SSC I and SSC II taking title to the waste water discharge land, which
17  in fact was to SK Foods' detriment.

18      147.   As another example of intercompany transfers, SK Foods "borrowed" $4 million
19  from SS Farms at the end of 2006. SK Foods then paid the $4 million to SSC Farming. SSC
20  Farming was supposed to use the funds to pay down a line of credit, which had no benefit to SK
21  Foods.

22      148.   As another example of intercompany transfers, in November 2005, SK Foods paid
23  $3 million to SSC Farming for the purpose of paying down a line of credit with Wells Fargo held
24  by SSC Farming, SS Farms and Blackstone.

25      149.   As another example of intercompany transfers, in December 2006, SK Foods
26  transferred $4 million through the SSR Trust to RHM and SKF Aviation allowing them to make
27  tax prepayments.

28

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

150.     As further examples of intercompany transfers, SK Foods paid invoices for liabilities incurred by Affiliated Defendants, reimbursed Affiliated Defendants and Owner Defendants for costs spent on tenant improvements at the headquarters locations in Monterey, and provided funding to certain related Defendants to repay intercompany liability of other related Defendants, with no benefit to the Debtors.

151.     Salyer directed and caused SK Foods to make payments to various Affiliated Defendants for "prepaid expenses," which were the functional equivalent of intercompany transfers. The payments generally were made at the end of December for services or goods to be provided in the following year. However, on information and belief, the amounts of the "prepaid expenses" were arbitrarily determined based on Salyer's perceived personal tax advantages rather than for SK Foods' legitimate business purposes.

152.     Although the payments nominally were for "prepaid expenses," it was common for the Affiliated Defendants to return the funds to SK Foods within the first few weeks of January or to pay the monies to another Affiliated Defendant based on the Affiliated Defendant's need for funds. In short, for certain payments for "prepaid expenses," SK Foods in fact did not prepay any actual expenses despite the characterization of the transfers.

153.     For example, SK Foods commonly made such prepayments to SS Farms in the last week in December, which then returned the funds to SK Foods in January. SS Farms booked its return of these funds as "loans" to SK Foods.

154.     In December 2007, SK Foods paid $9 million for "prepaid expenses" to SS Farms for future services even though there was no contract between SK Foods and SS Farms. SS Farms did not send invoices to SK Foods prior to 2008.

155.     As another example, in December 2007, SK Foods paid $6 million to SK Farms Services for "prepaid expenses" for future services. SK Farms Services was a new entity purportedly created to make bulk purchases on behalf of the Debtors and the Affiliated Defendants. SK Farms Services had otherwise not been capitalized. On information and belief, Salyer had SK Foods transfer the $6 million to reduce his taxes for 2007.

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

1     156.    However, in February 2008, SK Foods needed funds to pay down its loan with its

2  secured lenders. Because SK Foods did not have the funds to do so, Salyer caused SK Farms

3  Services to transfer the $6 million to SSC Farming, which in turn transferred the $6 million back

4  to SK Foods.

5     157.    SK Farms Services recorded the $6 million transfer to SSC Farming as a loan.

6  Salyer wanted the $6 million payment from SSC Farming to SK Foods also booked as loan from

7  SSC Farming. However, SK Foods' Chief Financial Officer at the time refused because SSC

8  Farming owed SK Foods in excess of $6 million on account of inter-company transfers and other

9  claims. Thus SSC Farming and SK Foods treated SSC Farming's $6 million transfer as a

10  payment on account of SSC Farming's indebtedness owed to SK Farms.

11     158.    SK Farms Services never at any time performed bulk purchasing for SK Foods or

12  any other entity. SK Farms Services was never capitalized and has no assets except for its $6

13  million receivable from SSC Farming.

14     159.    As another example of prepaid expenses, SK Foods paid $1.5 million to SKF

15  Aviation in December 2007 for aviation transportation to be provided in 2008. On information

16  and belief, there are no records or logs of flights presented to SK Foods to show whether and to

17  what extent the prepaid expenses in fact were utilized, who flew on the aircraft, or the purpose of

18  the flights. Salyer used the aircraft repeatedly in 2008, including for his personal use. On

19  information and belief, at the direction of Salyer, SK Foods directly or through the Affiliated

20  Defendants paid arbitrary amounts to SKF Aviation to enable SKF Aviation to fund Salyer's use

21  of its aircraft.

22     160.    SK Foods and the Defendants documented and treated transfer of funds among

23  themselves differently than transactions with other creditors.

24     161.    The Debtor and Affiliated Defendants generally did not document whether the

25  "transfers," "loans," or "prepaid expenses" were repaid. Nor was there billing associated with

26  the alleged prepaid expenses to track the extent to which the Debtor in fact received services or

27  goods applied against the prepayments or associated with the loans to track whether they were

28  being repaid.

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

1   162.   Payment of inter-company obligations was frequently deferred and, if paid at all,

2   "caught up" at various intervals, often at the end of a tax year.

3   163.   Based on information known to date, between January 2005 and February 2009,

4   more than $170,000,000 was transferred from SK Foods to related parties, whereas less than

5   $37,000,000 flowed into SK Foods from those related parties. During this time period, therefore,

6   there was a net value of transactions from SK Foods to related parties of more than

7   $133,000,000.

8   164.   Based on information known to date, between January 2005 and February 2009,

9   the following total values were recorded for transactions from SK Foods to the identified related

10  party:

| | | | |
|----|----|----|----|
| 11 | a. | SS Farms: | $101,113,000 |
| 12 | b. | CSSS: | $16,153,000 |
| 13 | c. | SKF Aviation: | $13,560,000 |
| 14 | d. | SSR Trust: | $6,367,000 |
| 15 | e. | SK Farms Services: | $6,005,000 |
| 16 | f. | SKPM: | $2,458,000 |
| 17 | g. | SSC Farming: | $2,199,000 |
| 18 | h. | Cedenco Australia: | $1,700,000 |
| 19 | i. | Blackstone: | $918,000 |
| 20 | j. | Cedenco: | $800,000 |
| 21 | k. | SK Australia: | $247,000 |
| 22 | l. | SK International: | $241,000 |
| 23 | m. | SMC: | $165,000 |

24  These amounts do not include payments by SK Foods characterized as "investments" in these

25  entities, which additional payments or "investments" are described below.

26  165.   Based on a review of SK Foods' general ledger, between January 1, 2000 and the

27  present, more than $434 million in transactions took place from SK Foods to the named

28  defendants and certain other related parties, whereas there were less than $219 million in

PHDATA 3265645_3

Adversary Complaint

1   transactions into SK Foods from those same parties.  During this time period, therefore, there

2   was a net value of transactions from SK Foods to these related parties of more than $215 million.

3   A summary of these transactions is set forth on Exhibit A, attached hereto.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

25

PHDATA 3265645_3

Adversary Complaint

**Attempted Reconciliation**

166.   SK Foods itself attempted to reconcile these various intercompany transactions when various lenders started questioning the practices.  Despite many months of attempting to track all such transactions and the underlying reasons for such transactions, SK Foods ultimately determined it was not possible to determine the purposes for all the transactions and to reconcile the books.

167.   Management was not able to determine the purposes of various transactions because there was often no backup for the transfers.  For instance, when checks were used, generally there were no check requests or other documentation.  When wire transfers were used, amounts transferred were rounded up, again without backup.

168.   In sum, even when money could be followed from one entity to another, the underlying purposes of the transactions generally could not be determined.

169.   At the end of February 2008, Debtor and Affiliated Defendants transferred funds among each other in an effort to balance the intercompany transfers, despite a lack of understanding for the purposes of the transactions.

170.   At the conclusion of that process, SK Foods was left with approximately $9 million in unpaid receivables because the Affiliated Defendants had insufficient capital to repay their obligations.

**Investment in and Subsequent "Divestiture" of the Foreign Entities**

171.   SK Foods sought to diversify its operations and access foreign markets by expanding to New Zealand and Australia, whose growing seasons are opposite of that of California.  Cedenco Foods Limited ("Cedenco"), Cedenco Ohakune and SK Foods International managed operations in New Zealand similar to those of SK Foods, while Cedenco JV, Cedenco Australia Partnership and SK Foods Australia managed similar operations in Australia.  Those entities are engaged in tomato processing and the dehydration of various kinds of vegetables.

172.   SK Foods paid the purchase price and associated expenses to acquire the equity interests in the Foreign Entities.  Therefore, SK Foods initially owned (directly or indirectly) the Foreign Entities.

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

Adversary Complaint

1     173.    In 2001, SK Foods formed and became a member of SK Foods, LLC, which then

2  formed and became the 100% shareholder of SK Foods International.

3     174.    In a series of transactions from May 2001 to September 2003, SK Foods

4  International purchased all of the common stock of Cedenco.

5     175.    In 2002, SK Foods formed and became the sole stockholder of SK Foods

6  Australia.

7     176.    In March 2002, SK Foods Australia purchased a 50% interest in Cedenco

8  Australia.  The other 50% interest in Cedenco Australia was held by Cedenco JV, which was a

9  wholly-owned subsidiary of Cedenco, until March 2004 when it was sold to SK Foods Australia.

10     177.    In November 2005, Cedenco acquired the business and certain assets of Sunrise

11  Coast New Zealand, as well as 100% of the common stock of Sunrise Coast Japan.  The

12  businesses were transferred to a new corporation called Sunrise Coast.  Both Sunrise Coast

13  entities, as well as the new corporation are 100% owned subsidiaries of Cedenco.

14     178.    In November 2005, SK Foods International acquired 56.25% of what is now

15  Cedenco Ohakune.

16     179.    SK Foods provided capital to fund the Foreign Entities' operations.

17     180.    The ownership and operation of the Foreign Entities reportedly helped establish

18  an international reputation for SK Foods, and SK Foods had a management group specifically

19  focused on maintaining and growing SK Foods' international activity.

20     181.    In or about December 2007, SK Foods owned the Foreign Entities as a result of

21  having expended the funds both to purchase and operate those entities.

22     182.    Salyer, SKPM, and/or others working at Salyer's direction caused SK Foods to

23  transfer ownership of the Foreign Entities to other entities without consideration or benefit to SK

24  Foods.  Further, they purported to "back date" the transfer to November 1, 2006.  On information

25  and belief, the transaction documents were executed well after November 2006 and within two

26  years of the date of the Petition.

27

28

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

1    183.    Given the assets owned and operated by the Foreign Entities and the purpose of

2    purchasing the Foreign Entities, the divestiture was not in the best interests of SK Foods and did

3    not serve a legitimate corporate purpose.

4    184.    At the time of the divestiture, the Foreign Entities owed SK Foods $18 million,

5    which was net of $10 million that SK Foods owed to the Foreign Entities  (The Foreign Entities

6    thus owed a total of $28 million to SK Foods.)

7    185.    According to Consolidated Financial Statements for SK Foods issued for the eight

8    month period ending June 30, 2007 and dated January 15, 2008, SK Foods "sold the

9    Partnership's inter-company receivables to a revocable trust with common ownership with the

10   Partnership." SK Foods documented the transfer pursuant to a Debt Assignment Agreement.

11   186.    The revocable trust referenced in SK Foods financial statements is the SSC&L

12   2007 Trust ("SSC&L") which is a trust created by Salyer.  "SSC&L" is an acronym for Scott

13   [Salyer], Stephanie [Salyer], Caroline [Salyer], and Louie.  "Louie" is Salyer's dog.

14   187.    The Debt Assignment Agreement identified Cedenco's address as P.O. Box 160,

15   Lemoore, California, Attn: Mark McCormick.  Scott Salyer signed the Debt Assignment

16   Agreement on behalf of Cedenco, the SSC&L Trust and SK Foods.

17   188.    On information and belief, SSC&L has no, and never had, operations, revenues,

18   or assets.

19   189.    On information and belief, SSC&L did not pay any money to SK Foods for the

20   inter-company receivables, which has a value of at least $18,293,000.

21   **Salyer's Transfer Of The Drum Line**

22   190.    At the direction of Salyer and/or SKPM and/or the SSR Trust or those acting

23   under their direction and control, a valuable asset – "the Drum Line" – was transferred out of the

24   country for no consideration and in violation of injunctions issued by this Court.

25   191.    SK Foods used fiber drums in connection with its transport and processing of

26   tomatoes. SK Foods owns a commercial drum manufacturing line ("the Drum Line") that it used

27   to produce the fiber drums used in its processing facilities.  The Drum Line has a value of at least

28   $350,000.

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

28

Adversary Complaint

1   192.   Salyer, SKPM, and SSR Trust did not attempt to market the Drum Line to

2   unrelated third parties in an effort to maximize the sales price even though the Debtor was in

3   financial distress.

4   193.   At or around the date of the Petition, the Defendants disassembled and moved the

5   Drum Line from SK Food's premises to a location owned and or controlled by CSSS.

6   194.   SK Foods and CSSS executed a Purchase and Sale Agreement and a Promissory

7   Note, by which SK Foods purported to sell the Drum Line to CSSS and CSSS purported to buy

8   the Drum Line from SK Foods.  CSSS did not pay SK Foods anything for the Drum Line;

9   instead SK Foods gave CSSS a Promissory Note, in the amount of $350,000.  No payment was

10  required to be made by CSSS to SK Foods under the Note until December 31, 2009, and the

11  payment due then is only interest on the note, calculated at a fixed rate of 5% per annum.

12  Thereafter, only interest payments were required to be made until the Promissory Note came due

13  on June 1, 2013.

14  195.   Salyer signed the Purchase and Sale Agreement as Chief Executive Officer of

15  SKPM.

16  196.   Gerard Rose, a purported trustee for SAS Trust and CGS Trust (the putative

17  owners of CSSS), signed the Purchase and Sale Agreement on behalf of CSSS.

18  197.   Gerard Rose is an attorney having provided services for SK Foods and the

19  Defendants.  Mr. Rose was retained by Salyer and regularly took instruction from Salyer and

20  other officers of SK Foods.

21  198.   The Purchase and Sale Agreement did not represent an arms-length transaction,

22  and the terms did not represent market rates and terms.

23  199.   CSSS did not have the resources to pay for the Drum Line at the time the

24  Purchase and Sale Agreement was executed and did not have any reasonable or realistic prospect

25  of being able to pay for the Drum Line.

26  200.   The Purchase and Sale Agreement was not negotiated in good faith.

27

28

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

1       201.    On information and belief, the Purchase and Sale Agreement was executed around

2 the time of the petition but back-dated to December 1, 2008 in order to conceal the true date of

3 the purported transaction.

4       202.    As of the Petition Date, the purported sale of the Drum Line by SK Foods to

5 CSSS had not been reflected in the financial records of SK Foods.

6       203.    On August 24, 2009, this Court entered a temporary restraining order to prevent

7 shipment of the Drum Line out of California.  The Court then entered a preliminary injunction on

8 September 3, 2009 ("Injunction") to enjoin shipment of the Drum Line to any location outside of

9 California.

10      204. .  Despite the Injunction, the Drum Line was shipped at Salyer's direction to New

11 Zealand.

12      205.    The shipping documents list Affiliated Defendant Monterey Peninsula Farms

13 ("Monterey") as the shipping party, which is not a party to the Purchase and Sale Agreement.  The

14 majority owner of Monterey is SSC Farming, whose majority owner is the SSR Trust, whose

15 sole beneficiary is Salyer.

16      206.    In litigation concerning the Drum Line, CSSS could not produce a witness who

17 was knowledgeable concerning the identity of the individual who authorized the shipment of the

18 Drum Line to New Zealand, claimed to have no employees and claimed no ongoing operations.

19      207.    The Drum Line presently is in possession of a company in New Zealand called K-

20 Pack, which was the original manufacturer of the Drum Line.  On information and belief, Salyer

21 intended to refurbish the Drum Line and sell it for his personal benefit.

22      208.    The transfer of the Drum Line is representative of intercompany movement of

23 assets, the interchangeable nature of corporate entities, and Salyer's control.  It also is

24 representative of Salyer's willingness to act to the detriment of the Debtor in order to benefit

25 himself and the Defendants and entities that he controls.

26    **The Failed Chili Pepper Venture**

27      209.    SK Foods funded the purchase of RHM's facility in 2003.

28

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE (415) 364-6700
FAX (415) 364-6785

30

PHDATA 3265645_3

Adversary Complaint

1      210.   SK Foods paid for all assets and operations of RHM. RHM was never capitalized

2   and was always insolvent. RHM had no customers other than SK Foods.

3      211.   In or about 2003, Debtor sought to diversify its product offerings and increase

4   utilization of RHM's processing facility by processing chili peppers, which had a different

5   growing season than tomatoes.

6      212.   From 2003 through 2008, SK Foods expended significant sums in an effort to

7   have RHM develop the capability of processing chili peppers.

8      213.   In 2003 and 2004, RHM contracted for the use of a canning line from General

9   Mills and invested approximately $15-16 million to make it operational.

10     214.   In 2005, RHM spent millions of dollars to purchase five used evaporators. In

11  2006, RHM began remanufacturing operations, a further step in processing the product for retail

12  sale, which was beyond what SK Foods historically did.

13     215.   In 2007, RHM began its effort to process chili peppers.

14     216.   Due to the shapes and colors of chili peppers, RHM could not develop the

15  mechanical capabilities to pick and sort chili peppers with the efficiency that it picked and sorted

16  tomatoes.

17     217.   In 2007 and 2008, the Debtor invested significant sums to modify and rebuild the

18  processing lines two times in at attempt to increase the efficiency of the automated sorting

19  process.

20     218.   During the first harvest in or about April 2007, RHM was unable to properly

21  process the chili peppers (e.g., peppers were damaged and became unusable), and substantially

22  all of the chili production had to be discarded. SK Foods, who owned the inventory, experienced

23  approximately $2 million in losses as a result.

24     219.   During the following season in October-November 2007, RHM imported the chile

25  peppers from Mexico at double the normal cost because there were no chili peppers available in

26  Northern California  That season, RHM processed enough chili peppers to satisfy the demand for

27  the entire country for a year. However, many of the chili peppers spoiled or disintegrated due to

28  the passage of time from harvest in Mexico to processing in Colusa, California. After SK Foods

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA  94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

31

Adversary Complaint

1 incurred significant production costs, many customers refused to purchase the product because of

2 the poor quality. One of the customers (B&G) also refused to pay SK Foods $1 million in true-

3 up costs.

4      220.    During the next season in March-April 2008, RHM improved its mechanical

5 processing, obtained local chili peppers, and processed a three to four year national supply of

6 chili peppers. The customers, however, refused to purchase them. Due to the quality problems

7 in the prior season and failure to meet contractual commitments, the customers made

8 commitments with other suppliers. Overall, Debtor lost more than $20 million from the chili

9 peppers business.

10     **Insolvency**

11      221.    On information and belief, the Debtor became insolvent no later than the Fourth

12 Quarter 2007 and perhaps earlier.

13      222.    Beginning in or about June 2007, the Debtor's banks began to exercise dominion

14 over the Debtor's bank accounts and funds were released from the Debtor's bank accounts only

15 with approval of the banks.

16      223.    The notes to the audited financial statements for SK Foods for the eight months

17 ending June 30, 2007, audited by Moss-Adams LLP, disclose that the Partnership "was not in

18 compliance with certain covenants, including the funded debt to operating cash flow ratio, and

19 the fixed charge coverage ratio" for its bank line of credit, short-term borrowings, and long-term

20 debt.

21      224.    The same financial statements identified $18.7 million in current related-party

22 receivables and $22 million in non-current related party receivables, as well as current related

23 party payables of $14.048 million and non-current related party payables of $4.299 million.

24 However, the audited financial statements concluded that "[i]t is not practical to estimate the fair

25 value of related-party receivables or debt due to related parties, due to the nature of these items."

26      225.    On information and belief, the property, plant, and equipment ("PPE") on the

27 Moss-Adams financial statements were overvalued because the PPE was already used when

28 purchased, with the PPE continuing to age and depreciate in value while in continued operation.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

226. The Debtor lost millions of dollars as a result of the intercompany transfers and prepaid expenses to the Defendants described above.

227. In or about September 2007, the Debtor refinanced its debt, increasing both its term debt and its revolving loans.

228. At or about the same time, the banks and certain financial personnel of the Debtor advised Salyer that he needed to stop his exorbitant monthly expenses given the Debtor's financial condition. He failed and refused to do so.

229. The Debtor lost hundreds of thousands of dollars, if not millions of dollars, due to improper expenses charged by Salyer, which were funded directly or indirectly by the Debtor.

230. As set forth above, the Debtor lost millions of dollars from the failed chili peppers venture.

231. In April 2008, the Federal Bureau of Investigation raided the Debtor's operations in connection with its investigation of alleged price fixing and bribery by the Debtor and/or employees of the Debtor. The FBI seized various records belonging to the Debtor pursuant to search warrants and subpoenas. The raid was well-publicized and caused many customers of the Debtor to discontinue purchases from the Debtor of tomato products, materially depressing revenues.

**Identification of Certain Transfers of Assets and Funds**

232. According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to SMC[3]:

| Date | Amount | Description in General Ledger |
|------|--------|-------------------------------|
| 12/31/2008 | $104,621 | Liabilities |
| 2/10/2009 | $82,300 | Liabilities |
| 2/27/2009 | $82,300 | Liabilities |

---

[3] The allegations in paragraphs 232 through 241 are based on entries in SK Foods' general ledger. For the reasons outlined in footnote 2, the Trustee has not been able to confirm these entries through other records. The Trustee reserves the right to amend and/or supplement these allegations as appropriate, and reserves the right to identify and pursue other transfers not identified here.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

233. According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to the SSR Trust:

| Date | Amount | Description in General Ledger |
|---|---|---|
| 12/28/2007 | $750,000 | Capital – S. Salyer, Revocable Trust |
| 12/30/2007 | $500,000 | Rent/Lease – Bins/Drums |
| 12/28/2008 | $1,000,000 | |
| 4/14/2008 | $500,000 | Capital – S. Salyer, Revocable Trust |
| 4/14/2008 | $100,000 | Capital – S. Salyer, Revocable Trust |
| 4/14/2008 | $50,000 | Capital – S. Salyer, Revocable Trust |
| 6/16/2008 | $210,000 | Capital – S. Salyer, Revocable Trust |
| 9/15/2008 | $240,000 | Capital – S. Salyer, Revocable Trust |
| 12/30/2008 | $250,000 | Accounts Payable – Related Party |
| 12/30/2008 | $225,000 | Accounts Payable – Related Party |
| 12/30/2008 | $650,000 | Capital – S. Salyer, Revocable Trust |

234. According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to SK Frozen Foods:

| Date | Amount | Description in General Ledger |
|---|---|---|
| 6/12/2008 | $292,875 | Accounts Receivable – Related Parties |
| 9/26/2008 | $586,244 | Accounts Payable – Related Party |
| 1/20/2009 | $59,718 | Accounts Receivable – Related Parties |
| 2/25/2009 | $51,628 | Accounts Payable – Related Party |

235. According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to SKPM:

| Date | Amount | Description in General Ledger |
|---|---|---|
| 1/28/2008 | $2,298,396 | I/C CASH – SKPM CORP |

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

| 11/25/2008 | $126,191 | Accounts Payable – Related Party |

236. According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to SS Farms:

| Date | Amount | Description in General Ledger |
|------|--------|-------------------------------|
| 9/3/2007 | $278,924 | CLEARING ACCOUNT |
| 9/3/2007 | $235,880 | CLEARING ACCOUNT |
| 9/3/2007 | $115,026 | CLEARING ACCOUNT |
| 9/4/2007 | $1,103,041 | GROWER FEES WITHHELD |
| 9/4/2007 | $359,061 | RAW MATERIAL INVENTORY - PROCESSED |
| 10/2/2007 | $1,052,333 | GROWER FEES WITHHELD |
| 10/2/2007 | $1,021,887 | GROWER FEES WITHHELD |
| 10/2/2007 | $372,112 | RAW MATERIAL INVENTORY - PROCESSED |
| 10/2/2007 | $360,864 | RAW MATERIAL INVENTORY - PROCESSED |
| 10/12/2007 | $286,531 | CLEARING ACCOUNT |
| 10/12/2007 | $98,913 | CLEARING ACCOUNT |
| 10/16/2007 | $1,119,279 | GROWER FEES WITHHELD |
| 10/16/2007 | $399,587 | RAW MATERIAL INVENTORY - PROCESSED |
| 10/26/2007 | $171,760 | CLEARING ACCOUNT |
| 10/26/2007 | $102,774 | CLEARING ACCOUNT |
| 10/26/2007 | $71,557 | CLEARING ACCOUNT |
| 11/1/2007 | $433,037 | CLEARING ACCOUNT |
| 11/1/2007 | $150,565 | CLEARING ACCOUNT |
| 11/6/2007 | $130,263 | CLEARING ACCOUNT |
| 11/6/2007 | $83,497 | CLEARING ACCOUNT |
| 11/6/2007 | $70,139 | CLEARING ACCOUNT |
| 11/6/2007 | $56,341 | CLEARING ACCOUNT |
| 11/6/2007 | $52,847 | CLEARING ACCOUNT |
| 11/8/2007 | $169,904 | CLEARING ACCOUNT |
| 11/8/2007 | $114,310 | CLEARING ACCOUNT |
| 11/8/2007 | $94,449 | CLEARING ACCOUNT |
| 11/8/2007 | $68,024 | CLEARING ACCOUNT |
| 11/8/2007 | $63,293 | CLEARING ACCOUNT |
| 11/16/2007 | $1,027,111 | GROWER FEES WITHHELD |
| 11/16/2007 | $398,680 | INTEREST EXP PAYABLE AFFILIATED LT |
| 11/16/2007 | $110,953 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $97,861 | RAW MATERIAL INVENTORY |

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

Adversary Complaint

PHDATA 3265645_3

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

| | | |
|---|---|---|
| | | - PROCESSED |
| 11/16/2007 | $97,686 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $97,104 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $96,383 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $94,244 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $93,318 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $92,861 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $92,029 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $86,231 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $85,066 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $75,744 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $75,692 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $74,148 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $73,321 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $68,608 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $66,159 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $62,425 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $61,795 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $60,099 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $57,500 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $57,300 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/28/2007 | $318,623 | ACCOUNTS PAYABLE - ACCRUED |
| 11/28/2007 | $112,213 | ACCOUNTS PAYABLE - ACCRUED |
| 12/14/2007 | $405,078 | RAW MATERIAL INVENTORY - PROCESSED |

36

| 12/20/2007 | $369,568 | RAW MATERIAL INVENTORY - PROCESSED |
|---|---|---|
| 1/3/2008 | $1,049,863 | GROWER FEES WITHHELD |
| 1/3/2008 | $884,318 | GROWER FEES WITHHELD |
| 1/3/2008 | $666,470 | GROWER FEES WITHHELD |
| 1/3/2008 | $336,698 | RAW MATERIAL INVENTORY - PROCESSED |
| 1/3/2008 | $285,889 | RAW MATERIAL INVENTORY - PROCESSED |
| 1/15/2008 | $5,428,708 | I/C CASH - SS FARMS |
| 1/31/2008 | $4,000,000 | ACCOUNTS PAYABLE - ACCRUED |
| 3/17/2008 | $550,000 | ACCOUNTS PAYABLE - ACCRUED |
| 3/18/2008 | $225,361 | |
| 3/27/2008 | $100,000 | UNKNOWN |
| 4/1/2008 | $275,000 | UNKNOWN |
| 4/7/2008 | $300,000 | UNKNOWN |
| 4/8/2008 | $191,462 | UNKNOWN |
| 5/9/2008 | $500,000 | paydown loan -SSF |
| 5/14/2008 | $600,000 | paydown loan -SSF |
| 5/15/2008 | $200,000 | paydown loan -SSF |
| 5/28/2008 | $355,764 | paydown ssf note |
| 5/28/2008 | $50,000 | paydown ssf note |
| 6/4/2008 | $300,000 | paydown note SSF |
| 6/6/2008 | $500,000 | ST (90 day) Notes Receivable SSF |
| 6/6/2008 | $180,068 | Notes Payable SSF pay off |
| 7/1/2008 | $191,765 | Notes Payable SSF pay off |
| 8/4/2008 | $1,000,000 | PAYOFF 7/21 SSF LOAN TO SKF $1.5M 8/4 |
| 8/6/2008 | $51,490 | PMT ACCRUED INTEREST SSF 8/6 |
| 8/14/2008 | $1,599,179 | |
| 8/22/2008 | $1,507,034 | |
| 8/28/2008 | $1,557,675 | |
| 9/16/2008 | $1,134,298 | 08WK7HAUL-SKF&CCC90% |
| 9/29/2008 | $2,691,813 | |
| 10/7/2008 | $1,562,493 | |
| 10/14/2008 | $1,500,796 | |
| 10/17/2008 | $1,458,232 | |
| 10/23/2008 | $1,353,144 | |
| 10/24/2008 | $102,636 | |
| 10/28/2008 | $1,054,284 | |
| 10/30/2008 | $85,138 | Grower Payments 11-3-08 |
| 11/4/2008 | $440,434 | 08WK15HAUL-SKF&CCC90% |
| 11/4/2008 | $131,499 | 08WK16HAUL-SKF&CCC90% |
| 11/4/2008 | $81,517 | water purchase |

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

37

PHDATA 3265645_3

Adversary Complaint

| 11/5/2008 | $318,840 | Pepper Harvest |
| 11/5/2008 | $163,216 | Pepper Harvest |
| 11/13/2008 | $603,198 | |
| 1/2/2009 | $600,000 | GLV-000006739 |
| 1/12/2009 | $500,000 | ST Advance pymt Rltd Pty SSF |
| 1/14/2009 | $1,500,000 | ST Advance Receipt Rltd Pty SSF |
| 1/14/2009 | $756,000 | ST Advance Receipt Rltd Pty SSF |
| 1/14/2009 | $500,000 | |
| 2/27/2009 | $1,025,000 | Repayment of Short term Borrowings 1mm & 25k |

237.    According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to SSC Farming:

| Date | Amount | Description in General Ledger |
|------|--------|-------------------------------|
| 10/18/2007 | $75,000 | Other Long Term Assets |
| 7/24/2008 | $100,000 | Accounts Payable – Related Party |
| 7/25/2008 | $50,000 | Rent/Lease – General |
| 8/7/2008 | $150,000 | Accounts Payable – Related Party |
| 8/20/2008 | $464,866 | Accounts Payable – Growers |
| 10/13/2008 | $77,201 | RAW TOMATOES CONVENTIONAL |
| 10/20/2008 | $85,160 | RAW TOMATOES CONVENTIONAL |
| 11/11/2008 | $316,000 | Accounts Payable – Related Party |

238.    According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to the SSC I:

| Date | Amount | Description in General Ledger |
|------|--------|-------------------------------|
| 8/6/2008 | $160,000 | Accounts Payable – Related Party |
| 2/20/2008 | $66,357 | Accounts Payable – Growers |
| 8/26/2008 | $235,813 | Accounts Payable – Growers |
| 9/15/2008 | $65,606 | Accounts Payable – Growers |
| 11/11/2008 | $187,925 | Accounts Payable – Related Party |
| 11/13/2008 | $149,148 | Accounts Payable - Growers |

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE (415) 364-6700
FAX: (415) 364-6785

Adversary Complaint

PHDATA 3265645_3

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

239.    According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to SSC II:

| Date | Amount | Description in General Ledger |
|------|--------|-------------------------------|
| 8/6/2008 | $230,000 | Accounts Payable – Related Party |
| 8/20/2008 | $300,043 | Accounts Payable – Growers |
| 8/26/2008 | $345,685 | Accounts Payable – Growers |
| 10/24/2008 | $99,191 | Accounts Payable – Growers |
| 10/30/2008 | $119,183 | Accounts Payable – Growers |
| 10/30/2008 | $110,318 | Accounts Payable – Growers |
| 11/11/2008 | $161,531 | Accounts Payable – Related Party |
| 11/13/2008 | $325,366 | Accounts Payable -- Growers |

240.    According to SK Foods' books and records, the following transfers of funds or assets, among others, were made by SK Foods to SSC III:

| Date | Amount | Description in General Ledger |
|------|--------|-------------------------------|
| 10/14/2008 | $270,696 | Accounts Payable – Growers |
| 10/30/2008 | $282,620 | Accounts Payable – Growers |
| 11/13/2008 | $833,255 | Accounts Payable -- Growers |

241.    The above-referenced transfers are collectively referred to herein as the "Transfers." The Trustee reserves the right to identify and pursue other transfers where appropriate.

### Count I:  Avoidance of Preferential Payments Pursuant to 11 U.S.C. §547

242.    The Trustee incorporates by reference the preceding paragraphs of this Complaint as though set forth fully herein.

243.    The Transfers were transfers of Debtor's property to creditors of Debtor and made while Debtor was insolvent.

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

1    244.    The Transfers were made on account of antecedent debts owed by SK Foods

2  before the Transfers were made.

3    245.    Defendants are "insiders" as that term is defined in the United States Bankruptcy

4  Code.

5    246.    Many of the Transfers (all transfers dated May 5, 2008 to the present) were made

6  within one year of the Petition Date.

7    247.    The Transfers enabled the recipients to receive more than they would have

8  received if the Transfers had not been made, if the case were filed under Chapter 7 and if

9  Defendants were paid in accordance with the Bankruptcy Code.

10    248.    No new or additional value was given contemporaneously with the Transfers.

11    249.    The Transfers were not in payment of a debt incurred in the ordinary course of

12  Debtor's business affairs, and were not made according to ordinary business terms.

13    250.    Defendants are liable for the return of the assets transferred as avoidable

14  preferences pursuant to Section 547(b) of the Bankruptcy Code.

15  WHEREFORE, the Trustee prays for a judgment as set forth below.

16      ***COUNT II: Avoidance of Fraudulent Transfers Pursuant to 11 U.S.C. §548***

17    251.    The Trustee incorporates by reference the preceding paragraphs of this

18  Complaint as though set forth fully herein.

19    252.    The Transfers were transfers of Debtor's property.

20    253.    The Transfers were made within two years of the Petition Date.

21    254.    The Transfers were made with actual intent to hinder, delay, or defraud entities to

22  which SK Foods was or became indebted.

23    255.    Debtor received less than a reasonably equivalent value in exchange for the

24  Transfers.

25    256.    Debtor was insolvent on the date of the Transfers or became insolvent as a result

26  of the Transfers.

27    257.    Debtor was engaged in business for which the property remaining with the Debtor

28  was an unreasonably small capital.

PHDATA 3265645_3

Adversary Complaint

1    258.    Debtor intended to incur or believed that it would incur debts that would be
2    beyond its ability to pay.

3    259.    Defendants are liable for the return of the Transfers pursuant to 11 U.S.C. § 548
4    of the Bankruptcy Code.

5    WHEREFORE, the Trustee prays for a judgment as set forth below.

6                    ***COUNT III:  Avoidance of Fraudulent Transfers Pursuant to***
7    ***11 U.S.C. §§ 544(b) and 550(a) and California Civil Code §§ 3439.07, 3439.04 and 3439.05***

8    260.    The Trustee incorporates by reference the preceding paragraphs of this Complaint
9    as though set forth fully herein.

10   261.    The Transfers were transfers of Debtor's property.

11   262.    The Transfers were made within four years of the date this Complaint was filed.

12   263.    The Transfers were made without SK Foods receiving a reasonably equivalent
13   value from the Defendants in exchange for the Transfers.

14   264.    SK Foods was insolvent on the date of the Transfers or became insolvent as a
15   result of the Transfers.

16   265.    The Trustee is entitled to recover the Transfers or the value of the Transfers from
17   Defendants for the benefit of the Estate pursuant to 11 U.S.C. §§ 544(b) and 550(a), and
18   California Civil Code § 3439.07.

19   WHEREFORE, the Trustee prays for judgment as set forth below.

20                   ***Count IV:  Substantive Consolidation Against All Defendants***

21   266.    The Trustee hereby incorporates each of the foregoing paragraphs of the
22   Complaint as though set forth fully herein.

23   267.    Each of the Owner Defendants, Affiliated Defendants and the Debtor has
24   common ownership.

25   268.    Each of the Owner Defendants, Affiliated Defendants and the Debtor has
26   common management.

27   269.    Salyer and the Owner Defendants managed and operated each of the Affiliated
28   Defendants and, until Salyer was terminated by the Trustee, the Debtor.

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE (415) 364-6700
FAX: (415) 364-6785

41

Adversary Complaint

270.     Debtor, Owner Defendants and Affiliated Defendants all operated as a single cohesive enterprise.

271.     Owner Defendants and Affiliated Defendants had little, if any, operations independent of their relationships to the Debtor.

272.     Many of the Owner Defendants and Affiliated Defendants were never capitalized or operated for profit, as described above.

273.     The Debtor, Owner Defendants and Affiliated Defendants did not negotiate with each other at arms-length.

274.     The corporate and financial integrity of the Owner Defendants, Affiliated Defendants, and the Debtor has never been respected.

275.     The funds, assets, books, records and financial affairs of each of the Owner Defendants, Affiliated Defendants and the Debtor have been inextricably commingled.

276.     With respect to **Blackstone**, in addition to the allegations set forth above, substantive consolidation with the Debtor's estate is appropriate because:

    a.   It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 27)

    b.   It has common management with Debtor and other Defendants (¶¶ 34, 36-37, 40-41)

    c.   Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and the Owner Defendants (¶¶ 34,40-42)

    d.   Together with Debtor and the other Defendants, it is operated as a single enterprise (¶¶ 43-44, 45, 48, 54-61, 62)

    e.   It has little if any operations independent of its relationship with Debtor (¶¶ 65, 72, 73)

    f.   It was never capitalized or operated for profit (¶¶ 74, 85-86)

    g.   It did not adhere to corporate formalities (¶¶87-88, 89, 93-94, 138)

    h.   It shares management and administration with Debtor and the other Defendants (¶¶ 95-96, 97, 98, 101, 104, 107-08, 110-13)

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

i.   It shares facilities, records and resources with Debtor and the other
Defendants (¶¶ 116, 117-21, 122, 124)

j.   It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26,
129-30, 135-36)

k.   There were inappropriate and insufficiently documented intercompany
transfers of funds and other assets between it and Debtor and the other
Defendants (¶¶ 137-40, 142, 143, 148, 150-52, 161-65).

277.   With respect to **SS Farms**, in addition to the allegations set forth above,
substantive consolidation with the Debtor's estate is appropriate because:

a.   It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 29)

b.   It has common management with Debtor and other Defendants (¶¶ 34, 36-37,
40-41)

c.   Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and
the Owner Defendants (¶¶ 34, 40-42)

d.   Together with Debtor and the other Defendants, it is operated as a single
enterprise (¶¶ 43-45, 48, 54-61, 62)

e.   It has little if any operations independent of its relationship with Debtor (¶¶
65, 68, 69, 73)

f.   It was never capitalized or operated for profit (¶¶ 74, 81, 85-86)

g.   It did not adhere to corporate formalities (¶¶ 87-88, 93-94, 138)

h.   It shares management and administration with Debtor and the other
Defendants (¶¶ 95-96, 97, 98, 100, 101, 103, 104, 106, 107-08, 110-13)

i.   It shares facilities, records and resources with Debtor and the other
Defendants (¶¶ 116, 117-21, 122)

j.   It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26,
129-30, 133, 135-36)

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

1     k.  There were inappropriate and insufficiently documented intercompany

2       transfers of funds and other assets between it and Debtor and the other

3       Defendants (¶¶ 84, 137-40, 142, 143, 147-48, 150-52, 153-54, 161-65).

4

5   278. With respect to **SSC Farming**, in addition to the allegations set forth above,

6  substantive consolidation with the Debtor's estate is appropriate because:

7     a.  It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 29)

8     b.  It has common management with Debtor and other Defendants (¶¶ 34, 36-37,

9       40-41)

10    c.  Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and

11      the Owner Defendants (¶¶ 34, 40-42)

12    d.  Together with Debtor and the other Defendants, it is operated as a single

13      enterprise (¶¶ 43-45, 46, 54-61, 62)

14    e.  It has little if any operations independent of its relationship with Debtor (¶¶

15      65, 67, 72, 73)

16    f.  It was never capitalized or operated for profit (¶¶ 74, 82, 85-86)

17    g.  It did not adhere to corporate formalities (¶¶ 87-88, 93-94, 138)

18    h.  It shares management and administration with Debtor and the other

19      Defendants (¶¶ 95-96, 97, 98, 99, 100, 101, 104, 106, 107-08, 110-13)

20    i.  It shares facilities, records and resources with Debtor and the other

21      Defendants (¶¶ 116, 117-21, 122)

22    j.  It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26,

23      127-28, 129-30, 133, 135-36)

24    k.  There were inappropriate and insufficiently documented intercompany

25      transfers of funds and other assets between it and Debtor and the other

26      Defendants (¶¶ 137-40, 142, 143, 144-45, 147-48, 150-52, 157-58, 161-65).

27

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

Adversary Complaint

279.   With respect to SSC I, in addition to the allegations set forth above, substantive consolidation with the Debtor's estate is appropriate because:

    a.   It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 30)

    b.   It has common management with Debtor and other Defendants (¶¶ 34, 36-37, 40-41)

    c.   Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and the Owner Defendants (¶¶ 34, 40-42)

    d.   Together with Debtor and the other Defendants, it is operated as a single enterprise (¶¶ 43-45, 46, 54-61)

    e.   It has little if any operations independent of its relationship with Debtor (¶¶ 65, 66, 73)

    f.   It was never capitalized or operated for profit (¶¶ 74, 75-76, 82, 85-86)

    g.   It did not adhere to corporate formalities (¶¶ 87-88, 93-94, 138)

    h.   It shares management and administration with Debtor and the other Defendants (¶¶ 95-96, 98, 99, 100, 101, 106, 107-08, 110-13)

    i.   It shares facilities, records and resources with Debtor and the other Defendants (¶¶ 114, 117-21, 122)

    j.   It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26, 127-30-135-36)

    k.   There were inappropriate and insufficiently documented intercompany transfers of funds and other assets between it and Debtor and the other Defendants (¶¶ 137-40, 142, 146, 150-52, 161-65).

280.   With respect to SSC II, in addition to the allegations set forth above, substantive consolidation with the Debtor's estate is appropriate because:

    a.   It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 30)

    b.   It has common management with Debtor and other Defendants (¶¶ 34, 36-37, 40-41 )

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

1    c.  Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and

2        the Owner Defendants (¶¶ 34, 40-42)

3    d.  Together with Debtor and the other Defendants, it is operated as a single

4        enterprise (¶¶ 43-45, 47, 54-61)

5    e.  It has little if any operations independent of its relationship with Debtor (¶¶

6        65, 66, 73)

7    f.  It was never capitalized or operated for profit (¶¶ 74, 75-76, 82, 85-86)

8    g.  It did not adhere to corporate formalities (¶¶ 87-88, 93-94, 138)

9    h.  It shares management and administration with Debtor and the other

10       Defendants (¶¶ 95-96, 98, 99,100, 101, 106, 107-08, 110-13)

11   i.  It shares facilities, records and resources with Debtor and the other

12       Defendants (¶¶ 114, 117-21, 122)

13   j.  It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26,

14       127-30, 135-36)

15   k.  There were inappropriate and insufficiently documented intercompany

16       transfers of funds and other assets between it and Debtor and the other

17       Defendants (¶¶ 137-40, 142, 146, 150-52, 161-65).

18

19   281.  With respect to **SSC III**, in addition to the allegations set forth above, substantive

20   consolidation with the Debtor's estate is appropriate because:

21   a.  It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 31)

22   b.  It has common management with Debtor and other Defendants (¶¶ 34, 36-37,

23       40-41)

24   c.  Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and

25       the Owner Defendants (¶¶ 34, 40-42 )

26   d.  Together with Debtor and the other Defendants, it is operated as a single

27       enterprise (¶¶ 43-45, 54-61)

28

46

e.  It has little if any operations independent of its relationship with Debtor (¶¶ 65, 73)

f.  It was never capitalized or operated for profit (¶¶ 74, 82, 85-86)

g.  It did not adhere to corporate formalities (¶¶ 87-88, 93-94, 138)

h.  It shares management and administration with Debtor and the other Defendants (¶¶ 95-96, 98, 101, 107-08, 110-13)

i.  It shares facilities, records and resources with Debtor and the other Defendants (¶¶ 114, 117-21, 122)

j.  It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26, 129-30, 135-36)

k.  There were inappropriate and insufficiently documented intercompany transfers of funds and other assets between it and Debtor and the other Defendants (¶¶ 137-40, 142, 150-52, 161-65).

282.  With respect to **Monterey,** in addition to the allegations set forth above, substantive consolidation with the Debtor's estate is appropriate because:

a.  It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 31)

b.  It has common management with Debtor and other Defendants (¶¶ 34, 36-38, 40-41)

c.  Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and the Owner Defendants (¶¶ 34, 40-42 )

d.  Together with Debtor and the other Defendants, it is operated as a single enterprise (¶¶ 43, 44, 50, 54-61)

e.  It has little if any operations independent of its relationship with Debtor (¶¶ 65, 73, 82)

f.  It was never capitalized or operated for profit (¶¶ 74, 82, 85-86)

g.  It did not adhere to corporate formalities (¶¶ 87-88, 93-94, 138 )

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

PHDATA 3265645_3

Adversary Complaint

1      h.  It shares management and administration with Debtor and the other

2          Defendants (¶¶ 95-96, 98, 101, 107-08, 110-13)

3      i.  It shares facilities, records and resources with Debtor and the other

4          Defendants (¶¶ 117-21)

5      j.  It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26,

6          129-30, 135-36, 206-08)

7      k.  There were inappropriate and insufficiently documented intercompany

8          transfers of funds and other assets between it and Debtor and the other

9          Defendants (¶¶ 137-40, 142, 150-52, 161-65).

10

11     283.   With respect to **SMC**, in addition to the allegations set forth above, substantive

12  consolidation with the Debtor's estate is appropriate because:

13     a.  It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 32)

14     b.  It has common management with Debtor and other Defendants (¶¶ 34, 36-38,

15         40-41 )

16     c.  Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and

17         the Owner Defendants (¶¶ 34, 40-42)

18     d.  Together with Debtor and the other Defendants, it is operated as a single

19         enterprise (¶¶ 43-44, 49, 54-61)

20     e.  It has little if any operations independent of its relationship with Debtor (¶¶

21         65, 73, 84)

22     f.  It was never capitalized or operated for profit (¶¶ 74, 84, 85-86)

23     g.  It did not adhere to corporate formalities (¶¶ 87-88, 93-94, 138)

24     h.  It shares management and administration with Debtor and the other

25         Defendants (¶¶ 95-96, 98, 101, 107-08, 110-13)

26     i.  It shares facilities, records and resources with Debtor and the other

27         Defendants (¶¶ 114, 117-21)

28

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

Adversary Complaint

PHDATA 3265645_3

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: (415) 364-6700
FAX: (415) 364-6785

j.   It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26, 129-30, 135-36)

k.   There were inappropriate and insufficiently documented intercompany transfers of funds and other assets between it and Debtor and the other Defendants (¶¶ 137-40, 141, 142, 150-52, 161-65).

284.   With respect to **SK Farms Services**, in addition to the allegations set forth above, substantive consolidation with the Debtor's estate is appropriate because:

a.   It has common ownership with Debtor and other Defendants (¶¶ 24, 26, 33)

b.   It has common management with Debtor and other Defendants (¶¶ 34, 36-38, 40-41)

c.   Like Debtor and the other Affiliated Defendants, it is controlled by Salyer and the Owner Defendants (¶¶ 34, 40-42)

d.   Together with Debtor and the other Defendants, it is operated as a single enterprise (¶¶ 43, 44, 52, 54-61, 159)

e.   It has little if any operations independent of its relationship with Debtor (¶¶ 65, 73)

f.   It was never capitalized or operated for profit (¶¶ 74, 85-86)

g.   It did not adhere to corporate formalities (¶¶ 87-88, 90, 93-94, 138 )

h.   It shares management and administration with Debtor and the other Defendants (¶¶ 95-96, 98, 101, 105, 107-08, 110-13)

i.   It shares facilities, records and resources with Debtor and the other Defendants (¶¶ 114, 117-21, 122)

j.   It did not deal with Debtor and other Defendants at arms-length (¶¶ 125-26, 129-30, 135-36)

k.   There were inappropriate and insufficiently documented intercompany transfers of funds and other assets between it and Debtor and the other Defendants (¶¶ 137-44, 141, 142, 150-52, 155-57, 159, 161-65).

49

Adversary Complaint